SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
JENNIFER G. REDMOND, Cal. Bar No. 144790
jredmond@sheppardmullin.com
Four Embarcadero Center, 17th Floor
San Francisco, California 94111
Telephone:  (213) 434-9100
Facsimile:   (213) 434-3947

Y. DOUGLAS YANG, Cal. Bar No. 307550
dyang@sheppardmullin.com
333 South Hope Street, 43rd Floor
Los Angeles, California 90071-1422
Telephone:  (213) 620-1780
Facsimile:   (213) 620-1398

Attorneys for Plaintiffs
FIRST FOUNDATION INC. and
FIRST FOUNDATION ADVISORS

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| FIRST FOUNDATION INC., a Delaware Corporation; and FIRST FOUNDATION ADVISORS, a California Corporation,<br><br>        Plaintiffs,<br><br>        v.<br><br>THOMAS MUNSON GIDDINGS, an individual; and LOUIS PANCOAST ABEL, an individual,<br><br>        Defendants. | Case No. 8:20-cv-00359<br><br>**PLAINTIFFS' NOTICE OF APPLICATION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER, ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION, AND EXPEDITED DISCOVERY**<br><br>**ORAL ARGUMENT REQUESTED**<br><br>Complaint Filed: February 21, 2020 |

-1-

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

Please take notice that pursuant to Rule 65 of the Federal Rules of Civil Procedure and Local Rule 65-1, plaintiffs First Foundation Inc. ("FFI") and First Foundation Advisors ("FFA" and collectively, "Plaintiffs") respectfully apply for a Temporary Restraining Order, Order to Show Cause Re Preliminary Injunction, and Expedited Discovery against defendants Thomas Munson Giddings ("Defendant Giddings") and Louis Pancoast Abel ("Defendant Abel" and collectively, "Defendants").

In support of this Application, Plaintiffs rely upon the accompanying declarations of Scott Kavanaugh ("Kavanaugh") and John Hakopian ("Hakopian"), as well as the exhibits to Kavanaugh and Hakopian's respective declarations.

Plaintiffs concurrently have filed a Complaint in this action with the Court (ECF No. 1), which is incorporated herein by reference.

Defendants are former executives of FFA, and have misappropriated, and threatened to further misappropriate Plaintiffs' trade secrets, including Plaintiffs' confidential and proprietary business and customer information, for Defendants' own pecuniary gain and benefit.  Specifically, Plaintiffs allege that, by virtue of Defendants' breach of their contractual, fiduciary, and other legal obligations to FFA and/or FFI, Defendants have utilized, and will utilize, Plaintiffs' trade secrets to compete directly with Plaintiffs.

As set forth in the Complaint, the below Memorandum of Points and Authorities, and the declaration of Hakopian, unless injunctive relief is granted preventing Defendants from breaching their contractual, fiduciary, and other obligations to FFA and/or FFI, including using Plaintiffs' trade secrets, confidential and proprietary business and client information, Plaintiffs will be irreparably harmed by:

> a.  Use and disclosure of Plaintiffs' confidential and proprietary business and client information;

b. Loss of a substantial percentage of Plaintiffs' customers and associated revenue, loss of key employees, a negative impact to reputation as an employer, reputational damage with current customers, prospective customers, investors and market analysts, and possible negative impact on FFI's stock price as a result of negative publicity and potential loss of customers and revenue;

c. Present economic loss, which is unascertainable at this time, and future economic loss, which is now incalculable;

d. Having no adequate remedy at law;

e. The threat of irreparable harm, which is imminent and ongoing; and

f. Any delay in granting Plaintiffs the injunctive relief requested, which would result in Plaintiffs sustaining irreparable harm and the destruction of the *status quo ante* pending resolution of this matter.

WHEREFORE, Plaintiffs respectfully request that this Court ORDER and DECREE that, until such time as this Court orders otherwise on Plaintiffs' request for a permanent injunction on the merits after a full hearing:

1) Defendants, and all those acting in concert with them, are hereby enjoined and restrained, directly or indirectly, from:

a. Using or disclosing the confidential information and trade secrets of Plaintiffs;

b. Soliciting FFA's clients;

c. Soliciting FFA's employees;

d. Engaging in any conduct that violates Defendants' respective Employment Agreement and/or Confidentiality Agreement;

-3-

1       2) Defendants shall immediately return to Plaintiffs all confidential

2           information, trade secrets and property belonging to Plaintiffs in their

3           possession, custody or control, including without limitation all

4           passwords and user names.

5       3) Defendants shall produce for inspection and imaging all computers,

6           personal electronic devices, cloud accounts, email accounts, and other

7           electronic storage devices belonging to, under the control of, accessible

8           to, or operated by the Defendants in order to ensure the return and

9           removal of all of Plaintiffs' confidential business information and trade

10          secrets.

11       WHEREFORE, Plaintiffs further request that this Court ORDER that the

12  parties engage in expedited discovery in this case.

13

14                           Respectfully submitted,

15                      SHEPPARD, MULLIN, RICHTER &

16                      HAMPTON LLP

    Dated:  February 21, 2020

17

18                By           */s/ Jennifer G. Redmond*

19                      JENNIFER G. REDMOND

20                      Y. DOUGLAS YANG

21                      Attorneys for Plaintiffs

22                      FIRST FOUNDATION INC. and FIRST

                    FOUNDATION ADVISORS

23

24

25

26

27

28

1

2  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
     A Limited Liability Partnership

3     Including Professional Corporations
   JENNIFER G. REDMOND, Cal. Bar No. 144790

4  jredmond@sheppardmullin.com
   Four Embarcadero Center, 17th Floor

5  San Francisco, California 94111
   Telephone:  (213) 434-9100

6  Facsimile:   (213) 434-3947

7  Y. DOUGLAS YANG, Cal. Bar No. 307550
   dyang@sheppardmullin.com

8  333 South Hope Street, 43rd Floor
   Los Angeles, California 90071-1422

9  Telephone:  (213) 620-1780
   Facsimile:   (213) 620-1398

10  Attorneys for Plaintiffs
   FIRST FOUNDATION INC. and

11  FIRST FOUNDATION ADVISORS

12                    UNITED STATES DISTRICT COURT

13          CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

14

15

16  FIRST FOUNDATION INC., a          Case No.
   Delaware Corporation; and FIRST

17  FOUNDATION ADVISORS, a            **PLAINTIFFS' MEMORANDUM OF**
   California Corporation,            **POINTS AND AUTHORITIES IN**

18                                     **SUPPORT OF APPLICATION FOR**
                                      **TEMPORARY RESTRAINING**

19            Plaintiffs,             **ORDER, ORDER TO SHOW**
                                      **CAUSE RE PRELIMINARY**

