PATRICIA L. GLASER - State Bar No. 55668
pglaser@glaserweil.com
RORY S. MILLER - State Bar No. 238780
rmiller@glaserweil.com
MICHAEL L. SMITH - State Bar No. 298917
msmith@glaserweil.com
GLASER WEIL FINK HOWARD
  AVCHEN & SHAPIRO LLP
10250 Constellation Boulevard, 19th Floor
Los Angeles, California 90067
Telephone: (310) 553-3000
Facsimile: (310) 556-2920

Attorneys for Defendants
Thomas Giddings and Louis Abel

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| FIRST FOUNDATION INC., a Delaware Corporation; and FIRST FOUNDATION ADVISORS, a California Corporation,<br><br>Plaintiffs,<br><br>v.<br><br>THOMAS MUNSON GIDDINGS, an individual; LOUIS PANCOAST ABEL, an individual,<br><br>Defendants. | CASE NO.: 8:20-cv-00359-DOC-KES<br><br>Hon. David O. Carter<br><br>**DEFENDANTS' POST-HEARING BRIEF RE: PRELIMINARY INJUNCTION**<br><br>DATE: March 2, 2020<br>TIME: 8:30 a.m.<br>COURTROOM: 9D<br><br>TRIAL DATE: Not Scheduled |

**INTRODUCTION**

The Court has now had the chance not only to review the parties' papers and their respective declarations, but to receive substantial live testimony from both Defendants as well as that of John Hakopian, the President of plaintiff First Foundation Advisors, Inc. and the most senior employee and officer of that entity.

What was demonstrated in the papers was confirmed in the live testimony: Defendants have not done anything wrong, let alone anything necessitating an injunction, since First Foundation precipitously fired them on February 18. Defendants possess no internal company documents or secrets, and what client information they do have in their memories is not First Foundation's information or trade secrets at all—it is the clients' information.

The Court should see First Foundation's injunction request for what it is: an attempt to achieve through litigation what it is prohibited from obtaining through contract: a non-competition and non-solicitation agreement from Defendants. Anti-competitive covenants are prohibited in California law in significant part because of the harm they do, not only to the individuals who would be subjected to them, but also to the customers and clients who depend on such restrained individuals.

Here, even if the Court were to disregard the injuries that Defendants have already suffered (summary termination based on faulty and uninvestigated assumptions, followed by deprivation of earned pay and vested options) and continue to suffer (lack of any income, uncertain employment prospects, litigation costs), it should look to the injuries that have been and will continue to be suffered by the clients caught in the middle of this lawsuit.

As the Court is likely aware, the financial markets have been extremely volatile in recent weeks, breaking records for changes in a single day—both losses and gains. More than ever, clients will be looking to their wealth advisors for guidance on how to navigate these uncertain times. Plaintiffs' wide-ranging demand that Mr. Giddings and Mr. Abel be prohibited from any contact with the clients that they have served for

years and who trust their advice, does not serve those clients' interest in continuing to benefit from that advice and guidance. To prevent this harm, and to keep First Foundation from circumventing California's strong public policy favoring competition, the Court should reject First Foundation's broad overreach in requested injunction out of hand.

## ARGUMENT

Defendants will not repeat all the arguments from their papers, but instead wish to focus the Court's attention on facts and issues that were addressed in the testimony taken at the March 3 hearing.

### I. The Testimony Confirmed That the Information First Foundation Seeks to Restrict is Either Not a Trade Secret, Or Is Not in Defendants' Possession

The testimony demonstrated that there are, broadly speaking, two categories of information or materials at issue. The first is client-related information that Defendants know and remember from their relationships with clients. The second are materials, such as internally prepared spreadsheets (or derivative versions of those documents) over which First Foundation asserts a trade secret.

As to the first category, the questioning and testimony demonstrates that not only is that information not a trade secret, but it isn't even First Foundation's information at all—it belongs to the clients. First Foundation, as well as Defendants, are merely custodians of that client-related information, and any confidentiality is owed to the clients, not to First Foundation.

On the second category, many of the documents that First Foundation points to, such as the spreadsheets in Plaintiffs' Exhibits A & K, contains a written version of this same client-owned information. For the same reasons as the first category, such materials are also not entitled to trade secret protection. However, the Court need not rule on that issue, nor is there a need for the Court to parse such documents to determine if some arguably secret information is reflected in them. The reason is simple: Defendants have testified, both on the stand and in declarations, that they

have no copies of any such documents, and Mr. Hakopian confirmed in his testimony that neither he nor First Foundation generally have any evidence that Defendants do in fact have such materials. In other words, there is no unfair competitive advantage, because there are no documents from which to draw that advantage.

### A. The Information Defendants Actually Know is Not A Secret

Plaintiffs devoted a good portion of their briefing and examination to determining what information Defendants have in their heads regarding their clients, as though this were an "aha" moment. It is not.