20        v.                          **INJUNCTION, AND EXPEDITED**
                                      **DISCOVERY**

21  THOMAS MUNSON GIDDINGS, an
   individual; and LOUIS PANCOAST

22  ABEL, an individual,

23            Defendants.

24

25

26

27

28

## **<u>TABLE OF CONTENTS</u>**

I.      INTRODUCTION ...................................................................................10

II.     FACTUAL BACKGROUND ...............................................................11

        A.     Plaintiffs ..............................................................................11

        B.     Defendant Giddings ..........................................................11

        C.     Defendant Abel ...................................................................14

        D.     Discovery of Defendants' Illegal Plans .............................16

III.    A TEMPORARY RESTRAINING ORDER SHOULD ISSUE ..................18

        A.     Plaintiffs Are Likely To Succeed On The Merits Of Their Claims......19

               i.      Plaintiffs Will Prove That Defendants Breached The Terms Of
                       Their Respective Contracts..........................................................19

               ii.     Plaintiffs Will Prove That Defendants Breached Their Fiduciary
                       Duties to Plaintiffs. ......................................................................21

               iii.    Plaintiffs Will Prove That Defendants Misappropriated And
                       Threatened To Misappropriate Plaintiffs' Trade Secrets In
                       Violation Of Federal And State Law ...........................................21

                       1.     Plaintiffs' Confidential Customer Information And
                              Employee Information Constitute Trade Secrets ............23

                       2.     Defendants Misappropriated Plaintiffs' Confidential
                              Customer Information And Employee Information.........27

        B.     Plaintiffs Are Likely To Suffer Irreparable Harm Absent Preliminary
               Relief ................................................................................................29

        C.     The Balance Of Equities Weighs In Favor Of Injunctive Relief.........31

        D.     Granting The Proposed Order Is In The Public Interest .....................32

IV.     THE COURT SHOULD PERMIT EXPEDITED DISCOVERY .................32

V.      CONCLUSION .........................................................................................34

1

## **TABLE OF AUTHORITIES**

2

3
Page(s)

Cases

4

5
*Allergan, Inc. v. Merz Pharmaceuticals, LLC*
  WL 781705 (C.D. Cal. Mar. 9, 2012) ................................................ 31

6

7
*AlterG, Inc. v. Boost Treadmills LLC*
  388 F. Supp. 3d 1133 (N.D. Cal. 2019) ............................................ 22

8

9
*Am. LegalNet, Inc. v. Davis*
  673 F. Supp. 2d 1063 (C.D. Cal. 2009) ............................................ 32

10

11
*Am. Trucking Ass'ns Inc. v. City of L.A.*
  559 F.3d 1046 (9th Cir. 2009) .......................................................... 18

12

13
*Autodesk, Inc. v. ZWCAD Software Co.*
  WL 2265479 (N.D. Cal. May 13, 2015) .......................................... 22

14

15
*Bancroft–Whitney Co. v. Glen*
  64 Cal. 2d 327 (1966) ....................................................................... 23

16
*Burt v. Irvine Co.*
  237 Cal. App. 2d 828 (1965) ............................................................ 21

17

18
*CDF Firefighters v. Maldonado*
  158 Cal. App. 4th 1226 (2008) ......................................................... 19

19

20
*Courtesy Temp. Serv., Inc. v. Camacho*
  222 Cal. App. 3d 1278 (1990) .......................................................... 26

21

22
*Ernest & Ernest v. Carlson*
  247 Cal. App. 2d 125 (1966) ............................................................ 29

23

24
*Gable-Leigh, Inc. v. N. Am. Miss*
  WL 521695 (C.D. Cal. Apr. 13, 2001) ............................................ 23

25

26
*Granny Goose Foods, Inc. v. Bhd. Of Teamsters & Auto Truck Drivers*
  415 U.S. 423 (1974) .......................................................................... 18

27
*Hat World, Inc. v. Kelly*
  WL 3283486 (E.D. Cal. Aug. 10, 2012) .......................................... 31

28

*Henry Schein, Inc. v. Cook*
    191 F. Supp. 3d 1072 (N.D. Cal. 2016).................................................................32

*IIG Wireless, Inc. v. Yi*
    22 Cal. App. 5th 630 (2018) ............................................................................21

*Interserve, Inc. v. Fusion Garage PTE, Ltd.*
    WL 143665 (N.D. Cal. Jan. 7, 2010) .........................................................32, 33

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*
    634 F.2d 1197 (9th Cir. 1980) .........................................................................31

*Language Line Servs., Inc. v. Language Servs. Assoc., LLC*
    WL 2764714 (N.D. Cal. July 13, 2010) ..........................................................31

*MAI Sys. Corp. v. Peak Computer, Inc.*
    991 F.2d 511 (9th Cir. 1993) ...........................................................................23

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Chung*
    WL 283083 (C.D. Cal. Feb. 2, 2001) ..............................................................31

*Morlife, Inc. v. Perry*
    56 Cal. App. 4th 1514 (1997)...........................................................................26

*NobelBiz, Inc. v. Wesson*
    WL 1588715 (S.D. Cal. Apr. 18, 2014) ..........................................................33

*Pac. Aerospace & Elec., Inc. v. Taylor*
    295 F. Supp. 2d 1188 (E.D. Wash. 2003) .......................................................30

*Pellerin v. Honeywell Int'l, Inc.*
    877 F. Supp. 2d 983 (S.D. Cal. 2012) .............................................................22

*Semitool, Inc. v. Tokyo Electron Am., Inc.*
    208 F.R.D. 273 (N.D. Cal. 2002) ....................................................................32

*Stormans, Inc. v. Selecky*
    586 F.3d 1109 (9th Cir. 2009)..........................................................................31

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*
    240 F.3d 832 (9th Cir. 2001) .....................................................................18, 30

*United States v. Nutricology, Inc.*
    982 F.2d 394 (9th Cir. 1992) ...........................................................................30

*Vinyl Interactive, LLC v. Guarino*
    WL 1228695 (N.D. Cal. May 1, 2009) ................................................... 30

*Whyte v. Schlage Lock Co.*
    101 Cal. App. 4th 1443 (2002) .............................................................. 23

*Wyndham Resort Dev. Corp. v. Bingham*
    WL 2740158 (E.D. Cal. July 9, 2010) .................................................... 30

<u>Statutes</u>

18 U.S.C. § 1839(3) .................................................................................... 22

18 U.S.C. § 1839(5) ............................................................................... 22, 27

Cal. Civ. Code § 3426.1(b) ......................................................................... 27

Cal. Civ. Code § 3426.1(d) ......................................................................... 22

<u>Other Authorities</u>

Rule 26(f) .................................................................................................... 32

# I.    INTRODUCTION

Plaintiffs First Foundation Inc. ("FFI") and First Foundation Advisors ("FFA" and collectively, "Plaintiffs") seek to restrain and enjoin former employees Thomas Munson Giddings ("Defendant Giddings") and Louis Pancoast Abel ("Defendant Abel") from executing their secret plan to establish a competing wealth management business by exploiting Plaintiffs' trade secrets and confidential business information to raid Plaintiffs' private wealth clients and key employees.

Defendants developed their secret plan to compete over several years while they were employed as high-level executives working for FFI's wealth management division, FFA.  While they were sufficiently cunning to devise their nefarious plan, they were foolish enough to document their plan in writing, and sloppy enough to leave their written plans in Defendant Abel's office in an unsecured folder.  As a result, Defendants were discovered and fired.