As the examination showed, and the testimony confirmed, the mental information that First Foundation asserts a proprietary interest in is: (1) clients' investment strategy and objectives; (2) clients' risk tolerance; (3) clients' assets; (4) clients' liabilities; (5) clients' income; (6) clients' expenses; (7) clients' taxes and returns; (8) any negotiated fee schedules between the client and First Foundation;[1] and (9) clients' upcoming liquidity events. *See* Examination of Louis Abel by First Foundation.[2]

As the Court will observe, nearly every single item on this list refers to ***clients' information*** that had been provided to First Foundation in their pitch meetings—clients are the source of information about their objectives, risk tolerance, assets and liabilities, their own tax situation, future business plans (the "liquidity events") and whatever special deals they were able to strike with First Foundation. ***Clients*** may

---

[1] Notably, at the hearing, First Foundation did not identify a single negotiated fee schedule that it contends Defendants either have in their possession, or that Defendants know about. The sole fee testimony, by Mr. Giddings, confirms First Foundation's standard fee schedule. That standard fee schedule is readily available from, among other locations, First Foundation's own website. *See* Declaration of Rory S. Miller, filed concurrently, at ¶ 5 & Exs. 1-2.

[2] Elsewhere in the examination, First Foundation suggested that information regarding the compensation paid to Defendants' fellow employees was a trade secret. Employers' wage secrecy efforts such as this are illegal in California. Cal. Labor Code § 232. In any event, Mr. Hakopian's testimony confirmed that none of the approximately 65 employees of First Foundation Wealth Management have been solicited by Defendants, either before or after their termination.

DEFENDANTS' POST-HEARING BRIEF

4

1803568.1

freely disseminate this information to as few or as many individuals as they wish; First Foundation, as confirmed by Mr. Hakopian's testimony, does not have a proprietary right to that information.

The lone potential exception is the "strategy" for the clients' investments. In an appropriate case, where the investment product being sold utilized a secret and proprietary investment program or algorithm developed in-house by a company, that algorithm could very well be a trade secret.

***That is not this case.*** As Mr. Hakopian testified, First Foundation's investment strategies that are proposed to clients come in one of seven basic styles and are customized based on the various meetings with the clients that First Foundation would conduct. In other words, First Foundation's "product" is not a formula kept secret even from the clients that can be misappropriated. Rather, First Foundation sells the services of the professionals it employs—services that it has no right to control once it fires those professionals, as it did with Mr. Giddings and Mr. Abel.

For the same reason, First Foundation's heavy emphasis on the fact that trade secrets need not be written down but can be committed to memory, has no bearing. For this argument to even be relevant, there must be a protectible trade secret. As described above, nothing that Defendants know about clients meets that standard. Defendants have not, for example, memorized the formula for Coca-Cola or the recipe for the "eleven herbs and spices" in Kentucky Fried Chicken. What they know is who their personal relationships are with, and information about those individuals—all of which information originated with and belongs to, the client, not First Foundation.

### B. To the Extent That First Foundation Documents Contain Valid and Protectable Trade Secrets, Defendants Have No Such Materials

Plaintiffs displayed several exhibits at the hearing and asserted that the documents contained confidential and proprietary information—that is, trade secrets. Although Defendants note that much of the information Plaintiffs assert is a trade

secret is neither proprietary to First Foundation nor confidential, the Court need not rule on such disputes.

As the Court rightly observed, the goal of injunctive relief, and equity in general, is to ensure that someone does not receive an unfair competitive advantage or disadvantage. Here, there is no need for such concern: as both Mr. Giddings and Mr. Abel testified before the Court, and as they declared under penalty of perjury that they have no such documents. (*See* dkt. nos. 27-1, ¶ 43 & 27-2, ¶ 35.) To the extent that they ever did, such as Mr. Giddings' hard copy of the document designated Plaintiffs' Exhibit A, both immediately surrendered all such materials to counsel upon their termination from First Foundation—again, as they both testified before the Court and swore in their declarations. (*See* dkt. nos. 27-1, ¶ 21 & 27-2, ¶ 19.)

Mr. Hakopian even admitted on the stand that First Foundation has no evidence that Defendants have kept or used any of these materials following their termination. First Foundation's speculations are insufficient to support an injunction, especially when the Court has received uncontradicted testimony categorically stating that no such materials are in either Mr. Giddings or Mr. Abel's possession, custody, or control. *See, e.g., Giftango, LLC v. Rosenberg,* 925 F. Supp. 2d 1128, 1140 (D. Or. 2013) (plaintiff fails to demonstrate irreparable injury when defendants submit declarations confirming that they had not misappropriated information).

## II. First Foundation Advisors' President, Mr. Hakopian, Confirmed That Defendants' Post-Termination Actions Are Entirely Proper

On direct examination, First Foundation's counsel elicited testimony from Mr. Hakopian that the company requires new hires to "create their own database," rather than, for example, bringing a database or spreadsheet with them from their prior employment. First Foundation's counsel asked what "creating their own database" entailed, and, before being cut off by his company's own counsel, Mr. Hakopian testified that "creating their own database" included drawing up lists of "referral sources" and "potential client names."