In the creation of their plan and execution of their plot to betray the trust Plaintiffs afforded to them, Defendants have misappropriated and used Plaintiffs' non-public, confidential, and trade secret information, including top-secret information about:  (a) Plaintiffs' high net worth clients, including highly confidential information concerning client names and contact information (cell phone, email, home phone, address), assets under management, bank account balances, trading strategies, trust terms, planning goals, investment objectives, risk tolerance, assets, liabilities, income, expenses, taxes, and similar highly confidential client data; and (b) Plaintiffs' key employees, including information about their compensation, specialized expertise, level of involvement in specific client relationships, and other similar highly confidential information.

Plaintiffs are informed and believe that Defendants have been secretly planning their new business since 2017, all while employed with Plaintiffs, using Company time, equipment, and resources in addition to the theft and misuse of Plaintiffs' confidential information and trade secrets.

NOTICE OF APPLICATION AND APPLICATION
FOR TEMPORARY RESTRAINING ORDER

1    On February 18, 2020, Plaintiffs' Chief Executive Officer learned about
2    Defendants' secret plan to compete with FFA.  Plaintiffs promptly terminated the
3    employment of Defendants and immediately ceased their access to Plaintiffs'
4    confidential information and trade secrets.  At no time did Plaintiffs authorize or
5    consent to Defendants' use of Plaintiffs' non-public, confidential information and
6    trade secrets to the detriment of Plaintiffs.  Plaintiffs' investigation into Defendants'
7    wrongdoing is continuing.

8    Defendants' misconduct constitutes breach of contract, breach of fiduciary
9    duty, misappropriation and threatened misappropriation of confidential information
10   and trade secrets, and unfair business practices.  Defendants have caused, and will
11   continue to cause, irreparable harm to Plaintiffs.  Absent injunctive relief from this
12   Court, Plaintiffs will continue to be irreparably injured by Defendants' misconduct.
13   Thus, this Court should issue the requested temporary restraining order.

14   **II.    FACTUAL BACKGROUND**

15          **A.    Plaintiffs**

16   FFA is an SEC-registered Investment Advisor that offers integrated wealth
17   management, investment services, and advisory services primarily for high net
18   worth individuals and business entities.   (Declaration of John Hakopian ("Hakopian
19   Decl."), ¶ 2).  At all times relevant to this action, FFI was and is the parent
20   corporation of FFA, and generated policies and agreements that applied equally to
21   FFA and its employees.  (*Id*.)

22          **B.    Defendant Giddings**

23   Defendant Giddings was employed by FFA and its predecessors from
24   September 2008 to February 18, 2020.  At all times relevant to Plaintiffs' claims in
25   this action, Defendant Giddings worked for FFA as its Senior Managing Director,
26   Sales and Marketing.  (Hakopian Decl., ¶ 3).

27   As FFA's Senior Managing Director, Defendant Giddings was responsible
28   leading all aspects of the new client acquisition process for FFA, for identifying and

1   designing plans to acquire specific clients, identifying and cultivating referral

2   sources from whom to acquire client leads, serving as primary interface with

3   existing referral sources, managing sales efforts and individuals implementing those

4   efforts, managing individual investor accounts and the FFA personnel that

5   administer those accounts.  (Hakopian Decl., ¶5).  In his role and through his

6   attendance at board meetings and business strategy meetings, Defendant Giddings

7   had access to FFA's highly confidential business information and trade secrets,

8   including employee compensation, client names, client contact information (cell,

9   email, home phone, address), assets under management by client, client bank

10  account balances, client trading strategies, client trust terms, client planning goals,

11  and similar highly confidential client data.  (*Id*.)  In his role, Defendant Giddings

12  was involved in every strategic decision regarding every aspect of the business of

13  FFA.  (*Id*.)

14        On January 1, 2011, Defendant Giddings and FFA entered into an

15  Employment Agreement.  (Hakopian Decl., ¶ 10, Ex. E).  The Employment

16  Agreement was amended several times and ultimately expired; however, certain key

17  provisions of the Employment Agreement relating to preservation of confidential

18  information survive expiration.  (*Id*. at ¶ 10).  Defendant Giddings further

19  acknowledged that he was bound by and agreed to abide by Plaintiffs' Employee

20  Handbook and Plaintiffs' Code of Conduct, both of which contain various

21  provisions regarding protection of confidential business information.  (*Id*. at Ex. D).

22  Under the terms of his Employment Agreement, Defendant Giddings agreed:

23        (a)   To devote his full "business time, best efforts and business

24              judgment, skill and knowledge to the advancement of [FFA's]

25              business and interests and to the discharge of [Defendant

26              Gidding's] duties and responsibilities under this [Employment]

27              Agreement."  (*Id*., Ex. D at ¶ 3).

28

NOTICE OF APPLICATION AND APPLICATION
FOR TEMPORARY RESTRAINING ORDER

(b)  To refrain from "engag[ing] in any other business activity," except as approved by FFA.  (*Id*.)

(c)  That his "employment creates a relationship of confidence and trust between [him] and [FFA], including with respect to all Confidential Information," and that "Confidential Information" included "financial information, including financial statements and projections, business and expansion or growth plans, reports, and forecasts; . . . trade secrets; know-how; designs, processes or formulae;. . . market or sales information or plans; customer lists and information regarding, or supplied to [FFA] or any of its Affiliates by, any of their respective existing or prospective customers; . . . information regarding the capabilities, duties or compensation of employees of [FFA] or of any its Affiliates." (*Id*., Ex. D at ¶ 8(b)(i)).

(d)  To "keep all Confidential Information in strict confidence and trust and will not disclose any of the Confidential Information to any Person, and [Defendant Giddings] covenants and agrees that he will not use any of the Confidential Information for [his] benefit or the benefit of any Person other than [FFA] and [FFI] and their Affiliates." (*Id*.)

(e)  To refrain, both during his employment and for a period of 18 months after the end of his employment, from "directly or indirectly, solicit or attempt to employ or hire or recruit or hire any Person who is, or during the prior twelve (12) months had been, an employee of [FFA], [FFI] or any of their Affiliates or induce or influence any such employee to leave the employ of [FFA], [FFI] or any of their respective Affiliates." (*Id*., Ex. D at ¶ 8(3)).

### C.    Defendant Abel

Defendant Abel was employed by FFA as an at-will employee from March 2010 to February 18, 2020.  (Hakopian Decl., ¶ 3).  At all times relevant to Plaintiffs' claims in this action, Defendant Abel worked as the Chief Investment Officer of FFA.  (*Id.*).

As FFA's Chief Investment Officer, Defendant Abel was responsible for designing and implementing investment and portfolio strategies for all clients of FFA, and preparing regular financial market and investing communications that were distributed to all clients of FFA.  (Hakopian Decl., ¶ 4).  In this role, Defendant Abel had access to FFA's highly confidential business information and trade secrets, including personal and confidential information for every client of FFA, investment objectives and risk for tolerance for every client of FFA, assets, liabilities, income and expense and taxes for every client of FFA, personal and professional contact information for every employee of FFA, and through inappropriate disclosure by Defendant Giddings, Defendant Abel had access to personal compensation information for select employees of FFA.  (*Id.*).