In this testimony, Mr. Hakopian confirmed that any injunction of Defendants' *actual* conduct would be inequitable. As noted in Defendants' opposition (dkt. no. 27 at 21:1-22:7), where an employer engages in a course of conduct against its competitors, it cannot enjoin that same conduct by its own former employees. *See, e.g., Barney v. Burrow,* 558 F. Supp. 2d 1066, 1081 (E.D. Cal. 2008) (employer estopped from preventing former employees from using client information when employer encouraged employees to recruit clients of their former employers); *Morgan Stanley DW, Inc. v. Frisby,* 163 F. Supp. 2d 1371, 1377 (N.D. Ga. 2001) (equitable estoppel applies where employer "actively hires brokers from competitors and encourages them to use their client information to solicit account transfers").

Mr. Hakopian's testimony demonstrated that not only does First Foundation consider the likelihood that new hires will be able to generate business by enticing their former clients to follow them to First Foundation, but that these same new hires are encouraged to create, from their memory, "their own databases" of referral sources and potential client contacts. That is exactly what Mr. Giddings and Mr. Abel have done following their termination, and before the Court's temporary restraining order: without reference to a single First Foundation document, let alone the detailed documents shown at the hearing comprising portions of Plaintiffs' Exhibit A and the entirety of Plaintiffs' Exhibit K, Defendants assembled a list of individuals with whom they had personal business relationships, and began to reach out to them to inform them of their separation from First Foundation. (Testimony of Louis Abel; *see also* dkt. no. 27-1, ¶ 35 & 27-2, ¶¶ 33-34.) This is *exactly* what Mr. Hakopian was describing First Foundation encouraging its new hires to do before First Foundation's counsel cut his answer off.

Nor does the Court need to take Mr. Hakopian's testimony alone: First Foundation has defended these practices against trade secret suits. As First Foundation argued, "such businesses and relationships do not 'belong' to Plaintiff, any more than they belonged to [the employee's] prior employer from whom Plaintiff

recruited the employee." Dkt. no. 27-3, Ex. 1 at 3:21-23.

To be clear: Defendants are *not* implying that there is anything wrong in First Foundation's conduct; this is not an unclean hands issue, but an equitable estoppel issue. Neither First Foundation's encouraging its new hires to "create their own database" nor Defendants' post-termination efforts to contact their former clients involves any protected information or unfair competitive advantage. "[A]n unadorned list of clients, even one labeled 'secret' or 'confidential,' does not constitute a protectible trade secret all on its own." *Pollara v. Radiant Logistics Inc.*, 2014 WL 12585781 at *5 (C.D. Cal. June 6, 2014) (citing *Thompson v. Impaxx, Inc.*, 113 Cal. App. 4th 1425, 1430 (2003)); *see also, e.g., AMN Healthcare, Inc. v. Aya Healthcare Services, Inc.*, 28 Cal. App. 5th 923, 944-45 (2018) (customer list of travel nurses not a trade secret); *American Paper & Packaging Products, Inc. v. Kirgan,* 183 Cal. App. 3d 1318, 1326 (1986) (customer list not a trade secret).[3]

## CONCLUSION

For the foregoing reasons, the Court should deny both of Plaintiffs' requests for a preliminary injunction in its entirety. At a minimum, Plaintiffs have failed to demonstrate that the balance of the equities is in their favor, as they are equitably estopped from seeking this injunction. Additionally, as described above, Plaintiffs' claimed trade secrets either are no such thing or Defendants have no documents containing such information. As such, Plaintiffs have failed to demonstrate likelihood of success on the merits or irreparable injury entitling them to an injunction, and their request for a preliminary injunction should be denied and the Court's temporary restraining order dissolved.

If the Court believes that a formal order beyond a simple denial is necessary, Defendants urge that the Court reject Plaintiffs' amorphous and wide-sweeping

---

[3] One such list that goes beyond a mere list of clients, but also demonstrates the personal relationship between Defendants and the clients is Mr. Giddings' holiday card list introduced as Defendants' Hearing Exhibit 3.

DEFENDANTS' POST-HEARING BRIEF

8

1803568.1

1 proposals, and instead adopt the proposed order submitted with this filing. Not only
2 does Defendants' proposed order provide Plaintiffs assurances (backed up through the
3 Court's contempt enforcement power) that Defendants do not, in fact, possess any
4 company proprietary documents or other materials, but it also clearly delineates what
5 is, and what is not, acceptable conduct for the parties as they part ways.

6 Most importantly, however, Defendants' proposed order does justice: it allows
7 clients the ability to choose their advisors, assures that neither Mr. Giddings nor Mr.
8 Abel will use any legitimately protected information belonging to First Foundation,
9 and forces First Foundation to compete fairly in the marketplace, rather than
10 hampering their competition through a blanket prior restraint. Defendants fully
11 welcome that fair competition.

DATED: March 4, 2020

GLASER WEIL FINK HOWARD
    AVCHEN & SHAPIRO LLP

By: _____
PATRICIA L. GLASER
RORY S. MILLER
MICHAEL L. SMITH
    Attorneys for Defendants
    Thomas Giddings and Louis Abel