On March 5, 2010, Defendant Abel and FFI entered into an Employment Confidentiality and Invention Assignment Agreement ("Confidentiality Agreement").  (Hakopian Decl., ¶ 10, Ex. F)  Under the terms of the Confidentiality Agreement, Defendant Abel agreed that *during* his employment, he would:

> (a)    Not use or disclose any confidential information of FFI, except on behalf of FFI.  (*Id.*, Ex. F at ¶ 1).
>
> (b)    Take every reasonable precaution to preserve and protect confidential information entrusted to him.  (Id., Ex. F at ¶ 2).
>
> (c)    Not remove files containing confidential information from FFI's offices without prior authorization.  (Id.)
>
> (d)    Give FFI his undivided loyalty, devote all of his working time and energy to the business of FFI, give preference to the business

-14-

of FFI, and deliver everything he received or acquired in his employment (other than earned compensation and benefits) to FFI. (*Id*., Ex. F at ¶ 7).

(e) Not engage in any other employment or outside activities that interfere with his ability to perform his duties and responsibilities to FFI or that create a conflict of interest with FFI. (Id., Ex. F at ¶ 8).

(f) Make full disclosure to FFI before entering into any such employment or outside activities. (Id.)

(g) Not make preparations to form a competing business, or acquire any ownership interest in any competing business, without the prior approval of FFI. (Id., Ex. F at ¶ 9).

(h) Not exploit or take advantage of any outside business opportunities that he learned of through his employment with FFI without first disclosing them to FFI and obtaining FFI's express written consent to pursue such opportunities. (Id., Ex. F at ¶ 10).

(i) Not directly or indirectly solicit or induce, or attempt to solicit or induce, any employee or consultant of FFI to quit their employment or cease rendering services to FFI. (*Id*., Ex. F at ¶ 15).

Defendant Abel further agreed that at termination and *following* termination of his employment, he would:

(j) Immediately gather up all property of FFI or its customers in his possession or under his control and return it unconditionally to FFI. (Id., Ex. F at ¶ 13).

(k) Provide FFI with a just and accurate account of all transactions that he engaged in during his employment. (*Id*.)

NOTICE OF APPLICATION AND APPLICATION
FOR TEMPORARY RESTRAINING ORDER

(l)    Not disclose or use any confidential information of FFI for any purpose, either on his own or on behalf of anyone else.  (Id., Ex. F at ¶ 14).

(m)    For a period of six months after termination of employment, not directly or indirectly solicit or induce, or attempt to solicit or induce, any employee or consultant of FFI to quit their employment or cease rendering services to FFI.  (*Id*., Ex. F at ¶ 15).

**D.    Discovery of Defendants' Illegal Plans**

On February 18, 2020, FFI's Chief Executive Officer Scott Kavanaugh ("Kavanaugh") learned from an employee of FFA that Defendant Giddings and Defendant Abel were planning to start a competing business.  (Declaration of Scott Kavanaugh ("Kavanaugh Decl."), ¶ 3).  The staff member handed to Kavanaugh photocopies of: (1) a long typed document with handwritten notes on it detailing their plans to target FFA clients and employees to start new competing wealth management business, (2) a multi-page chart listing FFA clients in alphabetical order, and containing confidential information about those clients, including their assets under management, comments about the client's relationships with FFA employees, and other key client information, and (3) other notes related to their plans ("Competing Business Plan").  (*Id*. at ¶ 3, Ex. A).

When Kavanaugh reviewed the Competing Business Plan, it was immediately apparent to him that Defendants had engaged in a detailed planning process for the purpose of establishing an investment advisory business to compete directly with FFA.  (Kavanaugh Decl., ¶ 4).  The Competing Business Plan also revealed that Defendants' new business would be built upon their use of non-public, confidential information and trade secrets that belong to FFA and/or FFI.  (*Id*.)  Kavanaugh was surprised and angry about the contents of their Competing Business Plan.  (*Id*.)

NOTICE OF APPLICATION AND APPLICATION
FOR TEMPORARY RESTRAINING ORDER

The Competing Business Plan created by Defendants called for Defendants to use Plaintiffs' confidential client information and trade secrets in furtherance of Defendants' competing business, and to embark on a "charm offensive" with FFA's clients.  (Kavanaugh Decl., ¶ 3 at Ex. A).  Defendants' Competing Business Plan also made clear that Defendants intended to poach existing FFA employees to join their new business:

> Build out organization chart – Tom (CEO & Relationship Manager); Lou (Chairman, President & Chief Investment Officer); Jonathan (Relationship Manager); Stephen (Relationship Manager); Donna (Wealth Advisor).  What about a Financial Planner?  Operations?  Need to hire someone with strength in these two areas.  Other considerations – Cathy Fair, Lindsey Hess and Roger Stinnett

(*Id.*)  The individuals whom Defendants listed in their business plan as hires for Defendants' competing business were and are employees of FFA.  (Hakopian Decl., ¶15).  Defendants obtained and utilized confidential information concerning FFA's employee compensation, with which Defendants used or intend to use to solicit FFA employees to work for Defendants' competing business venture.

Notably, Defendants' Competing Business Plan also predicted that given Defendants' plan to use Plaintiffs' trade secrets and to solicit FFA's employees to work for their competing business, Defendants would almost certainly face litigation.  (Kavanaugh Decl., ¶ 3 at Ex. A).

> **Legal** - We are very likely going to face litigation. Is it better to go to John and tell him we are leaving and we seek an amicable departure or simply cut ties?
>
> Transition process – we essentially haver 3 weeks to transition all our clients.  We will get hit with a lawsuit and a cease and desist which will be a large distraction for our team.

Almost immediately after Kavanaugh was made aware of Defendants' Competing Business Plan, he went to Defendant Abel's office, located the Competing Business Plan inside Defendant Abel's office, and confronted Defendant

1  Abel.  (Kavanaugh Decl., ¶ 5).  On that same day, FFA terminated the employment

2  of Defendants.  (*Id*.; Hakopian Decl., ¶16).

3         Following the termination of Defendants' employment, Kavanaugh directed

4  FFA staff to conduct an inventory of Defendant Abel's office.  (Kavanaugh Decl., ¶

5  6).  As a result of the inventory, Plaintiffs discovered that Defendant Giddings and

6  Defendant Abel created additional files memorializing their plans to compete with

7  FFA using Plaintiffs' trade secrets and confidential information, going back as early

8  as 2017.  (*Id*. at Ex. B).

9         Plaintiffs are informed and believe that notwithstanding the termination of

10 their employment, Defendants are continuing to pursue the establishment and

11 operation of their competing wealth management business using Plaintiffs'

12 confidential and proprietary trade secret information, as well as to poach existing

13 employees of FFA using confidential information concerning Plaintiffs'

14 compensation structure for FFA's employees.

15 **III.   A TEMPORARY RESTRAINING ORDER SHOULD ISSUE**

16        The standard for a Temporary Restraining Order ("TRO") and Preliminary

17 Injunction are "substantially identical."  *Stuhlbarg Int'l Sales Co. v. John D. Brush*

18 *& Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).  "A plaintiff seeking a preliminary

19 injunction must establish that he is likely to succeed on the merits, that he is likely

20 to suffer irreparable harm in the absence of preliminary relief, that the balance of

21 equities tips in his favor, and that an injunction is in the public interest."  *Am.*

22 *Trucking Ass'ns Inc. v. City of L.A.*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting

23 *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 21 (2008)).  A TRO's "underlying

24 purpose [is to] preserv[e] the status quo and prevent[ ] irreparable harm" until a

25 preliminary injunction can be held.  *Granny Goose Foods, Inc. v. Bhd. Of Teamsters*

26 *& Auto Truck Drivers*, 415 U.S. 423, 439 (1974).

27        Plaintiffs have met all requirements for issuance of the requested TRO, as set

28 forth below.

**A.      Plaintiffs Are Likely To Succeed On The Merits Of Their Claims**

In their underlying Complaint, Plaintiffs allege causes of action against Defendants for: (1) breach of contract under California law; (2) breach of fiduciary duty under California law; (3) misappropriation, and/or threatened misappropriation, of trade secrets in violation of the Defend Trade Secrets Act and California's Uniform Trade Secret Act, and (4) unfair business practices under California law. As discussed below, Plaintiffs are likely to succeed on the merits of their claims.

**i.      Plaintiffs Will Prove That Defendants Breached The Terms Of Their Respective Contracts**

To prevail on their breach of contract claim, Plaintiffs must show the following elements: (1) existence of the contract; (2) Plaintiffs' performance or excuse for nonperformance; (3) Defendants' breach; and (4) damages to Plaintiffs as a result of the breach. *CDF Firefighters v. Maldonado*, 158 Cal. App. 4th 1226, 1239 (2008). Here, Plaintiffs will be able to decisively prove each of those elements with respect to each Defendant.

First, it is without dispute that each Defendants entered into contracts with FFA. (Hakopian Decl., ¶ 10 at Exs. E, F). Plaintiffs performed under those agreements. (*Id*. at ¶ 10). Defendants did not.

More specifically, Defendant Abel breached his Confidentiality Agreement during his employment by:

- Using confidential information of FFI for his personal benefit in preparing the Competing Business Plan;
- Failing to take every reasonable precaution to preserve and protect the confidential information entrusted to him, and instead using it to prepare the Competing Business Plan;
- Failing to give FFI and FFA his undivided loyalty, devote all of his working time and energy to the business of FFI, and give preference to the business of FFI;

NOTICE OF APPLICATION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER

- Engaging for years in a plan to compete with FFI and FFA, missing meetings, and otherwise engaging in outside activities that interfered with his ability to perform his duties and responsibilities to FFI and created a serious conflict of interest with FFI and FFA;

- Failing to make full disclosure to FFI before entering into any such outside activities;

- Making preparations to form a competing business, and/or to acquire any ownership interest in any competing business, without the prior approval of FFI;

- Exploiting outside business opportunities (potential acquisitions) learned of through employment with FFI without first disclosing them to FFI and obtaining FFI's express written consent to pursue such opportunities; and

- On information and belief, directly or indirectly soliciting or inducing, or attempting to solicit or induce, employees of FFA to quit their employment or cease rendering services to FFA.

(*See generally* Hakopian Decl., ¶ 10 at Ex. F).

Similarly, Defendant Giddings violated the ongoing confidentiality obligations set forth in his Employment Agreement by failing to keep Plaintiffs' Confidential Information in strict confidence and trust and instead used and disclosed the Confidential Information for his personal benefit and the benefit of Defendant Abel.  (Hakopian Decl., ¶ 10 at Ex. E).   On information and belief, Defendant Giddings further breached his Employment Agreement by soliciting or attempting to solicit FFA's employees while he was still employed by FFA.

Plaintiffs have thus established a likelihood of the success on the merits of their claims for breach of contract.

NOTICE OF APPLICATION AND APPLICATION
FOR TEMPORARY RESTRAINING ORDER

**ii.      Plaintiffs Will Prove That Defendants Breached Their Fiduciary Duties to Plaintiffs.**

To state a claim for breach of fiduciary duty independent of a claim for misappropriation of trade secrets, Plaintiffs must prove that, based on factual allegations distinct from the trade secret misappropriation:  (1) Defendants owed Plaintiffs a fiduciary duty as officers of the FFA; (2) Defendants breached that duty; and (3) Defendants' conduct was a substantial factor in causing harm to Plaintiffs. *IIG Wireless, Inc. v. Yi*, 22 Cal. App. 5th 630, 646 (2018).  Officers of a company indisputably owe a fiduciary duty to the company and its stockholders.   *Burt v. Irvine Co.*, 237 Cal. App. 2d 828, 850 (1965) (holding that defendant officer, who was non-director vice-president, owed fiduciary duty to corporation and stockholders).

Here, Defendants abused their positions as officers of FFA by considering potential acquisitions of competitors or investments in competitors without presenting those corporate opportunities to Plaintiffs.  (Kavanaugh Decl., ¶¶ 4-5). They also appear to have used Plaintiffs' property, equipment, resources, and their own working time against the interests of Plaintiffs, considering that the Competing Business Plan and other related files were found in Defendant Abel's Pasadena office.  (*Id.* at ¶ 5).   Plaintiffs have been harmed by their conduct in that they were deprived of the full, and undivided efforts of Plaintiffs in the performance of their job and possible considerations of the corporate opportunities considered by Defendants.

Plaintiffs have thus demonstrated a likelihood of success on their breach of fiduciary duty claim.

**iii.      Plaintiffs Will Prove That Defendants Misappropriated And Threatened To Misappropriate Plaintiffs' Trade Secrets In Violation Of Federal And State Law**

NOTICE OF APPLICATION AND APPLICATION
FOR TEMPORARY RESTRAINING ORDER

To state a claim for misappropriation of trade secrets under the California Uniform Trade Secrets Act ("CUTSA"), a plaintiff must allege: (1) the existence and ownership of a trade secret, and (2) misappropriation of the trade secret. *Pellerin v. Honeywell Int'l, Inc.*, 877 F. Supp. 2d 983, 988 (S.D. Cal. 2012) (citation omitted). A claim for misappropriation under the Defend Trade Secrets Act ("DTSA") has substantially similar elements. *See AlterG, Inc. v. Boost Treadmills LLC*, 388 F. Supp. 3d 1133, 1144 (N.D. Cal. 2019) (citing *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 877 (N.D. Cal. 2018) (citation omitted)); 18 U.S.C. § 1839(5) (defining "misappropriation" in the context of trade secrets).

In establishing the existence of a trade secret, "[a] plaintiff need not 'spell out the details of the trade secret,'" *Autodesk, Inc. v. ZWCAD Software Co.*, No. 5:14-cv-1409-EJD, 2015 WL 2265479, at *5 (N.D. Cal. May 13, 2015) (citation omitted), but must "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies." *Pellerin*, 877 F. Supp. 2d at 988 (quoting *Diodes, Inc. v. Franzen*, 260 Cal. App. 2d 244, 253 (1968)). Both the DTSA and CUTSA define a "trade secret" as:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if- (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3); *see also* Cal. Civ. Code § 3426.1(d).

### 1.   Plaintiffs' Confidential Customer Information And Employee Information Constitute Trade Secrets

The trade secrets at issue here are Plaintiffs' confidential information regarding (a) their high net worth clients, including highly confidential information concerning client names and contact information (cell phone, email, home phone, address), assets under management, bank account balances, trading strategies, trust terms, planning goals, investment objectives, risk tolerance, assets, liabilities, income, expenses, taxes, and similar highly confidential client data; and (b) Plaintiffs' key employees, including information about their compensation, specialized expertise, level of involvement in specific client relationships, and similar highly confidential information.  This information clearly qualifies as trade secrets because the information is highly valuable and thus has independent economic value, and Plaintiffs take reasonable steps to protect the confidentiality of that information.  *See MAI Sys. Corp. v. Peak Computer, Inc*., 991 F.2d 511, 521 (9th Cir. 1993) (customer database qualifies as a trade secret); *Gable-Leigh, Inc. v. N. Am. Miss*, No. CV 01-01019 MMM(SHX), 2001 WL 521695, at *16 (C.D. Cal. Apr. 13, 2001) (customer list qualified for trade secret protection); *Bancroft–Whitney Co. v. Glen*, 64 Cal. 2d 327, 351–52 (1966) (unpublished list of salaries paid by a corporation to its employees was considered confidential information); *Whyte v. Schlage Lock Co*., 101 Cal. App. 4th 1443, 1454–56 (2002) (cost and pricing information not readily known in the industry may constitute trade secret).

<u>This information has independent economic value</u>:  FFA assembles detailed client information of the type misappropriated by Defendants through a substantial investment of time, at significant expense to FFA.  (Hakopian Decl., ¶ 6).  The information is not readily or publicly available.  (*Id*.)  When FFA is seeking to engage with a new client, through a client referral or otherwise, it assigns a team of professionals (wealth advisors, investment advisors, planning advisors, and other professionals) to meet with the prospective client to gather information and develop

an investment strategy for that client.  (*Id*.)  This process takes places through a series of in-person meetings and planning sessions.  (*Id*.)  The new client sales process at FFA takes approximately four to six months, at a cost to FFA that ranges from $25,000 to $50,000 per prospect.  (*Id*.)  This cost may or may not be fully recouped, depending on whether the prospect decides to work with FFA or goes to one of FFA's competitors and, if they chose FFA, how long they continue to work with FFA.  (*Id*.)  Thus, FFA invests heavily in developing its client relationships and client data.  This up-front investment makes good business sense because the private wealth clients of FFA tend to remain as client for a relatively long period of time.  On average, private wealth clients stay with FFA between five to ten years.  (*Id*. at ¶ 8).

If a competitor of FFA were able to access the client data that FFA has assembled and prepared through its significant investment of time and money, the competitor could shorten the sales process, could significantly lessen the expense associated with the sales process, and would deprive FFA of the value of its investment in the client relationship.  (Hakopian Decl., ¶ 7).  As for the employee information, a competitor could use information about employee compensation, employee relationships with clients, and similar information to raid Plaintiffs' workforce and assemble a team that would be most likely to convince a client to transfer its business away from FFA, based on the team's familiarity with the client's business.  (*Id*. at ¶¶ 13-15).  There can be no doubt that the information taken and used by Defendants is highly valuable in the competitive private wealth marketplace.

Plaintiffs take reasonable steps to protect their confidential information:  In order to protect the privacy of its clients and substantial investment in developing clients, FFA takes seriously the protection of client data.  (Hakopian Decl., ¶¶ 9-12).  FFA requires employees to sign confidentiality agreements, and to acknowledge annually Plaintiffs' Code of Conduct and Employee Handbook.  (*Id*. at ¶ 9).

The Code of Conduct reminds employees of their legal obligation to maintain the privacy of client data, their duty of loyalty to the Company, their obligation to avoid conflicts of interest, and their obligation not to misuse confidential information, among other important obligations to the Company.  (Hakopian Decl., ¶ 9).  Similarly, Plaintiffs' Employee Handbook lists disclosing or misusing trade secrets or confidential or proprietary information belonging to the Company or its clients as a violation of the Company's ethical standards, and reminds employees of their obligation to protect the interests of the Company, its clients, and other employees during their employment.  (*Id*.)  The Employee Handbook further notifies employees to shred confidential information pertaining to the Company, clients etc. in its Housekeeping policy.  (*Id*.)  Plaintiffs' Office Equipment Policy instructs employees to use special caution in handling any confidential or proprietary information, and notifies them that, in general, email should not be used to transmit confidential information outside of the Company unless appropriate precautions are taken to assure confidentiality.  (*Id*.)

In addition, Plaintiffs have a comprehensive Corporate Information Security Policy, the goal of which is to protect Confidential Information.  (Hakopian Decl., ¶ 9).  Under this policy, Confidential Information includes trade secrets, proprietary business information, and Customer Information.  (*Id*.)  Customer Information is defined as any record containing non-public personal information about an individual who has obtained a financial product or service from the institution that is to be used primarily for personal, family, or household purposes and who has an ongoing relationship with the Company.  (*Id*.)  The purpose of the policy is to provide clarity and guidance for the administration of the Company's program to safeguard Confidential Information while still providing superior customer service. Employees are required to sign off on this policy annually.  (*Id*.)

Both Defendant Abel and Defendant Giddings also signed agreements with FFA and/or FFI containing express obligations not to disclose or use any

confidential information except on behalf of Plaintiffs.  (Hakopian Decl., ¶ 10). Although Defendant Giddings' Employment Agreement has expired, his obligation of confidentiality survives expiration of the Employment Agreement, and continues throughout and after his employment.  (*Id*. at Ex. E).  Defendant Abel's 2010 Confidentiality Agreement similarly contains obligations during his term of employment, as well as ongoing post-employment obligations.  (*Id*. at Ex. F)

In addition, Plaintiffs have put in place systems to protect data within their network.  (Hakopian Decl., ¶ 11).  For example, Plaintiffs employ a data loss prevention tool to make sure that end users do not send sensitive or critical information outside the corporate network, by controlling what data end users can transfer.  (*Id*.)  Access to Plaintiffs' CRM system is limited to users with a business need to access client data.  (*Id*.)  Similarly, access to Plaintiffs' portfolio management system is limited.  (*Id*.)  Plaintiffs require passwords for access to client data. (*Id*.)  Plaintiffs' business partners, such as Schwab and TD Ameritrade, limit access to client accounts.  (*Id*.)  Access to shared drives are limited to employees who require access to perform their jobs.  (*Id*.)

Clients and prospective clients also expect and require Plaintiffs to maintain their private data as confidential.  (Hakopian Decl., ¶ 12).  Further, Plaintiffs are legally required to protect client data under Regulation S-P promulgated under section 504 of the Gramm-Leach-Bliley Act, Pub. L. 106–102, 113 Stat. 1338.

These steps are more than sufficient to satisfy this prong of the trade secrets test.  *See Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514, 1523 (1997) (finding reasonable measures where customer list was stored on a computer with restricted access and company instructed employees to maintain confidentiality); *Courtesy Temp. Serv., Inc. v. Camacho*, 222 Cal. App. 3d 1278, 1288 (1990) (finding reasonable measures where customer list was distributed to employees on an "as needed basis" and employees were directed to keep it confidential).

### 2.     Defendants Misappropriated Plaintiffs' Confidential Customer Information And Employee Information

Misappropriation is defined as:

(1) Acquisition of a trade secret of another by a person

who knows or has reason to know that the trade secret was

acquired by improper means; or

(2) Disclosure or use of a trade secret of another without

express or implied consent by a person who:

     (A) Used improper means to acquire knowledge of the trade secret; or

     (B) At the time of disclosure or use, knew or had reason to know that

     his or her knowledge of the trade secret was:

          (i) Derived from or through a person who had

          utilized improper means to acquire it;

          (ii) Acquired under circumstances giving rise

          to a duty to maintain its secrecy or limit its use;

          (iii) Derived from or through a person who

          owed a duty to the person seeking relief to maintain

          its secrecy or limit its use; or

     (C) Before a material change of his or her position

     knew or had reason to know that it was a trade secret and

     that knowledge of it had been acquired by accident or by

     mistake.

Cal. Civ. Code § 3426.1(b).  The definition of Misappropriation under the DTSA is nearly identical to that of CUTSA. *Cf.* 18 U.S.C § 1839(5).

Here, Defendants' plan to set up a competing business, by raiding FFA's clients and employees using Plaintiffs' confidential business information and trade secrets, is well documented in their Competing Business Plan and related files, which Defendant Abel maintained in his FFA office.  (Kavanaugh Decl., ¶ 3 at Ex.

A).  The clients listed on the spreadsheet in the Competing Business Plan are FFA clients.  (*Id*.; Hakopian Decl., ¶ 13).  The client spreadsheet includes a detailed summary of the client relationship, which (as discussed above) would give a competitor an unfair advantage in competing for client business.  (*Id*.)  For example, their client spreadsheet includes highly confidential client data such as upcoming liquidity events, financial needs, asset locations, etc.  (*Id*.)  If a competitor had access to this assembled information, it would be much easier to target the client for transfer.  (Hakopian Decl., ¶ 13).

Their business plan and the client spreadsheet also contemplate raiding FFA's employees to staff their new business.  (Kavanaugh Decl., ¶ 3 at Ex. A; Hakopian Decl., ¶ 15).  They focus on the employees with the closest relationships with the target clients in order to facilitate their efforts to acquire those clients, and/or those employees that they know have the specialized expertise necessary for their competing business.  (*Id*.)  This information was only available to them through their roles as officers of FFA.  (Hakopian Decl., ¶ 15).  Their proposed org chart in the competing business plan lists only FFA employees, and the plan references current compensation of the target FFA employees, which is information that Defendant Giddings was required to keep confidential but nonetheless shared with his business partner Defendant Abel.  (Kavanaugh Decl., ¶ 3 at Ex. A; Hakopian Decl., ¶ 15).

In connection with inventorying Defendant Abel's office, Plaintiffs located additional files containing information relevant to Defendants' efforts to raid customers and employees in further of a competing business.  (Kavanaugh Decl., ¶ 6; Hakopian Decl., ¶ 17).  One of the files is entitled "Riviera" and dates from 2017. It includes financial projections based on Plaintiffs' clients and appears to be include a proposal to join forces with a competitor.  (*Id*.)  The term sheet referenced in the file required Defendants to transfer all of "their" existing clients.  (Kavanaugh Decl., ¶ 6 at Ex. B; Hakopian Decl., ¶ 17).  The second folder located is entitled "Project

Free Solo" and includes notes dated as late as February 18, 2019. (*Id*.) The proposal appears to contemplate that Defendants would acquire control of an existing competitor in order to compete with FFA, which, as they note in the Competing Business Plan, would allow them to take advantage of existing relationship with important business partners such as Schwab that might otherwise refuse to contract with them. (*Id*.; Kavanaugh Decl., ¶ 3 at Ex. A).

In addition to the actual misappropriation that has already taken place, Defendants' malicious activities continue to pose a clear and present threat of future misappropriation, if not enjoined. Their years of planning to compete while continuing employment as officers of FFA, their willingness to blatantly use of trade secrets for their personal benefit, their breaches of fiduciary duty, and their plan to raid FFA's employees underscore the need for injunctive relief to prevent future threatened misappropriation. (Hakopian Decl., ¶ 18).

In sum, Plaintiffs easily satisfy all elements of a claim for actual and threatened misappropriation of trade secrets under both the DTSA and CUTSA. The information they took and used in the preparation of their secret plan to compete with FFA is highly valuable, was assembled at significant cost to Plaintiffs, and Plaintiffs have been and will continue to be significantly harmed by their illegal conduct if they are not stopped.

**B.     Plaintiffs Are Likely To Suffer Irreparable Harm Absent Preliminary Relief**

The blatant misappropriation of Plaintiffs' trade secrets by Defendants, coupled with their continued breaches of their contractual obligations, conclusively demonstrate a present threat of irreparable harm. Irreparable injury justifying injunctive relief has been presumed in similar situations where a defendant's conduct is misappropriation of confidential information. *See Ernest & Ernest v. Carlson*, 247 Cal. App. 2d 125, 128-29 (1966). "[A]n intention to make imminent or continued use of a trade secret or to disclose it to a competitor will almost always

certainly show irreparable harm." *Pac. Aerospace & Elec., Inc. v. Taylor*, 295 F. Supp. 2d 1188, 1198 (E.D. Wash. 2003) (quoting *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 92–93 (3rd Cir. 1992)). "Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm." *Stuhlbarg Int'l Sales*, 240 F.3d at 841. Irreparable injury also is presumed when a plaintiff has met the "probability of success" prong in a statutory violation matter. *United States v. Nutricology, Inc.*, 982 F.2d 394, 398 (9th Cir. 1992) (passage of statute shows Congress believes violations will harm the public).

Here, Plaintiffs have met the "probability of success" prong in showing that Defendants have breach their respective contracts, and violated the DTSA and CUTSA. Thus, Defendants are entitled to a presumption that they will suffer irreparable injury without the temporary restraining order. *Ernest & Ernest*, 247 Cal. App. at 128-29; *Vinyl Interactive, LLC v. Guarino*, No. C 09-0987 (CW), 2009 WL 1228695, at *8 (N.D. Cal. May 1, 2009) ("The Court presumes that Vinyl will suffer irreparable harm if its proprietary information is misappropriated.") (citation omitted).

Even if Plaintiffs do not enjoy the presumption of irreparable injury (they do), they would otherwise be able to show that if Defendants are not enjoined and are instead able to execute on their plan to raid FFA's clients and employees, FFA will suffer irreparable harm, including potentially losing a substantial percentage of customers and associated revenue, losing key employees, suffering a negative impact to its reputation as an employer, suffering reputational damage with customers, prospective customers, investors and market analysts, and the parent company's (i.e., FFI) stock price may be impacted as a result of negative publicity and potential loss of FFA customers and revenue. (Hakopian Decl., ¶ 18); *see also Wyndham Resort Dev. Corp. v. Bingham*, No. 2:10-cv-01556-(GEB-KJM), 2010 WL 2740158, at *6-7 (E.D. Cal. July 9, 2010) (disclosure of confidential customer

information threatened irreparable harm in the form of loss of goodwill); *Language Line Servs., Inc. v. Language Servs. Assoc., LLC*, No. C 10-02605 (JW), 2010 WL 2764714, at *5 (N.D. Cal. July 13, 2010) (finding the plaintiff faced a risk of irreparable harm in the form of lost customers and goodwill); *Hat World, Inc. v. Kelly*, No. S-12-01591 (LKK/EFB), 2012 WL 3283486, at *8 (E.D. Cal. Aug. 10, 2012) (stating that harm to goodwill may be considered irreparable).[1]

## C.      The Balance Of Equities Weighs In Favor Of Injunctive Relief

"To qualify for injunctive relief, Plaintiff[s] must establish that 'the balance of the equities tips in [their] favor.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20).  A court has the "duty . . . to balance the interests of all parties and weigh the damage to each." *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980). The damage to Plaintiffs, as noted above, is the loss of customers, loss of employees, goodwill, reputational damage and more.  (Hakopian Decl., ¶ 18). Defendants will likely argue that they were only preparing to compete and did not engage in actual competition.  Yet, their own Competing Business Plan and related files conclusively evinces their willingness to cheat to get ahead.  Plaintiffs are merely asking the Court to level the playing field and require Defendants to compete fairly for business, without the shortcuts afforded by the theft of Plaintiffs' highly valuable trade secrets accomplished through Defendants' breaches of the contractual

---

[1]   In that same vein, "California courts have held that the solicitation of a company's clients by . . . [a] former employee[] causes irreparable harm."  *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Chung*, No. CV 01-00659 CBM RCX, 2001 WL 283083, at *5 (C.D. Cal. Feb. 2, 2001); *cf. Allergan, Inc. v. Merz Pharmaceuticals, LLC*, No. SACV 11-446 AG (Ex), 2012 WL 781705, at *13 (C.D. Cal. Mar. 9, 2012) (relying on a presumption of irreparable harm from the misappropriation of proprietary information as well as from the risk of losing customers to determine that the threat of injury was imminent and the measure of that injury defied calculation) (citations omitted).

and fiduciary duties they owed to Plaintiffs.  The balance of equities in this case tip heavily in Plaintiffs' favor.

### D.     Granting The Proposed Order Is In The Public Interest

"The public interest is served when [a] defendant is asked to do no more than abide by trade laws and the obligations of contractual agreements signed with [his] employer.  The public interest is also served by enabling the protection of trade secrets." *Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1078 (N.D. Cal. 2016) (citing *Bank of Am., N.A. v. Lee*, No. CV 08–5546 CAS (JWJX), 2008 WL 4351348, at *7 (C.D. Cal. Sept. 22, 2008)).  Accordingly, the public interest is served in ordering Defendants here to abide by trade laws, protect Plaintiffs' trade secrets, and honor their contractual obligations to Plaintiffs.

## IV.   THE COURT SHOULD PERMIT EXPEDITED DISCOVERY

Courts within the Ninth Circuit generally use the "good cause" standard to determine whether to permit discovery prior to a Rule 26(f) conference.  *See, e.g., Interserve, Inc. v. Fusion Garage PTE, Ltd.,* No. C 09–05812 JW (PVT), 2010 WL 143665, at *2 (N.D. Cal. Jan. 7, 2010); *Semitool, Inc. v. Tokyo Electron Am., Inc.,* 208 F.R.D. 273, 276 (N.D. Cal. 2002).  "Good cause may be found where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party."  *Semitool,* 208 F.R.D. at 276.

In determining whether good cause justifies expedited discovery, courts commonly consider factors including: "(1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made." *Am. LegalNet, Inc. v. Davis,* 673 F. Supp. 2d 1063, 1067 (C.D. Cal. 2009).

Here, in order to fully understand the scope of Defendants' wrongdoing and ensure that they have not secretly secured Plaintiffs' trade secrets for future use,

Plaintiffs request that the Court authorize expedited discovery in advance of the hearing on the preliminary injunction.  The requested discovery includes:

- Depositions of Defendant Giddings and Defendant Abel as to the following topics:
  - Defendants' acts in furtherance of preparing to establish their competing business;
  - The timeframe in which Defendants made steps in furtherance of establishing their competing business; and
  - Individuals and other entities with whom Defendants have divulged or otherwise communicated Plaintiffs' trade secrets.
- Forensic examination of Defendants' computers, electronic devices, email accounts, cloud accounts and any other storage devices used during their employment with FFA, to search for documents and communications relevant to Plaintiffs' claims; and
- Document requests relating to activities in setting up their competing business, client contacts, employee contacts, and other documents relevant to their misconduct.

Plaintiffs have good cause to seek expedited discovery in this case.  As an initial matter, a compaction of the usual discovery schedule is warranted, as Plaintiffs seek a preliminary injunction and wish to use information gathered from expedited discovery in preparation thereof.  *See Interserve, Inc.,* 2010 WL 143665, at *2 ("Expedited discovery will allow plaintiff to determine whether to seek an early injunction.").  Moreover, the expedited discovery Plaintiffs seek is directly relevant to their misappropriation claims.  *NobelBiz, Inc. v. Wesson*, No. 14CV0832 W JLB, 2014 WL 1588715, at *2 (S.D. Cal. Apr. 18, 2014) (permitting expedited discovery where requests were directly relevant to misappropriation claim).  The burden on Defendants to comply with Plaintiffs' discovery requests is minimal, as Plaintiffs who, upon information and belief, have a limited number of computers,

devices, email accounts, cloud accounts, and other storage devices.  Finally, good cause exists here because Plaintiffs are making their expedited discovery request at the earliest practicable moment: on the same day that Plaintiffs initiated litigation in the above-captioned case.

**V.    CONCLUSION**

Through their years-long and secret preparations to set up a competitive business while remaining employed as officers of First Foundation Advisors, defendants Thomas Giddings and Louis Abel have proven their willingness to abuse their fiduciary relationship, ignore their contractual obligations, and steal Plaintiffs' trade secrets.  They should be stopped in their tracks now.  Plaintiffs have met their burden for requested injunctive relief, and respectfully request that the Court issue an immediate temporary restraining order, order to show cause, and authorize the requested expedited discovery.

Respectfully submitted,

Dated:  February 21, 2020        SHEPPARD, MULLIN, RICHTER & HAMPTON LLP


By _____
                    */s/ Jennifer G. Redmond*
                    JENNIFER G. REDMOND
                    Y. DOUGLAS YANG
                    Attorneys for Plaintiffs
                    FIRST FOUNDATION INC. and FIRST
                    FOUNDATION ADVISORS