PATRICIA L. GLASER - State Bar No. 55668
pglaser@glaserweil.com
RORY S. MILLER - State Bar No. 238780
rmiller@glaserweil.com
MICHAEL L. SMITH - State Bar No. 298917
msmith@glaserweil.com
GLASER WEIL FINK HOWARD
  AVCHEN & SHAPIRO LLP
10250 Constellation Boulevard, 19th Floor
Los Angeles, California 90067
Telephone:  (310) 553-3000
Facsimile:   (310) 556-2920

Attorneys for Defendants
Thomas Giddings and Louis Abel

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| FIRST FOUNDATION INC., a Delaware Corporation; and FIRST FOUNDATION ADVISORS, a California Corporation, | CASE NO.: 8:20-cv-00359 |
| Plaintiffs, | Hon. David O. Carter |
| v. | **DECLARATION OF RORY S. MILLER IN SUPPORT OF DEFENDANTS' CONSOLIDATED OPPOSTION TO PLAINTIFFS' *EX PARTE* APPLICATIONS FOR INJUNCTIVE RELIEF AND EXPEDITED DISCOVERY** |
| THOMAS MUNSON GIDDINGS, an individual; LOUIS PANCOAST ABEL, an individual, | |
| Defendants. | DATE:           March 2, 2020<br>TIME:           8:30 a.m.<br>COURTROOM:   9D |
| | TRIAL DATE:   Not Scheduled |

*Glaser Weil*

1803458

# DECLARATION OF RORY S. MILLER

I, Rory S. Miller, declare as follows:

1.     I am an attorney at law duly licensed to practice before all courts of the State of California and a partner of the law firm of Glaser Weil Fink Howard Avchen & Shapiro LLP, attorneys of record for Defendants Thomas Giddings and Louis Abel. I make this declaration in support of Defendants' Post-Hearing Brief.  I have personal knowledge of the facts set forth herein, and if called upon to testify thereto, I could and would competently do so under oath.

2.     At the hearing, the Court was presented with testimony that First Foundation's standard fee schedule was publicly available from SEC filings called the "Form ADV."  The Court requested to see those forms.

3.     During the hearing, I was able to download the form ADV, including First Foundation's standard fee schedule, both from the First Foundation website, as well as directly from the United States Securities and Exchange Commission.

4.     Concurrently with this declaration, Defendants are lodging a thumb drive with the Court.  That thumb drive contains a video capture of my computer screen as I navigated to, accessed, and downloaded First Foundation's Form ADV.

5.     One video shows the procedure to access the document from First Foundation's website, and the other shows the procedure to access the document from the SEC's website.  I personally created these videos and downloaded the associated documents during the hearing on March 3.  The video of my access of the document from First Foundation's website is lodged as Exhibit 1.  The video of my access of the document from the SEC's website is lodged as Exhibit 2.

6.     Attached as Exhibit 3 is a hard copy of the document downloaded from First Foundation's website.  The fee schedule information that was at issue during the hearing can be located on page nine of the exhibit.

7.     Attached as Exhibit 4 is a hard copy of the document downloaded from the SEC's website; although it appears to be identical to Exhibit 1, both are provided

1803458

here to ensure that there is no concern about any differences between the two.  As with Exhibit 1, the fee schedule information that was at issue during the hearing can be located on page nine of the exhibit.

8.      I provided a copy of these videos and documents to Plaintiffs' counsel via an email yesterday evening.  A copy of that email is attached as Exhibit 5.


I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration is executed on March 4, 2020 at San Francisco, California.


Rory S. Miller

3

DECLARATION OF RORY S. MILLER

1803458

# Exhibit 1

Exhibit 1 Lodged with Court Pursuant to
L.R. 5-4.2

Exhibit 2

Exhibit 2 Lodged with Court Pursuant to
L.R. 5-4.2

Exhibit 3

# FIRST FOUNDATION ADVISORS

**Item 1**      **Cover Page**

# First Foundation Advisors
SEC File Number: 801 – 35973

**Brochure**
**Dated 03/22/2019**

Contact: Greg Bruce, Chief Compliance Officer
18101 Von Karman Avenue, Suite 700
Irvine, California 92612
www.ff-inc.com

This brochure provides information about the qualifications and business practices of First Foundation Advisors (the **"Registrant"**). If you have any questions about the contents of this brochure, please contact us at (949) 476-0300 or gbruce@ff-inc.com. The information in this brochure has not been approved or verified by the United States Securities and Exchange Commission or by any state securities authority.

Additional information about First Foundation Advisors also is available on the SEC's website at www.adviserinfo.sec.gov.

References herein to First Foundation Advisors as a "registered investment adviser" or any reference to being "registered" does not imply a certain level of skill or training.

## Item 2          Material Changes

Since last year's Annual Amendment filing on April 2, 2018, there have been no material changes made to First Foundation Advisors' (the "Registrant") disclosure statement. However, the Registrant at Items 4, 5, 7 and 15 below, has made certain disclosure additions and enhancements regarding financial planning limitations, retirement rollovers, advisory fees, conflicts of interest, margin, and custody.

**ANY QUESTIONS**: The Registrant's Chief Compliance Officer, Greg Bruce, remains available to address any questions that a client or prospective client may have regarding the below changes and additions, or any other issue pertaining to this Brochure.

## Item 3          Table of Contents

Item 1     Cover Page ............................................................................................................... 1
Item 2     Material Changes ...................................................................................................... 2
Item 3     Table of Contents ...................................................................................................... 2
Item 4     Advisory Business ...................................................................................................... 3
Item 5     Fees and Compensation ............................................................................................ 9
Item 6     Performance-Based Fees and Side-by-Side Management ....................................... 11
Item 7     Types of Clients ....................................................................................................... 12
Item 8     Methods of Analysis, Investment Strategies and Risk of Loss ................................ 12
Item 9     Disciplinary Information .......................................................................................... 14
Item 10    Other Financial Industry Activities and Affiliations ............................................... 15
Item 11    Code of Ethics, Participation or Interest in Client Transactions and Personal Trading ................. 17
Item 12    Brokerage Practices ................................................................................................. 18
Item 13    Review of Accounts ................................................................................................. 21
Item 14    Client Referrals and Other Compensation ............................................................... 21
Item 15    Custody .................................................................................................................... 24
Item 16    Investment Discretion .............................................................................................. 25
Item 17    Voting Client Securities ........................................................................................... 25
Item 18    Financial Information ............................................................................................... 26

## Item 4      Advisory Business

A.   First Foundation Advisors (the "Registrant") is a corporation formed on December 12, 1985 in the State of California. The Registrant became registered as an investment adviser in February 1990. John A. Hakopian is the Registrant's President. The Registrant is owned by First Foundation Inc. (FFI). FFI's common stock is publicly traded on the NASDAQ Global Market under the symbol "FFWM" and the ownership of that entity will change on a regular basis.

B.   As discussed below, the Registrant offers to its clients, directly or through one of its affiliated entities, investment advisory services, and, <u>to the extent specifically requested by a client</u>, financial planning and related consulting services.

### <u>INVESTMENT ADVISORY SERVICES</u>

The client can engage Registrant to provide discretionary and/or non-discretionary investment advisory services to individuals, families, businesses, and retirement plans (**_see below_**). Before engaging Registrant to provide investment advisory services, clients are required to enter into an agreement with Registrant setting forth the terms and conditions of the engagement, describing the scope of the services to be provided, and the fees that a client will incur (**_see_** fee schedule at Item 5 below). Registrant provides investment advisory services specific to the needs of each client. Before providing investment advisory services, Registrant will determine the client's investment objectives. Registrant will then allocate (or recommend that the client allocate) the assets in a client's portfolio consistent with their designated investment objectives. To the extent requested by an individual client, Registrant will generally provide financial planning and consulting services. In the event that the client requires extraordinary planning or consultation services, the Registrant may determine to charge a client for such additional services pursuant to a stand-alone written agreement (**_see Limitations_** below).

**<u>ERISA PLAN ENGAGEMENTS</u>**: Registrant may be engaged to provide investment advisory services to ERISA retirement plans, where the Firm manages plan assets consistent with the investment objective designated by the plan sponsor. In such engagements, the Registrant will serve as an investment fiduciary as that term is defined under the Employee Retirement Income Security Act of 1974 ("ERISA"). The Registrant will generally provide services on an "assets under management" fee basis per the terms and conditions of an Investment Advisory Agreement between the Plan and the Registrant. Registrant may also provide investment advisory services to participant directed retirement plans per the terms and conditions of a Retirement Plan Consulting Agreement between Registrant and the plan. For such engagements, Registrant shall assist the plan with the selection of an investment platform from which plan participants can make their respective investment choices, and, to the extent engaged to do so, may also provide education to assist the participants with their decision making process.

**<u>SUB-ADVISED MUTUAL FUNDS AND CONFLICT OF INTEREST:</u>** Pursuant to a written sub-advisory agreement, the Registrant serves as a sub-adviser to a registered investment company under the Investment Company Act of 1940. At this time, the Registrant currently serves as a sub-adviser to certain funds advised by Highland Capital Management Fund Advisors, L.P. The Registrant will observe the investment parameters described in the fund's offering documents as well as those required by the Investment Company Act of 1940. A conflict of interest arises whenever the Registrant has an actual or perceived economic or other incentive in its management of client's accounts in a way that benefits the Registrant. A conflict is present where we may invest, on a discretionary basis, in a mutual fund where we

sub-advise. All else equal, the Registrant has a preference for mutual funds where it serves as sub-adviser. When appropriate, the Registrant's mutual funds that it sub-advises may be held in client accounts (up to 100%), subject to applicable law and any account-specific considerations. Clients may contact us to elect not to invest in any investment product that we sub-advise by emailing us at **gbruce@ff-inc.com** or contacting Greg Bruce at (949) 476-0300. As discussed above, clients may elect to exclude from their accounts investments in any fund that the Registrant serves as subadviser. If a client has already made an investment in a fund that we serve as subadviser, and request selling the fund, they may incur tax consequences because of such election. The Registrant will comply with ERISA and Section 4975 of the Internal Revenue Code for all purchases of mutual funds it sub-advises in Individual Retirement Accounts or in qualified retirement plans subject to ERISA by providing a credit of advisory fees associated with the discretionary management of these funds against the client's management fee set forth in Item 5 below. A credit of advisory fees associated with the discretionary management of these funds for other nonqualified client accounts will be applied in the same manner as above. The Registrant's Chief Compliance Officer remains available to address any questions that a client or prospective client may have regarding the above conflict of interest. See Item 5 for a summary of fees associated with the Registrant's Sub-Adviser services.

## FINANCIAL PLANNING AND CONSULTING SERVICES (STAND-ALONE)

To the extent requested by a client, the Registrant *may* provide financial planning and/or consulting services (including investment and non-investment related matters, such as estate, tax and insurance planning, etc.) on a stand-alone separate hourly rate basis. Registrant's planning and consulting fees are negotiable, but generally range from negotiable up to $350 on an hourly rate basis, depending upon the scope and complexity of the service(s) required and the professional(s) rendering the service(s). Alternatively, the Registrant may charge a fixed rate for the project with up to 50% of the total fee due at inception and the balance due at the completion of the project depending on the scope of the project. Prior to engaging the Registrant to provide planning or consulting services, clients are generally required to enter into a *Financial Planning and Consulting Agreement* with Registrant setting forth the terms and conditions of the engagement (including termination), describing the scope of the services to be provided, an estimated fee and the portion of the fee that is due from the client prior to Registrant commencing services. If requested by the client, Registrant may recommend the services of outside professionals for additional consulting and/or implementation purposes. The client is under no obligation to engage the services of any such recommended professional. The client retains absolute discretion over all such implementation decisions and is free to accept or reject any recommendation from the Registrant. Registrant's consulting services pursuant to this agreement do not include investment implementation, supervisory, management, or reporting services, nor the regular review or monitoring of the client's investment portfolio. In the event the client desires the Registrant **to** provide investment supervisory or management services, such engagement shall be set forth in a separate *Investment Advisory Agreement* between the Registrant and the client, for which services Registrant shall be paid a separate and additional fee.

## MISCELLANEOUS

**Retirement Rollovers**. A client or prospective client leaving an employer typically has four options regarding an existing retirement plan (and may engage in a combination of these options): (i) leave the money in the former employer's plan, if permitted, (ii) roll over the assets to the new employer's plan, if one is available and rollovers are permitted, (iii) roll over to an Individual Retirement Account ("IRA"), or (iv) cash out the account value (which could, depending upon the client's age, result in adverse tax consequences). If **Registrant**

recommends that a client roll over their retirement plan assets into an account to be managed by Registrant, such a recommendation creates a <u>conflict of interest</u> if Registrant will earn new (or increase its current) compensation as a result of the rollover. When acting in such capacity, Registrant serves as a fiduciary under the Employee Retirement Income Security Act (ERISA), or the Internal Revenue Code, or both. **<u>No client is under any obligation to rollover retirement plan assets to an account managed by Registrant</u>**. **<u>Registrant's Chief Compliance Officer, Greg Bruce, remains available to address any questions that a client or prospective client may have regarding the potential for conflict of interest presented by such rollover.</u>**

**<u>Limitations of Non-Investment Consulting/Implementation Services</u>**.  As indicated above, **to the extent specifically requested by a client,** the Registrant may provide consulting services regarding non-investment related matters, such as estate planning, tax planning, insurance, etc. Neither the Registrant, nor any of its representatives, serves as an attorney or accountant, and no portion of the Registrant's services should be construed as legal or accounting advice. To the extent requested by a client, the Registrant may recommend the services of other professionals for certain non-investment implementation purposes (i.e. attorneys, accountants, insurance, etc.), including the Registrant's insurance affiliate (**See** disclosure at Item 10.C.2). If the client engages any recommended professional, and a dispute arises thereafter relative to such engagement, the client agrees to seek recourse exclusively from and against the engaged professional. At all times, the engaged licensed professional[s] (i.e. attorney, accountant, insurance agent, etc.), and **<u>not</u>** Registrant, shall be responsible for the quality and competency of the services provided.  **<u>Clients are responsible for promptly notifying the Registrant if there is ever any change in their financial situation or investment objectives so that the Registrant can review, and if necessary, revise its previous recommendations or services.</u>**

**<u>Independent Managers</u>**. Registrant may allocate a portion of a client's investment assets among unaffiliated independent investment managers in accordance with the client's designated investment objectives. In such situations, the Independent Managers shall have day-to-day responsibility for the active discretionary management of the allocated assets. Registrant shall continue to render investment supervisory services to the client relative to the ongoing monitoring and review of account performance, asset allocation and client investment objectives. Factors which Registrant shall consider in recommending Independent Managers include the client's designated investment objectives, and the manager's management style, performance, reputation, financial strength, reporting, pricing, and research. **<u>Please Note</u>**: The investment management fee charged by any Independent Managers is separate from, and in addition to, Registrant's advisory fee as set forth in the fee schedule at Item 5 below.

**<u>Unaffiliated Private Investment Funds</u>**. Registrant may also provide investment advice regarding unaffiliated private investment funds. Registrant, on a non-discretionary basis, may recommend that certain qualified clients consider an investment in unaffiliated private investment funds. Registrant's role relative to the private investment funds shall be limited to its initial and ongoing due diligence and investment monitoring services. If a client determines to become a private fund investor, the amount of assets invested in the fund(s) shall be included as part of "assets under management" for purposes of Registrant calculating its investment advisory fee. <u>Registrant's clients are under absolutely no obligation to consider or make an investment in a private investment fund(s)</u>. **<u>Please Note:</u>** Private investment funds generally involve various risk factors, including, but not limited to, potential for complete loss of principal, liquidity constraints and lack of transparency, a complete discussion of which is set forth in each fund's offering documents, which will be provided to each client for review and consideration. Unlike liquid investments that a client may own, private investment funds

5

do not provide daily liquidity or pricing. Each prospective client investor will be required to complete a Subscription Agreement, pursuant to which the client shall establish that he/she is qualified for investment in the fund, and acknowledges and accepts the various risk factors that are associated with such an investment. **Please Also Note: Valuation**. In the event that Registrant references private investment funds owned by the client on any supplemental account reports prepared by Registrant, the value(s) for all private investment funds owned by the client shall reflect the most recent valuation provided by the fund sponsor.  However, if subsequent to purchase, the fund has not provided an updated valuation, the valuation shall reflect the initial purchase price.  If subsequent to purchase, the fund provides an updated valuation, then the statement will reflect that updated value. The updated value will continue to be reflected on the report until the fund provides a further updated value.  As result of the valuation process, if the valuation reflects initial purchase price or an updated value subsequent to purchase price, the current value(s) of an investor's fund holding(s) could be significantly more or less than the value reflected on the report. Unless otherwise indicated, the client's advisory fee shall be based upon the value reflected on the report. **Conflict of Interest**: Registrant may recommend that a client consider investing in a private fund that is associated with another Registrant client. Such a recommendation creates a conflict of interest because the Registrant has an economic incentive to make such recommendation (i.e., as result of the allocation, Registrant will assist an existing individual client from whom it currently earns, and anticipates it will continue to earn, investment advisory fees). If, and when, the Registrant makes such a recommendation, it shall disclose the specific conflict, in writing, at that time. **Again, no client is obligated to invest in any private investment fund**.

**Interval Mutual Funds**. **Please Note: Fund Liquidity Constraints**. Registrant may utilize mutual funds and/or exchange traded funds that provide for limited liquidity, generally on a quarterly basis. Thus, if we determined that the fund was no longer performing or if you ever determined to transfer your account, the Fund could not be sold or transferred immediately. Rather, sale or transfer would need to await the quarterly permitted sale date, or longer. Moreover, the eventual net asset value for the Fund could be substantially different (positive or negative) than the Fund value on the date that the sale was requested. There can be no assurance that any such strategy will prove profitable or successful. In light of these enhanced risks/rewards, a client may direct Registrant, in writing, not to employ any or all such strategies for the client's account.

**Wrap/Separate Managed Account/UMA program engagements**.  In the event that Registrant is engaged to provide investment advisory services as part of an unaffiliated wrap-fee program, Registrant will be unable to negotiate commissions and/or transaction costs. Under a wrap program, the wrap program sponsor arranges for the investor participant to receive investment advisory services, the execution of securities brokerage transactions, custody and reporting services for a single specified fee. <u>Participation in a wrap program may cost the participant more or less than purchasing such services separately</u>. If the program is offered on a non-wrap basis, the program sponsor will determine the broker-dealer though which transactions must be effected, and the amount of transaction fees and/or commissions to be charged to the participant investor accounts.

**Custodian Charges-Additional Fees**: As discussed below at Item 5 and 12 below, when requested to recommend a broker-dealer/custodian for client accounts, Registrant generally recommends that Charles Schwab and Co., Inc. (*"Charles Schwab")*, Fidelity Investments *("Fidelity")* and/or TD Ameritrade Inc. (*"TD Ameritrade")*  serve as the broker-dealer/custodian for client investment management assets. Broker-dealers such as *Schwab, Fidelity,* and *TD Ameritrade* charge transaction fees for effecting securities transactions. In addition to Registrant's investment advisory fee referenced in Item 5 below, the client will also incur transaction fees

to purchase securities for the client's account (i.e., mutual funds, exchange traded funds, individual equity and fixed income transactions, etc.). **ANY QUESTIONS: Registrant's Chief Compliance Officer, Greg Bruce, remains available to address any questions that a client or prospective client may have regarding the above.**

**Tradeaway/Prime Broker Fees**. Relative to its discretionary investment management services, when beneficial to the client, individual equity and/or fixed income transactions may be effected through broker-dealers other than the account custodian, in which event, the client generally will incur both the fee (commission, mark-up/mark-down) charged by the executing broker-dealer and a separate "tradeaway" and/or prime broker fee charged by the account custodian.

**Use of Mutual Funds and ETFs**. While the Registrant may recommend allocating investment assets to mutual funds that are not available directly to the public, the Registrant may also recommend that clients allocate investment assets to publicly available mutual funds and exchange traded funds that the client could obtain without engaging Registrant as an investment adviser. However, if a client or prospective client determines to allocate investment assets to publicly available mutual funds or exchange traded funds without engaging Registrant as an investment adviser, the client or prospective client would not receive the benefit of Registrant's initial and ongoing investment management services. **Please Note**: In addition to Registrant's investment advisory fee described below, and transaction and/or custodial fees discussed below, clients will also incur, relative to all mutual fund and exchange traded fund purchases, charges imposed at the fund level (e.g. management fees and other fund expenses). **ANY QUESTIONS: Registrant's Chief Compliance Officer, Greg Bruce, remains available to address any questions that a client or prospective client may have regarding the above.**

**Investment Risk**. Different types of investments involve varying degrees of risk, and it should not be assumed that future performance of any specific investment or investment strategy (including the investments and/or investment strategies recommended or undertaken by Registrant) will be profitable or equal any specific performance level(s).

**Client Obligations**. The Registrant will not be required to verify any information received from the client or from the client's other professionals and is expressly authorized to rely on the information in its possession. Clients are responsible for promptly notifying the Registrant if there is ever any change in their financial situation or investment objectives so that the Registrant can review, and if necessary, revise its previous recommendations or services.

C.  The Registrant shall provide investment advisory services specific to the needs of each client. Prior to providing investment advisory services, an investment adviser representative will ascertain each client's investment objective(s). Thereafter, the Registrant shall allocate and/or recommend that the client allocate investment assets consistent with the designated investment objective(s). The client may, at any time, impose reasonable restrictions, in writing, on the Registrant's services.

D.  Registrant does not offer a wrap fee program for its investment advisory services. However, Registrant is a participating investment adviser in certain unaffiliated wrap and managed account fee programs. There is no significant difference between how the Registrant manages wrap fee accounts and non-wrap fee accounts. **Please Note:** When managing a client's account on a wrap fee basis, the Registrant shall receive as payment for its investment

advisory services, the balance of the wrap fee after all other costs incorporated into the wrap fee have been deducted.

**E.**  As of December 31, 2018, the Registrant had $3,769,040,423 in assets under management on a discretionary basis and $165,658,897 assets under management on a non-discretionary basis.

## Item 5          Fees and Compensation

A. Clients can engage the Registrant to provide investment advisory services and financial planning as part of a single engagement or may separately engage the Registrant for financial planning and consulting services. The details for each of these engagements are described in detail below.

**INVESTMENT ADVISORY SERVICES**

The client can engage the Registrant to provide discretionary investment advisory services and financial planning services on a *fee-only* basis. The Registrant's annual investment advisory fee is based upon a percentage (%) of the market value of the assets placed under the Registrant's management as follows:

| Market Value of Portfolio | % of Assets |
|---|---|
| **Equity and Balanced Accounts Program** | |
| On the First $3,000,000 | 1.00% Annual Fee |
| On the Next $2,000,000 | 0.75% |
| Amount over $5,000,000 | 0.50% |
| | |
| **Fixed Income Accounts Program** | |
| On the First $2,000,000 | 0.50% Annual Fee |
| On the Next $3,000,000 | 0.40% |
| On the Next $5,000,000 | 0.30% |
| Amount over $10,000,000 | 0.25% |
| | |
| **Fixed Income Short Duration Accounts Program** | |
| On the First $5,000,000 | 0.25% Annual Fee |
| On the Next $10,000,000 | 0.20% |
| On the Next $15,000,000 | 0.15% |
| On the Next $25,000,000 | 0.10% |
| Amount Over $55,000,000 | 0.05% |
| | |
| **High Quality Core Individual Accounts Program** | |
| On the First $3,000,000 | 1.00% Annual Fee |
| On the Next $2,000,000 | 0.90% |
| On the Next $5,000,000 | 0.80% |

Although the Registrant will allocate client assets consistent with the client's designated investment objective, the fact that the Registrant earns a higher fee for management of equity and balanced account strategies, presents a **_conflict of interest_** since the Registrant has an economic incentive to allocate more assets to equity securities to earn more compensation. **ANY QUESTIONS**: The Registrant's Chief Compliance Officer, Greg Bruce, remains available to address any questions regarding this conflict of interest

The Registrant's investment advisory fee is negotiable at Registrant's discretion, depending upon objective and subjective factors including but not limited to: the amount of assets to be managed; portfolio composition; the scope and complexity of the engagement; the anticipated number of meetings and servicing needs; related accounts; future earning capacity; anticipated future additional assets; the professional(s) rendering the service(s); prior relationships with the Registrant and/or its representatives, and negotiations with the client.

9

In limited circumstances, the Registrant may agree to a flat annual fee. As a result of these factors, similarly situated clients could pay different fees, the services to be provided by the Registrant to any particular client could be available from other advisers at lower fees, and certain clients may have fees different than those specifically set forth above.

**Margin Accounts: Risks/Conflict of Interest.** Registrant does not recommend the use of margin. A *margin account* is a brokerage *account* that allows investors to borrow money to buy securities. By using borrowed funds, the customer is employing leverage that will magnify both account gains and losses. The broker charges the investor interest for the right to borrow money and uses the securities as collateral. Should a client determine to use margin, Registrant will include the entire market value of the margined assets when computing its advisory fee. Accordingly, Registrant's fee shall be based upon a higher margined account value, resulting in Registrant earning a correspondingly higher advisory fee. As a result, the potential of conflict of interest arises since Registrant may have an economic disincentive to recommend that the client terminate the use of margin. **ANY QUESTIONS**: **Our Chief Compliance Officer, Greg Bruce, remains available to address any questions that a client or prospective client may have regarding the use of margin.**

### FINANCIAL PLANNING AND CONSULTING SERVICES (STAND-ALONE)

To the extent requested by a client, the Registrant *may* provide financial planning and/or consulting services (including investment and non-investment related matters, such as estate, tax and insurance planning, etc.) on a stand-alone separate hourly rate basis. Registrant's planning and consulting fees are negotiable, but generally range from negotiable up to $350 on an hourly rate basis, depending upon the scope and complexity of the service(s) required and the professional(s) rendering the service(s).

**Sub-Advised Mutual Fund(s).** The Registrant has been engaged as a sub-adviser to investment advisers of registered investment companies. The Registrant will receive from the mutual fund's adviser a percentage-based fee based on the Average Daily Managed Assets of each fund's assets allocated to the Registrant. The Registrant's sub-advisory fee generally ranges between 0.10% and 0.30% of the Average Daily Managed Assets. Please see the disclosure in Item 4 above titled "**SUB-ADVISED MUTUAL FUNDS AND POTENTIAL CONFLICT OF INTEREST**" for a complete description of this relationship and the conflicts of interests it presents.

B. Clients may elect to have the Registrant's advisory fees deducted from their custodial account. Both Registrant's *Investment Advisory Agreement* and the custodial/ clearing agreement may authorize the custodian to debit the account for the amount of the Registrant's investment advisory fee and to directly remit that management fee to the Registrant in compliance with regulatory procedures. In the limited event that the Registrant bills the client directly, payment is due upon receipt of the Registrant's invoice. The Registrant shall deduct fees and/or bill clients quarterly in advance, based upon the market value of the assets on the last business day of the previous quarter. To the extent there are significant inflows or outflows of client assets ($250,000 net or more) during the previous quarter the advisory fee may also include a prorated fee adjustment based on the date and value of the asset flows that may increase or decrease the quarterly advisory fee, accordingly.

C. As discussed below, unless the client directs otherwise or an individual client's circumstances require, the Registrant shall generally recommend that *Charles Schwab, Fidelity* and/or *TD Ameritrade* serve as the broker-dealer/custodian for client investment management assets. Broker-dealers such as *Charles Schwab, Fidelity* and *TD Ameritrade* charge brokerage

commissions and transaction fees for effecting certain securities transactions (i.e. transaction fees are charged for certain mutual funds, commissions are charged for individual equity transactions, and mark-ups and mark-downs are charged for fixed income transactions). In addition, client accounts may invest in mutual funds (including money market funds) and ETFs that have various internal fees and expenses (i.e. management fees), which are paid by these funds but ultimately borne by clients as a fund shareholder.  These internal fees and expenses are in addition to the fees charged by the Registrant.

D.   Registrant's annual investment advisory fee shall be prorated and paid quarterly, in advance, based upon the market value of the assets on the last business day of the previous quarter. To the extent there are significant inflows or outflows of client assets ($250,000 net or more) during the previous quarter the advisory fee may also include a prorated fee adjustment based on the date and value of the asset flows that may increase or decrease the quarterly advisory fee, accordingly. The Registrant generally requires a minimum asset base of $500,000.00 for investment advisory services.  The Registrant, in its sole discretion, may charge a lower investment management fee or waive or reduce its minimum asset requirement based upon certain criteria (i.e. anticipated future earning capacity, anticipated future additional assets, dollar amount of assets to be managed, related accounts, account composition, negotiations with client, etc.). The *Investment Advisory Agreement* between the Registrant and the client will continue in effect until terminated by either party by written notice in accordance with the terms of the *Investment Advisory Agreement*.  Upon termination, the Registrant shall refund the pro-rated portion of the advanced advisory fee paid based upon the number of days remaining in the billing quarter.

E.    When beneficial to the client, individual fixed-income and/or equity transactions may be effected through broker-dealers with whom Registrant and/or the client have entered into arrangements for prime brokerage clearing services. This includes effecting certain client transactions through other SEC registered and FINRA member broker-dealers (in which event, the client generally will incur both the transaction fee charged by the executing broker-dealer and a "tradeaway" fee charged by *Charles Schwab, Fidelity*, or *TD Ameritrade*).

F.   Neither the Registrant, nor its representatives accept compensation from the sale of securities or other investment products.

## Item 6        Performance-Based Fees and Side-by-Side Management

If, and when, requested by a client, the Registrant *may* consider entering into a  performance-based fee arrangement with the client—that is, fees based on a share of capital gains or capital appreciation of the assets of a client.  The Registrant will only consider a performance-fee arrangement for a client who at the time of entering into an engagement with the Registrant has at least $1,000,000 in portfolio assets managed by the Registrant, or who together with their spouse have a net worth of at least $2,100,000 excluding their principal residence. Performance-based fee arrangements create an economic incentive for Registrant to take additional risks in the management of a client portfolio that may be in conflict with the client's current investment objectives and tolerance for risk.   Unless expressly requested to the contrary, we would generally manage a performance-based fee account in the same manner as our non-performance based accounts.

**Item 7**          **Types of Clients**

The Registrant's clients shall generally include individuals, pension and profit sharing plans, business entities, trusts, estates and charitable organizations. In addition, the Registrant serves as a sub-adviser to an investment adviser to a registered investment company.  The Registrant generally requires a minimum asset base of $500,000.00 for investment advisory services. Registrant, in its sole discretion, may charge a lesser investment advisory fee, waive its minimum asset base, and/or charge a flat fee based upon certain criteria (i.e. anticipated future earning capacity, anticipated future additional assets, dollar amount of assets to be managed, related accounts, account composition, competition, negotiations with client, etc.). **Please Note**: As result of the above, similarly situated clients could pay different fees. In addition, similar advisory services may be available from other investment advisers for similar or lower fees. **ANY QUESTIONS**: Registrant's Chief Compliance Officer, Greg Bruce, remains available to address any questions that a client or prospective client may have regarding advisory fees.

**Item 8**          **Methods of Analysis, Investment Strategies and Risk of Loss**

A.  Method of Analysis

The Registrant may utilize, but are not limited to, the following methods of security analysis:

- <u>Charting</u> - (analysis performed using patterns to identify current trends and trend reversals to forecast the direction of prices)
- <u>Fundamental</u> - (analysis performed on historical and present data, with the goal of making financial forecasts of potential market valuation)
- <u>Technical</u> – (analysis performed on historical and present data, focusing on price and trade volume, to forecast the direction of prices)
- <u>Cyclical</u> – (analysis performed on historical relationships between price and market trends, to forecast the direction of prices)

Every method of analysis has its own inherent risks. To perform an accurate market analysis the Registrant must have access to current/new market information. The Registrant has no control over the dissemination rate of market information; therefore, unbeknownst to the Registrant, certain analyses may be compiled with outdated market information, limiting the value of the Registrant's analysis. Furthermore, an accurate market analysis can only produce a forecast of the direction of market values. There can be no assurances that a forecasted change in market value will materialize into actionable and/or profitable investment opportunities.

B.  Investment Strategies.

The Registrant's investment strategy is primarily focused on achieving long term results that have favorable risk to reward characteristics.

The Registrant's individual **asset allocation strategies** and **investment strategies** use a flexible open architecture that generally employs multi-assets strategies that utilize a variety of asset classes and/or investment styles and employ a variety of techniques and investment

vehicles, including equities(stocks), fixed income securities, mutual funds, cash, closed-end funds, alternative investments and exchange traded funds (ETFs) on a discretionary basis and Independent Managers and private funds on a non-discretionary basis, in accordance with the clients designated investment objectives. (See Independent Managers discussion above in Item 4).

The Registrant's **asset allocation strategies** primarily allocate client investment assets among various individual equities(stocks), fixed income securities, mutual funds, cash, closed-end funds, alternative investments and exchange traded funds (ETFs) on a discretionary basis and Independent Managers and private funds on a non-discretionary basis, in accordance with the clients designated investment objectives.   The client's designated investment objective determines the allocation to each investment vehicle.

In contrast to the Registrant's **asset allocation strategies**, the **investment strategies** are designed to achieve certain strategic investment objectives and generally employ a more concentrated number of asset classes and investment vehicles and may not be as diversified across multiple assets classes as the **asset allocation strategies**.  An **investment strategy** may be used as a component of an **asset allocation strategy** depending on the client's designated investment objective.

The Registrant may employ a tactical asset allocation process, overweighting and underweighting various asset classes relative to their strategic asset allocation target based on the outlook for each asset class over the next 12 to 18 months.  This tactical asset allocation process is based on valuation philosophy and framework, whereby asset class is ranked based on its relative degree of attractiveness (or unattractiveness) in terms of its valuation vis-à-vis its historical average valuation over time.

In addition to the fundamental investment strategies discussed above, the Registrant may also recommend options transactions, a strategy that has a high level of inherent risk. (*See* discussion below in Risk of Loss). If an option strategy is recommended, it will generally be delivered on a limited basis via a third party manager.

When implementing investment advice given to clients the Registrant may employ methods that  include long term purchases (securities held at least a year) and short term purchases (securities sold within a year).  Short term purchases may be deemed necessary due to changes in security valuations, market conditions or meet the cash needs of the client.

C.   Risk of Loss

The Registrants method of analysis and investment strategies do not present any significant or unusual risks, however, every investment strategy has its own inherent risks and limitations. The risks involved for different client accounts will vary based in the client's investment strategy and the type of securities or other investment held in the client's account.   The following are descriptions of various primary risks related to the investment strategies used by the Registrant.   Not all possible risks are described below.

- Management Risks. There is risk that the investment techniques and risk analysis applied by the Registrant may not produce the desired results.  There is no guarantee that a client's investment objective will be achieved.
- Equity Market Risk. Equity(stock) market risks, include but are not limited to,  the risks that stock values will decline due to daily fluctuations in the markets,  and that stock values will decline over longer periods of time  (e.g.

13

bear markets) due to general market declines of stock prices of all companies regardless of an individual security's prospects.

- Fixed Income Risks. Fixed income investments are generally less volatile than equities but are subject to risks.  The risks include, without limitation, interest rate risks (risks that changes in the interest rates will devalue the investment), credit risks (risks of default by borrowers), or maturity risk (risk that bonds or notes will change value from the time of issuance to maturity).

- Foreign Security Risks. Risks for investing in foreign investments include that they may not be subject to uniform audit, financial reporting or disclosure standards, practices or requirements comparable to those companies in the U.S. Foreign investments are also subject to foreign withholding taxes and the risk of adverse changes in investment or exchange regulations.  Finally, foreign investments may involve currency risk, which is the risk that the value of the foreign security will decrease due to changes in the relative value of the U.S. dollar and security's underlying foreign currency.

- Long Term Purchases/Short Term Purchases Risk.  Long term investment strategies require a longer investment period to allow for the strategy to potentially develop.  Short term investment strategies require a shorter investment time period to potentially develop but, as result of more frequent trading may incur higher transactional costs and not be as tax efficient when compared to a longer term strategy.

- Options Risk. The use of options transactions as an investment strategy involves a high level of inherent risk. Option transactions establish a contract between two parties concerning the buying or selling of an asset at a predetermined price during a specific period of time. During the term of the option contract, the buyer of the option gains the right to demand fulfillment by the seller. Fulfillment may take the form of either selling or purchasing a security depending upon the nature of the option contract. Generally, the purchase/sell or the recommendation to purchase/sell an option contract by the Registrant shall be with the intent of offsetting/"hedging" a potential market risk in a client's portfolio. **Please Note**: Although the intent of the options-related transactions that may be implemented by the Registrant is to hedge against principal risk, certain of the options-related strategies (i.e. straddles, short positions, etc.), may, in and of themselves, produce principal volatility and/or risk. Thus, a client must be willing to accept these enhanced volatility and principal risks associated with such strategies. In light of these enhanced risks, client may direct the Registrant, in writing, not to employ any or all such strategies for their accounts

**Please Note: Investment Risk**. Different types of investments involve varying degrees of risk, and it should not be assumed that future performance of any specific investment or investment strategy (including the investments and/or investment strategies recommended or undertaken by the Registrant) will be profitable or equal any specific performance level(s).

## Item 9          Disciplinary Information

The Registrant has not been the subject of any disciplinary actions.

14

## Item 10        Other Financial Industry Activities and Affiliations

A.  Neither the Registrant, nor its representatives, are registered or have an application pending to register, as a broker-dealer or a registered representative of a broker-dealer.

B.  Neither the Registrant, nor its representatives, are registered or have an application pending to register, as a futures commission merchant, commodity pool operator, a commodity trading advisor, or a representative of the foregoing.

C.

1.  **Affiliated Private Investment Fund**. The Registrant is the investment adviser to The Keller Late Stage VC Fund, LP ("*affiliated private fund*"). The affiliated private fund is no longer open for investment, and is in the ongoing process of liquidating and winding down its operations.

2.  **Publicly Traded Holding Company.** The Registrant is wholly-owned by First Foundation Inc. (FFI). FFI's common stock is publicly traded on the NASDAQ Global Market under the symbol "FFWM". Since FFI is a publicly traded company, the ownership of that entity changes on a regular basis. In addition, FFI, through its Board of Directors have approved stock option plans to grant options to employees and directors of FFI. Certain members of the board of directors and executives of FFI and the Registrant own or have options to own stock in FFI. The Registrant will not purchase FFI stock or options for its clients, unless expressly requested to do so by a client. To the extent that a client wishes to own FFI stock or options, the Registrant generally recommends that FFI stock or options be held in an account not managed or supervised by the Registrant. The Registrant will not follow or track the performance of FFI and will not provide ongoing monitoring or review of FFI stock or options held in a client's account. Upon your request, the Registrant will consult with you regarding the disposition of FFI stock or options on an annual basis (unless you advise us, in writing, that you desire more frequent consultation). However, you will remain responsible for all decisions and consequences regarding FFI stock or options, including decisions regarding the retention or sale of FFI stock or options, or a portion thereof, regardless of whether FFI stock or options are reflected on any supplemental account reports prepared by the Registrant. The Registrant will have no proxy voting responsibility with respect to FFI stock. The Registrant will not take any action with respect to FFI stock or options unless and until specifically requested by you in writing (email will suffice). The Registrant is not in the business of accepting client orders for the purchase or sale of securities. Accordingly, upon receipt of any such request, the Registrant will endeavor, but cannot guarantee, that any transaction will be effected on the day received or at any specific time or price. The market value of any FFI stock or options will not be included in assets under management for purpose of determining the Registrant's investment advisory fee(s).

3.  **Affiliated Bank**. The Registrant is a wholly owned subsidiary of First Foundation Inc. ("FFP"), which is a holding company that also owns First Foundation Bank ("FFB"). FFI and/or its Principals and representatives provide two separate and distinct services: (1) investment advisory services as an SEC registered investment adviser through the Registrant, and (2) banking, trust and philanthropic and wealth management consulting services through FFB. Clients may engage the Registrant or its representatives for either or both services. Clients seeking banking, trust or philanthropic and wealth management consulting services will be referred to a FFB associate. However, no investment advisory client is required to engage the Registrant or its representatives for banking services, and

15

no banking client is required to engage the Registrant or its representatives for investment advisory services.

If the Registrant or its representatives are engaged by a client for banking services, the banking service shall not include any investment advisory services. Clients that receive cash proceeds as a result of any banking transaction are not obligated in any manner to engage the Registrant or its representative in its separate role as an investment adviser to invest those proceeds on their behalf. If the Registrant is engaged for investment advisory services, a copy of the Registrant's Brochure shall be provided discussing the scope of its investment advisory services and fees charged, and stating that any corresponding investment advisory engagement of the Registrant shall be subject to the terms and conditions of a separate written agreement. The Principals and/or representatives of the Registrant may be shareholders of FFI thereby creating a **conflict of interest** if banking, loan, trust or consulting services through FFB incur less favorable banking or loan costs/terms than the account would have otherwise incurred had banking, loan, trust or consulting services been engaged through alternative service providers.

As indicated above, the Registrant is affiliated with FFB. Financial instruments such as Money Market Funds or Certificates of Deposit offered by FFB may be recommended and utilized by the Registrant in the management of advisory accounts. **Please Note**: This arrangement creates a **conflict of interest**. In light of the conflict of interest, a client may direct the Registrant, in writing, not to purchase FFB investments/products for his/her/its accounts.

In the event that a client requires a banking relationship (i.e., a bank account, loan, trust services, consulting services, etc.), the Registrant's employees may refer the client to FFB, in return for which referral the employee may be compensated (generally, employee referrals will be considered when determining the employee's quarterly and/or annual bonus). This referral arrangement creates a **conflict of interest**. In light of the conflict of interest, no client is under any obligation to use FFB's services, and the Registrant shall work with any bank of the client's choosing.

In the event that a client of the Registrant and/or customer of FFB requires insurance-related services, FFB may refer the client to First Foundation Insurance Services, a licensed insurance agency owned by FFB, or an unaffiliated licensed insurance agency, as a result of which First Foundation Insurance Services (the Registrant's affiliate) shall generally receive a commission, thereby creating a **conflict of interest**. In addition, the referring Registrant employee may indirectly be compensated (generally, such employee referrals will be considered when determining the employee's quarterly and/or annual bonus). In light of the **conflict of interest**, no client is under any obligation to use First Foundation Insurance Services, and the Registrant shall work with any insurance agent of the client's choosing.

**FFB Referrals**: In addition to referrals from the Registrant's employees to FFB, FFB employees may refer prospective clients to the Registrant, in return for which referral the FFB employee may be compensated either directly by the Registrant and/or such referrals will be considered by FFB when determining the employee's quarterly and/or annual bonus. Given the commonality of ownership and control of the Registrant and FFB, FFB is an affiliated solicitor as defined under Rule 206(4)-3 of the Investment Advisers Act of 1940, and, as such the FFB employee is not required to present a copy of the Registrant's Brochure, nor a separate disclosure statement indicating that he/she may receive referral

compensation, at the time of the introduction to the Registrant.  See disclosure at Item 14.B below.

**The Registrant's Chief Compliance Officer, Greg Bruce, shall remain available to address any questions that a client or prospective client may have regarding the above conflicts of interest.**

D.  The Registrant does not receive, directly or indirectly, compensation from investment managers that it recommends or selects for its clients.

## Item 11        Code of Ethics, Participation or Interest in Client Transactions and Personal Trading

A.  The Registrant maintains an investment policy relative to personal securities transactions.  This investment policy is part of Registrant's overall Code of Ethics, which serves to establish a standard of business conduct for all of Registrant's Representatives that is based upon fundamental principles of openness, integrity, honesty and trust, a copy of which is available upon request.

In accordance with Section 204A of the Investment Advisers Act of 1940, the Registrant also maintains and enforces written policies reasonably designed to prevent the misuse of material non-public information by the Registrant or any person associated with the Registrant.

B.  As stated more fully in Item 10, the Registrant is wholly-owned by First Foundation Inc. (FFI).  FFI, through its Board of Directors have approved stock option plans to grant options to certain of the Registrant's Principals, affiliates, or related persons.  Certain members of the board of directors and executives of FFI and the Registrant own or have options to own stock in FFI.  The Registrant does not generally recommend to clients, or buy or sell for client accounts, FFI stock or options, except upon explicit request.  However, these transactions present a conflict of interest for certain of the Registrant's related persons, including FFI's directors, officers, and employees who all generally have an aligned incentive for higher FFI stock prices.  To address this conflict, as discussed more fully in Item 10, the Registrant will not purchase FFI stock or options for a client account, unless expressly requested by a client.  **The Registrant's Chief Compliance Officer, Greg Bruce, remains available to address any questions regarding this conflict of interest**.

C.  The Registrant and/or representatives of the Registrant *may* buy or sell securities that are also recommended to clients. This practice creates a situation where the Registrant and representatives of the Registrant are in a position to materially benefit from the sale or purchase of those securities. Therefore, this situation creates a conflict of interest. Practices such as "scalping" (i.e., a practice whereby the owner of shares of a security recommends that security for investment and then immediately sells it at a profit upon the rise in the market price which follows the recommendation) could take place if the Registrant did not have adequate policies in place to detect such activities. In addition, this requirement can help detect insider trading, "front-running" (i.e., personal trades executed prior to those of the Registrant's clients) and other potentially abusive practices.

The Registrant has a personal securities transaction policy in place to monitor the personal securities transactions and securities holdings of each of the Registrant's "Access Persons". The Registrant's securities transaction policy requires that an Access Person of the Registrant must provide the Chief Compliance Officer or his/her designee with a written report of their

current securities holdings within ten (10) days after becoming an Access Person. Additionally, each Access Person must provide the Chief Compliance Officer or his/her designee with a written report of the Access Person's current securities holdings at least once each twelve (12) month period thereafter on a date the Registrant selects.

D.   The Registrant and/or representatives of the Registrant *may* buy or sell securities, at or around the same time as those securities are recommended to clients. This practice creates a situation where the Registrant and/or representatives of the Registrant are in a position to materially benefit from the sale or purchase of those securities. Therefore, this situation creates a conflict of interest. As indicated above in Item 11 C, the Registrant has a personal securities transaction policy in place to monitor the personal securities transaction and securities holdings of each of Registrant's Access Persons.

## Item 12         Brokerage Practices

In the event that the client requests that Registrant recommend a broker-dealer/custodian for execution and/or custodial services, Registrant generally recommends that investment advisory accounts be maintained at *Charles Schwab, TD Ameritrade* and/or *Fidelity*. Prior to engaging Registrant to provide investment management services, the client will be required to enter into a formal *Investment Advisory Agreement* with Registrant setting forth the terms and conditions under which Registrant shall advise on the client's assets, and a separate custodial/clearing agreement with each designated broker-dealer/custodian.

Factors that Registrant considers in recommending *Charles Schwab, TD Ameritrade* and/or *Fidelity* (or any other broker-dealer/custodian to clients) include historical relationship with Registrant, financial strength, reputation, technology, execution capabilities, pricing, research, and service. Although the commissions and/or transaction fees paid by Registrant' clients shall comply with Registrant' duty to seek best execution, a client may pay a transaction fee that is higher than another qualified broker-dealer might charge to effect the same transaction where Registrant determines, in good faith, that the transaction fee is reasonable. In seeking best execution, the determinative factor is not the lowest possible cost, but whether the transaction represents the best qualitative execution, taking into consideration the full range of a broker-dealer's services, including the value of research provided, execution capability, commission rates, and responsiveness. Accordingly, although Registrant will seek competitive rates, it may not necessarily obtain the lowest possible commission rates for client account transactions. The brokerage commissions or transaction fees charged by the designated broker-dealer/custodian are exclusive of, and in addition to, Registrant's investment advisory fee.

**Non-Soft Dollar Research and Benefits**: Registrant receives from *Charles Schwab, TD Ameritrade* and/or *Fidelity* (and potentially other broker-dealers, custodians, investment platforms, unaffiliated investment managers, vendors, or fund sponsors) free or discounted support services and products.  Certain of these products and services assist the Registrant to better monitor and service client accounts maintained at these institutions. The support services that Registrant obtains can include investment-related research; pricing information and market data; compliance or practice management-related publications; discounted or free attendance at conferences, educational or social events; or other products used by Registrant to further its investment management business operations.

Certain of the support services or products received may assist the Registrant in managing and administering client accounts. Others do not directly provide this assistance, but rather assist the Registrant to manage and further develop its business enterprise.

*Charles Schwab* has agreed to pay up to $5,000 the Registrant would have otherwise incurred for technology and research.  This payment is not contingent upon the Registrant committing any specific amount of business to *Charles Schwab* in trading commissions or assets in custody but it does create a **conflict of interest**.  This creates an incentive for the Registrant to recommend *Charles Schwab* in order for the Registrant to receive *Charles Schwab's* payment for services for which it would otherwise have to pay.

Registrant's clients do not pay more for investment transactions effected or assets maintained at *Charles Schwab, TD Ameritrade* and/or *Fidelity* or other broker-dealers and custodians because of these arrangements. There is no corresponding commitment made by the Registrant to any broker-dealer or custodian or any other entity to invest any specific amount or percentage of client assets in any specific mutual funds, securities or other investment products because of the above arrangements.

**Registrant's Chief Compliance Officer, Greg Bruce, remains available to address any questions that a client or prospective client may have regarding the above arrangements and any corresponding perceived conflict of interest such arrangements may create.**

### Soft Dollar Arrangements

In return for effecting securities transactions through a designated broker-dealer/custodian, Registrant qualifies to receive through its relationship with Investment Technology Group, Inc. certain investment research products or services which assist the Registrant in its investment decision making process for the client pursuant to Section 28(e) of the Securities Exchange Act of 1934 (generally referred to as a "soft-dollar" arrangement). Investment research products or services received by Registrant may include, but are not limited to, analyses pertaining to specific securities, companies or sectors; market, financial and economic studies and forecasts; financial publications, portfolio management systems, and statistical and pricing services. Although the commissions paid by Registrant's clients shall comply with the Registrant's duty to seek best execution, a client may pay a commission that is higher than another qualified broker-dealer might charge to effect the same transaction where the Registrant determines, in good faith, that the commission is reasonable in relation to the value of the brokerage and research services received. In seeking best execution, the determinative factor is not the lowest possible cost, but whether the transaction represents the best qualitative execution, taking into consideration the full range of broker-dealer services, including the value of research provided, execution capability, commission rates, and responsiveness. Accordingly, although Registrant will seek competitive rates, it may not necessarily obtain the lowest possible commission rates for client account transactions. Although the investment research products or services that may be obtained by Registrant will generally be used to service all of Registrant's clients, a brokerage commission paid by a specific client may be used to pay for research that is not used in managing that specific client's account. With respect to investment research products or services obtained by the Registrant that have a mixed use of both a research and non-research (i.e., administrative, etc.) function, Registrant shall make a reasonable allocation of the cost of the product or service according to its use - the percentage of the product or service that provides assistance to the Registrant's investment decision-making process will be paid for with soft dollars while that portion which provides administrative or other non-research assistance will be paid for by the Registrant with hard dollars. The brokerage commissions or transaction fees charged by the designated broker-dealer/custodian are exclusive of, and in addition to, Registrant's investment management fee.

**The Registrant's Chief Compliance Officer, Greg Bruce, remains available to address any questions that a client or prospective may have regarding the above conflict of interest**.

TD Ameritrade Institutional

The Registrant participates in the institutional advisor program (the "*Program*") offered by TD Ameritrade Institutional. TD Ameritrade Institutional is a division of TD Ameritrade Inc., member FINRA/SIPC ("*TD Ameritrade*"), an unaffiliated SEC-registered broker-dealer and FINRA member. *TD Ameritrade* offers to independent investment advisers services which include custody of securities, trade execution, clearance and settlement of transactions. Registrant receives some benefits from *TD Ameritrade* through its participation in the *Program*. (Please see the disclosure under Item 14 below.)

**The Registrant's Chief Compliance Officer, Greg Bruce, remains available to address any questions that a client or prospective may have regarding the above arrangement and any corresponding conflict of interest such arrangement may create**.

**Directed Brokerage.** Registrant recommends that its clients utilize the brokerage and custodial services provided by *Charles Schwab, TD Ameritrade* and/or *Fidelity*. Registrant generally does not accept directed brokerage arrangements (when a client requires that account transactions be effected through a specific broker-dealer). In such client directed arrangements, the client will negotiate terms and arrangements for their account with that broker-dealer, and Registrant will not seek better execution services or prices from other broker-dealers or be able to "batch" the client's transactions for execution through other broker-dealers with orders for other accounts managed by Registrant As a result, a client may pay higher commissions or other transaction costs or greater spreads, or receive less favorable net prices, on transactions for the account than would otherwise be the case. **Please Note**: In the event that the client directs Registrant to effect securities transactions for the client's accounts through a specific broker-dealer, the client correspondingly acknowledges that such direction may cause the accounts to incur higher commissions or transaction costs than the accounts would otherwise incur had the client determined to effect account transactions through alternative clearing arrangements that may be available through Registrant. Higher transaction costs adversely impact account performance. **Please Also Note**: Transactions for directed accounts will generally be executed following the execution of portfolio transactions for non-directed accounts. **The Registrant's Chief Compliance Officer, Greg Bruce, remains available to address any questions that a client or prospective client may have regarding the above arrangement**.

**Aggregation**. To the extent that the Registrant provides investment management services to its clients, the transactions for each client account generally will be effected independently, unless the Registrant decides to purchase or sell the same securities for several clients at approximately the same time. The Registrant may (but is not obligated to) combine or "bunch" such orders to obtain best execution, to negotiate more favorable commission rates or to allocate equitably among the Registrant's clients differences in prices and commissions or other transaction costs that might have been obtained had such orders been placed independently. Under this procedure, transactions will be averaged as to price and will be allocated among clients in proportion to the purchase and sale orders placed for each client account on any given day. The Registrant shall not receive any additional compensation or remuneration as a result of such aggregation.

**Item 13          Review of Accounts**

A. For those clients to whom Registrant provides investment supervisory services, account reviews are conducted on an ongoing basis by the Registrant's Principals and/or representatives. All investment supervisory clients are advised that it remains their responsibility to advise the Registrant of any changes in their investment objectives and/or financial situation. All clients (in person or via telephone) are encouraged to review financial planning issues (to the extent applicable), investment objectives and account performance with the Registrant on a minimum of an annual basis.

B. The Registrant **may** conduct account reviews on an other than periodic basis upon the occurrence of a triggering event, such as a change in client investment objectives and/or financial situation, market corrections and client request.

C. Clients are provided, at least quarterly, with written transaction confirmation notices and regular written summary account statements directly from the broker-dealer/custodian and/or program sponsor for the client accounts. The Registrant may also provide a written periodic report summarizing account activity and performance.

**Item 14          Client Referrals and Other Compensation**

As indicated at Item 12 above, Registrant receives from *Charles Schwab, TD Ameritrade* and/or *Fidelity* free and discounted support services and products.

If a client is introduced to the Registrant by either a solicitor, Registrant may pay that solicitor a referral fee in accordance with the requirements of Rule 206(4)-3 of the Investment Advisers Act of 1940, and any corresponding state securities law requirements. Any referral fee is paid solely from the Registrant's investment advisory fee, and will not result in any additional charge to the client.  If the client is introduced to the Registrant by an unaffiliated solicitor, the solicitor will provide each prospective client with a copy of the current version of this Brochure and a separate written disclosure statement disclosing the terms of the arrangement between the Registrant and the solicitor, including the compensation to be paid by the Registrant to the solicitor.

Schwab Advisor Network
Registrant receives client referrals from *Charles Schwab* through Registrant's participation in Schwab Advisor Network™ ("the Service"), designed to help investors find an independent investment advisor. *Charles Schwab* is a broker-dealer independent and unaffiliated with Registrant. *Charles Schwab* does not supervise Registrant and has no responsibility for Registrant's management of clients' portfolios or Registrant's other advice or services. Registrant pays *Charles Schwab* fees to receive client referrals through the Service. Registrant's participation in the Service may raise potential conflicts of interest described below.

Registrant pays *Charles Schwab* a Participation Fee on all referred clients' accounts that are maintained in custody at *Charles Schwab* and a Non-*Charles Schwab* Custody Fee on all accounts that are maintained at, or transferred to, another custodian.  The Participation Fee paid by Registrant is a percentage of the fees owed by the client to Registrant or a percentage of the value of the assets in the client's account, subject to a minimum Participation Fee. Registrant pays *Charles Schwab* the Participation Fee for so long as the referred client's account remains in custody at *Charles Schwab*. The Participation Fee is billed to Registrant quarterly and may be increased, decreased or waived by *Charles Schwab* from time to time. The Participation Fee is

paid by Registrant and not by the client. Registrant has agreed not to charge clients referred through the Service fees or costs greater than the fees or costs Registrant charges clients with similar portfolios (pursuant to Registrant's standard fee schedule as in effect from time to time) who were not referred through the Service.

Registrant generally pays *Charles Schwab* a Non- *Charles Schwab* Custody Fee if custody of a referred client's account is not maintained by, or assets in the account are transferred from *Charles Schwab*, unless the client was solely responsible for the decision not to maintain custody at *Charles Schwab*. The Non- *Charles Schwab* Custody Fee is a one-time payment equal to a percentage of the assets placed in custody other than at *Schwab*. The Non- *Charles Schwab* Custody Fee is higher than the Participation Fees Registrant generally would pay in a single year. Thus, Registrant will have an incentive to recommend that client accounts be held in custody at *Charles Schwab*.

The Participation and Non- *Charles Schwab* Custody Fees will be based on assets in accounts of Registrant's clients who were referred by *Charles Schwab* and those referred clients' family members living in the same household.  Thus, Registrant will have incentives to encourage household members of clients referred through the Service to maintain custody of their accounts and execute transactions at *Charles Schwab* and to instruct *Charles Schwab* to debit Registrant's fees directly from the accounts.

For accounts of Registrant's clients maintained in custody at *Charles Schwab*, *Charles Schwab* will not charge the client separately for custody but will receive compensation from Registrant's clients in the form of commissions or other transaction-related compensation on securities trades executed through *Charles Schwab*. *Charles Schwab* also will receive a fee (generally lower than the applicable commission on trades it executes) for clearance and settlement of trades executed through broker-dealers other than *Charles Schwab*. *Charles Schwab*'s fees for trades executed at other broker-dealers are in addition to the other broker-dealers fees.  Thus, Registrant has an incentive to cause trades to be executed through *Charles* Schwab rather than another broker-dealer.  Registrant nevertheless acknowledges its duty to seek best execution of trades for client accounts.  Trades for client accounts held in custody at *Charles Schwab* may be executed through a different broker-dealer than trades for Registrant's other clients. Thus, trades for accounts custodied at *Charles Schwab* may be executed at different times and different prices than trades for other accounts that are executed at other broker-dealers.

TD Ameritrade Institutional

As disclosed under Item 12 above, Registrant participates in *TD Ameritrade's* institutional customer program and Registrant may recommend *TD Ameritrade* to clients for custody and brokerage services.  There is no direct link between Registrant's participation in the program and the investment advice it gives to its clients, although Registrant receives economic benefits through its participation in the program that are typically not available to *TD Ameritrade* retail investors.  These benefits include the following products and services (provided free or at a discount): receipt of duplicate client statements and confirmations; research related products and tools; consulting services; access to a trading desk serving Registrant participants; access to block trading (which provides the ability to aggregate securities transactions for execution and then allocate the appropriate shares to client accounts); the ability to have advisory fees deducted directly from client accounts; access to an electronic communications network for client order entry and account information; access to mutual funds with no transaction fees and to certain institutional money managers; and discounts on compliance, marketing, research, technology, and practice management products or services provided to Registrant by

third party vendors. *TD Ameritrade* may also have paid for business consulting and professional services received by Registrant's related persons. These products or services may assist Registrant in managing and administering client accounts, including accounts not maintained at *TD Ameritrade*. Other services made available by *TD Ameritrade* are intended to help Registrant manage and further develop its business enterprise. The benefits received by Registrant or its personnel through participation in the program do not depend on the amount of brokerage transactions directed to *TD Ameritrade*. As part of its fiduciary duties to clients, Registrant endeavors at all times to put the interests of its clients first. Clients should be aware, however, that the receipt of economic benefits by Registrant or its related persons in and of itself creates a conflict of interest and may indirectly influence the Registrant's choice of *TD Ameritrade* for custody and brokerage services.

Registrant may receive client referrals from *TD Ameritrade* through its participation in TD Ameritrade AdvisorDirect. In addition to meeting the minimum eligibility criteria for participation in AdvisorDirect, Registrant may have been selected to participate in AdvisorDirect based on the amount and profitability to *TD Ameritrade* of the assets in, and trades placed for, client accounts maintained with *TD Ameritrade*. *TD Ameritrade* is a discount broker-dealer independent of and unaffiliated with Registrant and there is no employee or agency relationship between them. *TD Ameritrade* has established AdvisorDirect as a means of referring its brokerage customers and other investors seeking fee-based personal investment management services or financial planning services to independent investment advisors. *TD Ameritrade* does not supervise Registrant and has no responsibility for Registrant's management of client portfolios or Registrant's other advice or services. Registrant pays *TD Ameritrade* an on-going fee for each successful client referral. For referrals that occurred through AdvisorDirect before April 10, 2017, this fee is a percentage (not to exceed 25%) of the advisory fee that the client pays to Registrant ("Solicitation Fee"). For successful referrals made on or after June 9, 2017 the Solicitation Fee is an annualized fee based in the amount of referred client assets that does not exceed 25% of 1%, unless such client assets are subject to a Special Services Addendum. In the case of a special Services Addendum, the Solicitation Fee an annualized fee based on the amount of referred client assets that does not exceed 10% of 1%. Registrant will also pay *TD Ameritrade* the Solicitation Fee on any assets received by Registrant from any of a referred client's family members, including a spouse, child or any other immediate family member who resides with the referred client and hired Registrant on the recommendation of such referred client. Registrant will not charge clients referred through AdvisorDirect any fees or costs higher than its standard fee schedule offered to its clients or otherwise pass Solicitation Fees paid to *TD Ameritrade* to its clients. For information regarding additional or other fees paid directly or indirectly to *TD Ameritrade*, please refer to the TD Ameritrade AdvisorDirect Disclosure and Acknowledgement Form.

Registrant's participation in AdvisorDirect raises potential conflicts of interest. *TD Ameritrade* will most likely refer clients through AdvisorDirect to investment advisors that encourage their clients to custody their assets at *TD Ameritrade* and whose client accounts are profitable to *TD Ameritrade*. Consequently, in order to obtain client referrals from *TD Ameritrade*, Registrant may have an incentive to recommend to clients that the assets under management by Registrant be held in custody with *TD Ameritrade* and to place transactions for client accounts with *TD Ameritrade*. In addition, Registrant has agreed not to solicit clients referred to it through AdvisorDirect to transfer their accounts from *TD Ameritrade* or to establish brokerage or custody accounts at other custodians, except when its fiduciary duties require doing so. Registrant's participation in AdvisorDirect does not diminish its duty to seek best execution of trades for client accounts.

Registrant serves on the TD Ameritrade Institutional President's Council ("Council"). The Council consists of former Advisor Panel Members who are independent investment advisors that advise TD Ameritrade Institutional ("*TDA Institutional*") on issues relevant to the independent Advisor community.  The Registrant may be called upon periodically to attend Advisor Panel meetings and participate on conference calls or outreaches on an as needed basis. Investment advisors are invited to serve on the Council for an ongoing term by *TDA Institutional* senior management.   At times, Council members are provided confidential information about *TDA Institutional* initiatives. Council Members are required to sign a confidentiality agreement.   *TD Ameritrade* does not compensate Council Members. The benefits received by the Registrant or its personnel by serving on the Council do not depend on the amount of brokerage transactions directed to *TD Ameritrade*. Clients should be aware, however, the receipt of economic benefits by Registrant or its related person in and of itself creates a potential conflict of interest and may inadvertently influence the Registrant's recommendation of *TD Ameritrade* for custody and brokerage services.

**The Registrant's Chief Compliance Officer, Greg Bruce, remains available to address any questions that a client or prospective client may have regarding the above arrangements and any corresponding conflict of interest any such arrangement may create.**

## Item 15          Custody

Registrant shall have the ability to deduct its advisory fee from the client's custodial account. Clients are provided with written transaction confirmation notices, and a written summary account statement directly from the custodian (i.e., *Charles Schwab, TD Ameritrade, Fidelity,* etc.) at least quarterly. **Please Note:** To the extent that Registrant provides clients with periodic account statements or reports, the client is urged to compare any statement or report provided by Registrant with the account statements received from the account custodian. **Please Also Note:** The account custodian does not verify the accuracy of Registrant's advisory fee calculation.

Certain clients have established asset transfer authorizations that permit the qualified custodian to rely upon instructions from Registrant to transfer client funds or securities to third parties. These arrangements are disclosed at Item 9 of Part 1 of Form ADV. However, in accordance with the guidance provided in the SEC's February 21, 2017 *Investment Adviser Association* No-Action Letter, the affected accounts are not subject to an annual surprise CPA examination. In addition, certain of the Registrant's employees may serve clients in a trustee capacity, which service result in the Registrant being deemed to have custody of the corresponding assets, as also disclosed at Item 9 of Part 1 of Form ADV. However, when serving in a trustee capacity, the Registrant is subject to an annual surprise CPA examination relative to the affected accounts.

The Registrant can also be deemed to have custody of certain client account assets due to its relationship with its affiliate, First Foundation Bank.  As indicated above, the Registrant is subject to an annual surprise CPA examination. In addition, First Foundation Bank undergoes an annual internal controls report performed by a Public Company Accounting Oversight Board (*PCAOB*) registered and inspected accountant  relating to those assets. First Foundation Bank provides a copy of the *PCAOB* report to the Registrant.

As mentioned previously, the Registrant is the investment adviser to The Keller Late Stage VC Fund, LP (the "*affiliated private fund*").  Some cash assets of the *affiliated private fund* are held

at the Registrant's affiliate, First Foundation Bank. The *affiliated private fund* is subject to an annual certified audited performed by a *PCAOB* registered and inspected accountant. A copy of the audited financial statements are provided to each *affiliated private fund* investor. As indicated above, the *affiliated private fund* is no longer open for investment, and is in the ongoing process of liquidating and winding down its operations.

**ANY QUESTIONS: Registrant's Chief Compliance Officer, Greg Bruce, remains available to address any questions that a client or prospective client may have regarding custody-related issues.**

## Item 16          Investment Discretion

The client can determine to engage the Registrant to provide investment advisory services on a discretionary basis. Prior to the Registrant assuming discretionary authority over a client's account, the client shall be required to execute an *Investment Advisory Agreement*, naming the Registrant as the client's attorney and agent in fact, granting the Registrant full authority to buy, sell, or otherwise effect investment transactions involving the assets in the client's name found in the discretionary account.

Clients who engage the Registrant on a discretionary basis may, at any time, impose restrictions, **in writing**, on the Registrant's discretionary authority (i.e. limit the types/amounts of particular securities purchased for their account, exclude the ability to purchase securities with an inverse relationship to the market, limit or proscribe the Registrant's use of margin, etc.).

## Item 17          Voting Client Securities

Unless the client directs otherwise in writing, the Registrant is responsible for voting client proxies. However**,** the client shall maintain exclusive responsibility for all legal proceedings or other type events pertaining to the account assets**,** including, but not limited to, class action lawsuits.). The Registrant shall vote proxies in accordance with its Proxy Voting Policy, a copy of which is available upon request. The Registrant shall monitor corporate actions of individual issuers and investment companies consistent with the Registrant's fiduciary duty to vote proxies in the best interests of its clients.  Although the factors which Registrant will consider when determining how it will vote differ on a case by case basis, they may, but are not limited to, include the following: a review of recommendations from issuer management, shareholder proposals, cost effects of such proposals, effect on employees and executive and director compensation. With respect to individual issuers, the Registrant may be solicited to vote on matters including corporate governance, adoption or amendments to compensation plans (including stock options), and matters involving social issues and corporate responsibility. With respect to investment companies (e.g., mutual funds), the Registrant may be solicited to vote on matters including the approval of advisory contracts, distribution plans, and mergers. The Registrant maintains records pertaining to proxy voting as required by Rule 204-2 under the Advisers Act.  In addition, information pertaining to how the Registrant voted on any specific proxy issue is also available upon written request. Requests should be made by contacting the Registrant's Chief Compliance Officer, Greg Bruce.

**Item 18          Financial Information**

A.  The Registrant does not solicit fees of more than $1,200, per client, six months or more in advance.

B.  The Registrant is unaware of any financial condition that is reasonably likely to impair its ability to meet its contractual commitments relating to its discretionary authority over certain client accounts.

C.  The Registrant has not been the subject of a bankruptcy petition.

**ANY QUESTIONS**: **The Registrant's Chief Compliance Officer, Greg Bruce, remains available to address any questions that a client or prospective client may have regarding the above disclosures and arrangements.**

Exhibit 4

# FIRST FOUNDATION ADVISORS

**Item 1**          **Cover Page**

# First Foundation Advisors
SEC File Number: 801 – 35973

**Brochure**
**Dated 03/22/2019**

Contact: Greg Bruce, Chief Compliance Officer
18101 Von Karman Avenue, Suite 700
Irvine, California 92612
www.ff-inc.com

This brochure provides information about the qualifications and business practices of First Foundation Advisors (the **"Registrant"**).  If you have any questions about the contents of this brochure, please contact us at (949) 476-0300 or gbruce@ff-inc.com.  The information in this brochure has not been approved or verified by the United States Securities and Exchange Commission or by any state securities authority.

Additional information about First Foundation Advisors also is available on the SEC's website at www.adviserinfo.sec.gov.

References herein to First Foundation Advisors as a **"registered investment adviser"** or any reference to being **"registered"** does not imply a certain level of skill or training.

## Item 2        Material Changes

Since last year's Annual Amendment filing on April 2, 2018, there have been no material changes made to First Foundation Advisors' (the "Registrant") disclosure statement. However, the Registrant at Items 4, 5, 7 and 15 below, has made certain disclosure additions and enhancements regarding financial planning limitations, retirement rollovers, advisory fees, conflicts of interest, margin, and custody.

**ANY QUESTIONS**: The Registrant's Chief Compliance Officer, Greg Bruce, remains available to address any questions that a client or prospective client may have regarding the below changes and additions, or any other issue pertaining to this Brochure.

## Item 3        Table of Contents

| | | |
|---|---|---|
| Item 1 | Cover Page | 1 |
| Item 2 | Material Changes | 2 |
| Item 3 | Table of Contents | 2 |
| Item 4 | Advisory Business | 3 |
| Item 5 | Fees and Compensation | 9 |
| Item 6 | Performance-Based Fees and Side-by-Side Management | 11 |
| Item 7 | Types of Clients | 12 |
| Item 8 | Methods of Analysis, Investment Strategies and Risk of Loss | 12 |
| Item 9 | Disciplinary Information | 14 |
| Item 10 | Other Financial Industry Activities and Affiliations | 15 |
| Item 11 | Code of Ethics, Participation or Interest in Client Transactions and Personal Trading | 17 |
| Item 12 | Brokerage Practices | 18 |
| Item 13 | Review of Accounts | 21 |
| Item 14 | Client Referrals and Other Compensation | 21 |
| Item 15 | Custody | 24 |
| Item 16 | Investment Discretion | 25 |
| Item 17 | Voting Client Securities | 25 |
| Item 18 | Financial Information | 26 |

## Item 4          Advisory Business

A. First Foundation Advisors (the "Registrant") is a corporation formed on December 12, 1985 in the State of California. The Registrant became registered as an investment adviser in February 1990.  John A. Hakopian is the Registrant's President. The Registrant is owned by First Foundation Inc. (FFI).  FFI's common stock is publicly traded on the NASDAQ Global Market under the symbol "FFWM" and the ownership of that entity will change on a regular basis.

B. As discussed below, the Registrant offers to its clients, directly or through one of its affiliated entities, investment advisory services, and, <u>to the extent specifically requested by a client</u>, financial planning and related consulting services.

## INVESTMENT ADVISORY SERVICES

The client can engage Registrant to provide discretionary and/or non-discretionary investment advisory services to individuals, families, businesses, and retirement plans (**see below**). Before engaging Registrant to provide investment advisory services, clients are required to enter into an agreement with Registrant setting forth the terms and conditions of the engagement, describing the scope of the services to be provided, and the fees that a client will incur (**see** fee schedule at Item 5 below). Registrant provides investment advisory services specific to the needs of each client. Before providing investment advisory services, Registrant will determine the client's investment objectives. Registrant will then allocate (or recommend that the client allocate) the assets in a client's portfolio consistent with their designated investment objectives. To the extent requested by an individual client, Registrant will generally provide financial planning and consulting services. In the event that the client requires extraordinary planning or consultation services, the Registrant may determine to charge a client for such additional services pursuant to a stand-alone written agreement (**see Limitations** below).

**ERISA PLAN ENGAGEMENTS**: Registrant may be engaged to provide investment advisory services to ERISA retirement plans, where the Firm manages plan assets consistent with the investment objective designated by the plan sponsor. In such engagements, the Registrant will serve as an investment fiduciary as that term is defined under the Employee Retirement Income Security Act of 1974 ("ERISA"). The Registrant will generally provide services on an "assets under management" fee basis per the terms and conditions of an Investment Advisory Agreement between the Plan and the Registrant. Registrant may also provide investment advisory services to participant directed retirement plans per the terms and conditions of a Retirement Plan Consulting Agreement between Registrant and the plan. For such engagements, Registrant shall assist the plan with the selection of an investment platform from which plan participants can make their respective investment choices, and, to the extent engaged to do so, may also provide education to assist the participants with their decision making process.

**SUB-ADVISED MUTUAL FUNDS AND CONFLICT OF INTEREST:** Pursuant to a written sub-advisory agreement, the Registrant serves as a sub-adviser to a registered investment company under the Investment Company Act of 1940.  At this time, the Registrant currently serves as a sub-adviser to certain funds advised by Highland Capital Management Fund Advisors, L.P. The Registrant will observe the investment parameters described in the fund's offering documents as well as those required by the Investment Company Act of 1940. A conflict of interest arises whenever the Registrant has an actual or perceived economic or other incentive in its management of client's accounts in a way that benefits the Registrant.  A conflict is present where we may invest, on a discretionary basis, in a mutual fund where we

sub-advise. All else equal, the Registrant has a preference for mutual funds where it serves as sub-adviser. When appropriate, the Registrant's mutual funds that it sub-advises may be held in client accounts (up to 100%), subject to applicable law and any account-specific considerations. Clients may contact us to elect not to invest in any investment product that we sub-advise by emailing us at **gbruce@ff-inc.com** or contacting Greg Bruce (949) 476-0300. As discussed above, clients may elect to exclude from their accounts investments in any fund that the Registrant serves as subadviser. If a client has already made an investment in a fund that we serve as subadviser, and request selling the fund, they may incur tax consequences because of such election. The Registrant will comply with ERISA and Section 4975 of the Internal Revenue Code for all purchases of mutual funds it sub-advises in Individual Retirement Accounts or in qualified retirement plans subject to ERISA by providing a credit of advisory fees associated with the discretionary management of these funds against the client's management fee set forth in Item 5 below. A credit of advisory fees associated with the discretionary management of these funds for other nonqualified client accounts will be applied in the same manner as above. The Registrant's Chief Compliance Officer remains available to address any questions that a client or prospective client may have regarding the above conflict of interest. See Item 5 for a summary of fees associated with the Registrant's Sub-Adviser services.

**FINANCIAL PLANNING AND CONSULTING SERVICES (STAND-ALONE)**

To the extent requested by a client, the Registrant *may* provide financial planning and/or consulting services (including investment and non-investment related matters, such as estate, tax and insurance planning, etc.) on a stand-alone separate hourly rate basis. Registrant's planning and consulting fees are negotiable, but generally range from negotiable up to $350 on an hourly rate basis, depending upon the scope and complexity of the service(s) required and the professional(s) rendering the service(s). Alternatively, the Registrant may charge a fixed rate for the project with up to 50% of the total fee due at inception and the balance due at the completion of the project depending on the scope of the project. Prior to engaging the Registrant to provide planning or consulting services, clients are generally required to enter into a *Financial Planning and Consulting Agreement* with Registrant setting forth the terms and conditions of the engagement (including termination), describing the scope of the services to be provided, an estimated fee and the portion of the fee that is due from the client prior to Registrant commencing services. If requested by the client, Registrant may recommend the services of outside professionals for additional consulting and/or implementation purposes. The client is under no obligation to engage the services of any such recommended professional. The client retains absolute discretion over all such implementation decisions and is free to accept or reject any recommendation from the Registrant. Registrant's consulting services pursuant to this agreement do <u>not</u> include investment implementation, supervisory, management, or reporting services, nor the regular review or monitoring of the client's investment portfolio. In the event the client desires the Registrant **to** provide investment supervisory or management services, such engagement shall be set forth in a separate *Investment Advisory Agreement* between the Registrant and the client, for which services Registrant shall be paid a separate and additional fee.

**MISCELLANEOUS**

**Retirement Rollovers**. A client or prospective client leaving an employer typically has four options regarding an existing retirement plan (and may engage in a combination of these options): (i) leave the money in the former employer's plan, if permitted, (ii) roll over the assets to the new employer's plan, if one is available and rollovers are permitted, (iii) roll over to an Individual Retirement Account ("IRA"), or (iv) cash out the account value (which could, depending upon the client's age, result in adverse tax consequences). If **Registrant**

recommends that a client roll over their retirement plan assets into an account to be managed by Registrant, such a recommendation creates a <u>conflict of interest</u> if Registrant will earn new (or increase its current) compensation as a result of the rollover. When acting in such capacity, Registrant serves as a fiduciary under the Employee Retirement Income Security Act (ERISA), or the Internal Revenue Code, or both. **<u>No client is under any obligation to rollover retirement plan assets to an account managed by Registrant</u>**. **<u>Registrant's Chief Compliance Officer, Greg Bruce, remains available to address any questions that a client or prospective client may have regarding the potential for conflict of interest presented by such rollover.</u>**

**<u>Limitations of Non-Investment Consulting/Implementation Services</u>**.  As indicated above, **to the extent specifically requested by a client,** the Registrant may provide consulting services regarding non-investment related matters, such as estate planning, tax planning, insurance, etc. Neither the Registrant, nor any of its representatives, serves as an attorney or accountant, and no portion of the Registrant's services should be construed as legal or accounting advice. To the extent requested by a client, the Registrant may recommend the services of other professionals for certain non-investment implementation purposes (i.e. attorneys, accountants, insurance, etc.), including the Registrant's insurance affiliate (**See** disclosure at Item 10.C.2). If the client engages any recommended professional, and a dispute arises thereafter relative to such engagement, the client agrees to seek recourse exclusively from and against the engaged professional. At all times, the engaged licensed professional[s] (i.e. attorney, accountant, insurance agent, etc.), and **<u>not</u>** Registrant, shall be responsible for the quality and competency of the services provided.   **<u>Clients are responsible for promptly notifying the Registrant if there is ever any change in their financial situation or investment objectives so that the Registrant can review, and if necessary, revise its previous recommendations or services.</u>**

**<u>Independent Managers</u>**. Registrant may allocate a portion of a client's investment assets among unaffiliated independent investment managers in accordance with the client's designated investment objectives. In such situations, the Independent Managers shall have day-to-day responsibility for the active discretionary management of the allocated assets. Registrant shall continue to render investment supervisory services to the client relative to the ongoing monitoring and review of account performance, asset allocation and client investment objectives. Factors which Registrant shall consider in recommending Independent Managers include the client's designated investment objectives, and the manager's management style, performance, reputation, financial strength, reporting, pricing, and research. **<u>Please Note</u>**: The investment management fee charged by any Independent Managers is separate from, and in addition to, Registrant's advisory fee as set forth in the fee schedule at Item 5 below.

**<u>Unaffiliated Private Investment Funds</u>**. Registrant may also provide investment advice regarding unaffiliated private investment funds. Registrant, on a non-discretionary basis, may recommend that certain qualified clients consider an investment in unaffiliated private investment funds. Registrant's role relative to the private investment funds shall be limited to its initial and ongoing due diligence and investment monitoring services. If a client determines to become a private fund investor, the amount of assets invested in the fund(s) shall be included as part of "assets under management" for purposes of Registrant calculating its investment advisory fee. <u>Registrant's clients are under absolutely no obligation to consider or make an investment in a private investment fund(s)</u>. **<u>Please Note:</u>** Private investment funds generally involve various risk factors, including, but not limited to, potential for complete loss of principal, liquidity constraints and lack of transparency, a complete discussion of which is set forth in each fund's offering documents, which will be provided to each client for review and consideration. Unlike liquid investments that a client may own, private investment funds

do not provide daily liquidity or pricing. Each prospective client investor will be required to complete a Subscription Agreement, pursuant to which the client shall establish that he/she is qualified for investment in the fund, and acknowledges and accepts the various risk factors that are associated with such an investment. **Please Also Note: Valuation**. In the event that Registrant references private investment funds owned by the client on any supplemental account reports prepared by Registrant, the value(s) for all private investment funds owned by the client shall reflect the most recent valuation provided by the fund sponsor.  However, if subsequent to purchase, the fund has not provided an updated valuation, the valuation shall reflect the initial purchase price.  If subsequent to purchase, the fund provides an updated valuation, then the statement will reflect that updated value. The updated value will continue to be reflected on the report until the fund provides a further updated value.  As result of the valuation process, if the valuation reflects initial purchase price or an updated value subsequent to purchase price, the current value(s) of an investor's fund holding(s) could be significantly more or less than the value reflected on the report. Unless otherwise indicated, the client's advisory fee shall be based upon the value reflected on the report. **Conflict of Interest**: Registrant may recommend that a client consider investing in a private fund that is associated with another Registrant client. Such a recommendation creates a conflict of interest because the Registrant has an economic incentive to make such recommendation (i.e., as result of the allocation, Registrant will assist an existing individual client from whom it currently earns, and anticipates it will continue to earn, investment advisory fees). If, and when, the Registrant makes such a recommendation, it shall disclose the specific conflict, in writing, at that time. **Again, no client is obligated to invest in any private investment fund**.


**Interval Mutual Funds**. **Please Note: Fund Liquidity Constraints**. Registrant may utilize mutual funds and/or exchange traded funds that provide for limited liquidity, generally on a quarterly basis. Thus, if we determined that the fund was no longer performing or if you ever determined to transfer your account, the Fund could not be sold or transferred immediately. Rather, sale or transfer would need to await the quarterly permitted sale date, or longer. Moreover, the eventual net asset value for the Fund could be substantially different (positive or negative) than the Fund value on the date that the sale was requested. There can be no assurance that any such strategy will prove profitable or successful. In light of these enhanced risks/rewards, a client may direct Registrant, in writing, not to employ any or all such strategies for the client's account.

**Wrap/Separate Managed Account/UMA program engagements**.  In the event that Registrant is engaged to provide investment advisory services as part of an unaffiliated wrap-fee program, Registrant will be unable to negotiate commissions and/or transaction costs. Under a wrap program, the wrap program sponsor arranges for the investor participant to receive investment advisory services, the execution of securities brokerage transactions, custody and reporting services for a single specified fee. Participation in a wrap program may cost the participant more or less than purchasing such services separately. If the program is offered on a non-wrap basis, the program sponsor will determine the broker-dealer though which transactions must be effected, and the amount of transaction fees and/or commissions to be charged to the participant investor accounts.

**Custodian Charges-Additional Fees**: As discussed below at Item 5 and 12 below, when requested to recommend a broker-dealer/custodian for client accounts, Registrant generally recommends that Charles Schwab and Co., Inc. (*"Charles Schwab"*), Fidelity Investments *("Fidelity")* and/or TD Ameritrade Inc. (*"TD Ameritrade"*)  serve as the broker-dealer/custodian for client investment management assets. Broker-dealers such as *Schwab, Fidelity,* and *TD Ameritrade* charge transaction fees for effecting securities transactions. In addition to Registrant's investment advisory fee referenced in Item 5 below, the client will also incur transaction fees

to purchase securities for the client's account (i.e., mutual funds, exchange traded funds, individual equity and fixed income transactions, etc.). **ANY QUESTIONS: Registrant's Chief Compliance Officer, Greg Bruce, remains available to address any questions that a client or prospective client may have regarding the above.**

**Tradeaway/Prime Broker Fees**. Relative to its discretionary investment management services, when beneficial to the client, individual equity and/or fixed income transactions may be effected through broker-dealers other than the account custodian, in which event, the client generally will incur both the fee (commission, mark-up/mark-down) charged by the executing broker-dealer and a separate "tradeaway" and/or prime broker fee charged by the account custodian.

**Use of Mutual Funds and ETFs**. While the Registrant may recommend allocating investment assets to mutual funds that are not available directly to the public, the Registrant may also recommend that clients allocate investment assets to publicly available mutual funds and exchange traded funds that the client could obtain without engaging Registrant as an investment adviser. However, if a client or prospective client determines to allocate investment assets to publicly available mutual funds or exchange traded funds without engaging Registrant as an investment adviser, the client or prospective client would not receive the benefit of Registrant's initial and ongoing investment management services. **Please Note**: In addition to Registrant's investment advisory fee described below, and transaction and/or custodial fees discussed below, clients will also incur, relative to all mutual fund and exchange traded fund purchases, charges imposed at the fund level (e.g. management fees and other fund expenses). **ANY QUESTIONS: Registrant's Chief Compliance Officer, Greg Bruce, remains available to address any questions that a client or prospective client may have regarding the above.**

**Investment Risk**. Different types of investments involve varying degrees of risk, and it should not be assumed that future performance of any specific investment or investment strategy (including the investments and/or investment strategies recommended or undertaken by Registrant) will be profitable or equal any specific performance level(s).

**Client Obligations**. The Registrant will not be required to verify any information received from the client or from the client's other professionals and is expressly authorized to rely on the information in its possession. Clients are responsible for promptly notifying the Registrant if there is ever any change in their financial situation or investment objectives so that the Registrant can review, and if necessary, revise its previous recommendations or services.

C.  The Registrant shall provide investment advisory services specific to the needs of each client. Prior to providing investment advisory services, an investment adviser representative will ascertain each client's investment objective(s). Thereafter, the Registrant shall allocate and/or recommend that the client allocate investment assets consistent with the designated investment objective(s). The client may, at any time, impose reasonable restrictions, in writing, on the Registrant's services.

D.  Registrant does not offer a wrap fee program for its investment advisory services. However, Registrant is a participating investment adviser in certain unaffiliated wrap and managed account fee programs. There is no significant difference between how the Registrant manages wrap fee accounts and non-wrap fee accounts. **Please Note:** When managing a client's account on a wrap fee basis, the Registrant shall receive as payment for its investment

7

advisory services, the balance of the wrap fee after all other costs incorporated into the wrap fee have been deducted.

**E.**  As of December 31, 2018, the Registrant had $3,769,040,423 in assets under management on a discretionary basis and $165,658,897 assets under management on a non-discretionary basis.

**Item 5          Fees and Compensation**

A. Clients can engage the Registrant to provide investment advisory services and financial planning as part of a single engagement or may separately engage the Registrant for financial planning and consulting services. The details for each of these engagements are described in detail below.

**INVESTMENT ADVISORY SERVICES**

The client can engage the Registrant to provide discretionary investment advisory services and financial planning services on a *fee-only* basis. The Registrant's annual investment advisory fee is based upon a percentage (%) of the market value of the assets placed under the Registrant's management as follows:

| Market Value of Portfolio | % of Assets |
|---|---|
| **Equity and Balanced Accounts Program** | |
| On the First $3,000,000 | 1.00% Annual Fee |
| On the Next $2,000,000 | 0.75% |
| Amount over $5,000,000 | 0.50% |
| | |
| **Fixed Income Accounts Program** | |
| On the First $2,000,000 | 0.50% Annual Fee |
| On the Next $3,000,000 | 0.40% |
| On the Next $5,000,000 | 0.30% |
| Amount over $10,000,000 | 0.25% |
| | |
| **Fixed Income Short Duration Accounts Program** | |
| On the First $5,000,000 | 0.25% Annual Fee |
| On the Next $10,000,000 | 0.20% |
| On the Next $15,000,000 | 0.15% |
| On the Next $25,000,000 | 0.10% |
| Amount Over $55,000,000 | 0.05% |
| | |
| **High Quality Core Individual Accounts Program** | |
| On the First $3,000,000 | 1.00% Annual Fee |
| On the Next $2,000,000 | 0.90% |
| On the Next $5,000,000 | 0.80% |

Although the Registrant will allocate client assets consistent with the client's designated investment objective, the fact that the Registrant earns a higher fee for management of equity and balanced account strategies, presents a ***conflict of interest*** since the Registrant has an economic incentive to allocate more assets to equity securities to earn more compensation. **ANY QUESTIONS**: The Registrant's Chief Compliance Officer, Greg Bruce, remains available to address any questions regarding this conflict of interest

The Registrant's investment advisory fee is negotiable at Registrant's discretion, depending upon objective and subjective factors including but not limited to: the amount of assets to be managed; portfolio composition; the scope and complexity of the engagement; the anticipated number of meetings and servicing needs; related accounts; future earning capacity; anticipated future additional assets; the professional(s) rendering the service(s); prior relationships with the Registrant and/or its representatives, and negotiations with the client.

9

In limited circumstances, the Registrant may agree to a flat annual fee. As a result of these factors, similarly situated clients could pay different fees, the services to be provided by the Registrant to any particular client could be available from other advisers at lower fees, and certain clients may have fees different than those specifically set forth above.

**Margin Accounts: Risks/Conflict of Interest**. Registrant does not recommend the use of margin. A *margin account* is a brokerage *account* that allows investors to borrow money to buy securities. By using borrowed funds, the customer is employing leverage that will magnify both account gains and losses. The broker charges the investor interest for the right to borrow money and uses the securities as collateral. Should a client determine to use margin, Registrant will include the entire market value of the margined assets when computing its advisory fee. Accordingly, Registrant's fee shall be based upon a higher margined account value, resulting in Registrant earning a correspondingly higher advisory fee. As a result, the potential of conflict of interest arises since Registrant may have an economic disincentive to recommend that the client terminate the use of margin. **ANY QUESTIONS**: **Our Chief Compliance Officer, Greg Bruce, remains available to address any questions that a client or prospective client may have regarding the use of margin.**

### FINANCIAL PLANNING AND CONSULTING SERVICES (STAND-ALONE)

To the extent requested by a client, the Registrant *may* provide financial planning and/or consulting services (including investment and non-investment related matters, such as estate, tax and insurance planning, etc.) on a stand-alone separate hourly rate basis. Registrant's planning and consulting fees are negotiable, but generally range from negotiable up to $350 on an hourly rate basis, depending upon the scope and complexity of the service(s) required and the professional(s) rendering the service(s).

**Sub-Advised Mutual Fund(s).** The Registrant has been engaged as a sub-adviser to investment advisers of registered investment companies. The Registrant will receive from the mutual fund's adviser a percentage-based fee based on the Average Daily Managed Assets of each fund's assets allocated to the Registrant. The Registrant's sub-advisory fee generally ranges between 0.10% and 0.30% of the Average Daily Managed Assets. Please see the disclosure in Item 4 above titled "**SUB-ADVISED MUTUAL FUNDS AND POTENTIAL CONFLICT OF INTEREST**" for a complete description of this relationship and the conflicts of interests it presents.

B.  Clients may elect to have the Registrant's advisory fees deducted from their custodial account. Both Registrant's *Investment Advisory Agreement* and the custodial/ clearing agreement may authorize the custodian to debit the account for the amount of the Registrant's investment advisory fee and to directly remit that management fee to the Registrant in compliance with regulatory procedures. In the limited event that the Registrant bills the client directly, payment is due upon receipt of the Registrant's invoice. The Registrant shall deduct fees and/or bill clients quarterly in advance, based upon the market value of the assets on the last business day of the previous quarter. To the extent there are significant inflows or outflows of client assets ($250,000 net or more) during the previous quarter the advisory fee may also include a prorated fee adjustment based on the date and value of the asset flows that may increase or decrease the quarterly advisory fee, accordingly.

C.  As discussed below, unless the client directs otherwise or an individual client's circumstances require, the Registrant shall generally recommend that *Charles Schwab, Fidelity* and/or *TD Ameritrade* serve as the broker-dealer/custodian for client investment management assets. Broker-dealers such as *Charles Schwab, Fidelity* and *TD Ameritrade* charge brokerage

commissions and transaction fees for effecting certain securities transactions (i.e. transaction fees are charged for certain mutual funds, commissions are charged for individual equity transactions, and mark-ups and mark-downs are charged for fixed income transactions). In addition, client accounts may invest in mutual funds (including money market funds) and ETFs that have various internal fees and expenses (i.e. management fees), which are paid by these funds but ultimately borne by clients as a fund shareholder.  These internal fees and expenses are in addition to the fees charged by the Registrant.

D.   Registrant's annual investment advisory fee shall be prorated and paid quarterly, in advance, based upon the market value of the assets on the last business day of the previous quarter. To the extent there are significant inflows or outflows of client assets ($250,000 net or more) during the previous quarter the advisory fee may also include a prorated fee adjustment based on the date and value of the asset flows that may increase or decrease the quarterly advisory fee, accordingly. The Registrant generally requires a minimum asset base of $500,000.00 for investment advisory services.  The Registrant, in its sole discretion, may charge a lower investment management fee or waive or reduce its minimum asset requirement based upon certain criteria (i.e. anticipated future earning capacity, anticipated future additional assets, dollar amount of assets to be managed, related accounts, account composition, negotiations with client, etc.). The *Investment Advisory Agreement* between the Registrant and the client will continue in effect until terminated by either party by written notice in accordance with the terms of the *Investment Advisory Agreement*.  Upon termination, the Registrant shall refund the pro-rated portion of the advanced advisory fee paid based upon the number of days remaining in the billing quarter.

E.    When beneficial to the client, individual fixed-income and/or equity transactions may be effected through broker-dealers with whom Registrant and/or the client have entered into arrangements for prime brokerage clearing services. This includes effecting certain client transactions through other SEC registered and FINRA member broker-dealers (in which event, the client generally will incur both the transaction fee charged by the executing broker-dealer and a "tradeaway" fee charged by *Charles Schwab, Fidelity,* or *TD Ameritrade*).

F.   Neither the Registrant, nor its representatives accept compensation from the sale of securities or other investment products.

## Item 6          Performance-Based Fees and Side-by-Side Management

If, and when, requested by a client, the Registrant *may* consider entering into a  performance-based fee arrangement with the client—that is, fees based on a share of capital gains or capital appreciation of the assets of a client.  The Registrant will only consider a performance-fee arrangement for a client who at the time of entering into an engagement with the Registrant has at least $1,000,000 in portfolio assets managed by the Registrant, or who together with their spouse have a net worth of at least $2,100,000 excluding their principal residence. Performance-based fee arrangements create an economic incentive for Registrant to take additional risks in the management of a client portfolio that may be in conflict with the client's current investment objectives and tolerance for risk.   Unless expressly requested to the contrary, we would generally manage a performance-based fee account in the same manner as our non-performance based accounts.

## Item 7          Types of Clients

The Registrant's clients shall generally include individuals, pension and profit sharing plans, business entities, trusts, estates and charitable organizations. In addition, the Registrant serves as a sub-adviser to an investment adviser to a registered investment company.  The Registrant generally requires a minimum asset base of $500,000.00 for investment advisory services. Registrant, in its sole discretion, may charge a lesser investment advisory fee, waive its minimum asset base, and/or charge a flat fee based upon certain criteria (i.e. anticipated future earning capacity, anticipated future additional assets, dollar amount of assets to be managed, related accounts, account composition, competition, negotiations with client, etc.). **Please Note**: As result of the above, similarly situated clients could pay different fees. In addition, similar advisory services may be available from other investment advisers for similar or lower fees. **ANY QUESTIONS**: Registrant's Chief Compliance Officer, Greg Bruce, remains available to address any questions that a client or prospective client may have regarding advisory fees.

## Item 8          Methods of Analysis, Investment Strategies and Risk of Loss

A.  Method of Analysis

The Registrant may utilize, but are not limited to, the following methods of security analysis:

- <u>Charting</u> - (analysis performed using patterns to identify current trends and trend reversals to forecast the direction of prices)
- <u>Fundamental</u> - (analysis performed on historical and present data, with the goal of making financial forecasts of potential market valuation)
- <u>Technical</u> – (analysis performed on historical and present data, focusing on price and trade volume, to forecast the direction of prices)
- <u>Cyclical</u> – (analysis performed on historical relationships between price and market trends, to forecast the direction of prices)

Every method of analysis has its own inherent risks. To perform an accurate market analysis the Registrant must have access to current/new market information. The Registrant has no control over the dissemination rate of market information; therefore, unbeknownst to the Registrant, certain analyses may be compiled with outdated market information, limiting the value of the Registrant's analysis. Furthermore, an accurate market analysis can only produce a forecast of the direction of market values. There can be no assurances that a forecasted change in market value will materialize into actionable and/or profitable investment opportunities.

B.  Investment Strategies.

The Registrant's investment strategy is primarily focused on achieving long term results that have favorable risk to reward characteristics.

The Registrant's individual **asset allocation strategies** and **investment strategies** use a flexible open architecture that generally employs multi-assets strategies that utilize a variety of asset classes and/or investment styles and employ a variety of techniques and investment

vehicles, including equities(stocks), fixed income securities, mutual funds, cash, closed-end funds, alternative investments and exchange traded funds (ETFs) on a discretionary basis and Independent Managers and private funds on a non-discretionary basis, in accordance with the clients designated investment objectives. (See Independent Managers discussion above in Item 4).

The Registrant's **asset allocation strategies** primarily allocate client investment assets among various individual equities(stocks), fixed income securities, mutual funds, cash, closed-end funds, alternative investments and exchange traded funds (ETFs) on a discretionary basis and Independent Managers and private funds on a non-discretionary basis, in accordance with the clients designated investment objectives.   The client's designated investment objective determines the allocation to each investment vehicle.

In contrast to the Registrant's **asset allocation strategies**, the **investment strategies** are designed to achieve certain strategic investment objectives and generally employ a more concentrated number of asset classes and investment vehicles and may not be as diversified across multiple assets classes as the **asset allocation strategies**.  An **investment strategy** may be used as a component of an **asset allocation strategy** depending on the client's designated investment objective.

The Registrant may employ a tactical asset allocation process, overweighting and underweighting various asset classes relative to their strategic asset allocation target based on the outlook for each asset class over the next 12 to 18 months.  This tactical asset allocation process is based on valuation philosophy and framework, whereby asset class is ranked based on its relative degree of attractiveness (or unattractiveness) in terms of its valuation vis-à-vis its historical average valuation over time.

In addition to the fundamental investment strategies discussed above, the Registrant may also recommend options transactions, a strategy that has a high level of inherent risk. (*See* discussion below in Risk of Loss). If an option strategy is recommended, it will generally be delivered on a limited basis via a third party manager.

When implementing investment advice given to clients the Registrant may employ methods that  include long term purchases (securities held at least a year) and short term purchases (securities sold within a year).  Short term purchases may be deemed necessary due to changes in security valuations, market conditions or meet the cash needs of the client.

C.  Risk of Loss

The Registrants method of analysis and investment strategies do not present any significant or unusual risks, however, every investment strategy has its own inherent risks and limitations. The risks involved for different client accounts will vary based in the client's investment strategy and the type of securities or other investment held in the client's account.  The following are descriptions of various primary risks related to the investment strategies used by the Registrant.   Not all possible risks are described below.

- Management Risks. There is risk that the investment techniques and risk analysis applied by the Registrant may not produce the desired results.  There is no guarantee that a client's investment objective will be achieved.
- Equity Market Risk. Equity(stock) market risks, include but are not limited to,  the risks that stock values will decline due to daily fluctuations in the markets,  and that stock values will decline over longer periods of time  (e.g.

13

bear markets) due to general market declines of stock prices of all companies regardless of an individual security's prospects.

- Fixed Income Risks. Fixed income investments are generally less volatile than equities but are subject to risks. The risks include, without limitation, interest rate risks (risks that changes in the interest rates will devalue the investment), credit risks (risks of default by borrowers), or maturity risk (risk that bonds or notes will change value from the time of issuance to maturity).

- Foreign Security Risks. Risks for investing in foreign investments include that they may not be subject to uniform audit, financial reporting or disclosure standards, practices or requirements comparable to those companies in the U.S. Foreign investments are also subject to foreign withholding taxes and the risk of adverse changes in investment or exchange regulations. Finally, foreign investments may involve currency risk, which is the risk that the value of the foreign security will decrease due to changes in the relative value of the U.S. dollar and security's underlying foreign currency.

- Long Term Purchases/Short Term Purchases Risk. Long term investment strategies require a longer investment period to allow for the strategy to potentially develop. Short term investment strategies require a shorter investment time period to potentially develop but, as result of more frequent trading may incur higher transactional costs and not be as tax efficient when compared to a longer term strategy.

- Options Risk. The use of options transactions as an investment strategy involves a high level of inherent risk. Option transactions establish a contract between two parties concerning the buying or selling of an asset at a predetermined price during a specific period of time. During the term of the option contract, the buyer of the option gains the right to demand fulfillment by the seller. Fulfillment may take the form of either selling or purchasing a security depending upon the nature of the option contract. Generally, the purchase/sell or the recommendation to purchase/sell an option contract by the Registrant shall be with the intent of offsetting/"hedging" a potential market risk in a client's portfolio. **Please Note**: Although the intent of the options-related transactions that may be implemented by the Registrant is to hedge against principal risk, certain of the options-related strategies (i.e. straddles, short positions, etc.), may, in and of themselves, produce principal volatility and/or risk. Thus, a client must be willing to accept these enhanced volatility and principal risks associated with such strategies. In light of these enhanced risks, client may direct the Registrant, in writing, not to employ any or all such strategies for their accounts

**Please Note: Investment Risk**. Different types of investments involve varying degrees of risk, and it should not be assumed that future performance of any specific investment or investment strategy (including the investments and/or investment strategies recommended or undertaken by the Registrant) will be profitable or equal any specific performance level(s).

## Item 9          Disciplinary Information

The Registrant has not been the subject of any disciplinary actions.

14

**Item 10          Other Financial Industry Activities and Affiliations**

A.   Neither the Registrant, nor its representatives, are registered or have an application pending to register, as a broker-dealer or a registered representative of a broker-dealer.

B.   Neither the Registrant, nor its representatives, are registered or have an application pending to register, as a futures commission merchant, commodity pool operator, a commodity trading advisor, or a representative of the foregoing.

C.

1.   **Affiliated Private Investment Fund**. The Registrant is the investment adviser to The Keller Late Stage VC Fund, LP ("*affiliated private fund*"). The affiliated private fund is no longer open for investment, and is in the ongoing process of liquidating and winding down its operations.

2.   **Publicly Traded Holding Company.** The Registrant is wholly-owned by First Foundation Inc. (FFI). FFI's common stock is publicly traded on the NASDAQ Global Market under the symbol "FFWM". Since FFI is a publicly traded company, the ownership of that entity changes on a regular basis. In addition, FFI, through its Board of Directors have approved stock option plans to grant options to employees and directors of FFI. Certain members of the board of directors and executives of FFI and the Registrant own or have options to own stock in FFI. The Registrant will not purchase FFI stock or options for its clients, unless expressly requested to do so by a client. To the extent that a client wishes to own FFI stock or options, the Registrant generally recommends that FFI stock or options be held in an account not managed or supervised by the Registrant. The Registrant will not follow or track the performance of FFI and will not provide ongoing monitoring or review of FFI stock or options held in a client's account. Upon your request, the Registrant will consult with you regarding the disposition of FFI stock or options on an annual basis (unless you advise us, in writing, that you desire more frequent consultation). However, you will remain responsible for all decisions and consequences regarding FFI stock or options, including decisions regarding the retention or sale of FFI stock or options, or a portion thereof, regardless of whether FFI stock or options are reflected on any supplemental account reports prepared by the Registrant. The Registrant will have no proxy voting responsibility with respect to FFI stock. The Registrant will not take any action with respect to FFI stock or options unless and until specifically requested by you in writing (email will suffice). The Registrant is not in the business of accepting client orders for the purchase or sale of securities. Accordingly, upon receipt of any such request, the Registrant will endeavor, but cannot guarantee, that any transaction will be effected on the day received or at any specific time or price. The market value of any FFI stock or options will not be included in assets under management for purpose of determining the Registrant's investment advisory fee(s).

3.   **Affiliated Bank**. The Registrant is a wholly owned subsidiary of First Foundation Inc. ("FFP"), which is a holding company that also owns First Foundation Bank ("FFB"). FFI and/or its Principals and representatives provide two separate and distinct services: (1) investment advisory services as an SEC registered investment adviser through the Registrant, and (2) banking, trust and philanthropic and wealth management consulting services through FFB. Clients may engage the Registrant or its representatives for either or both services. Clients seeking banking, trust or philanthropic and wealth management consulting services will be referred to a FFB associate. However, no investment advisory client is required to engage the Registrant or its representatives for banking services, and

15

no banking client is required to engage the Registrant or its representatives for investment
advisory services.

If the Registrant or its representatives are engaged by a client for banking services, the
banking service shall not include any investment advisory services.  Clients that receive
cash proceeds as a result of any banking transaction are not obligated in any manner to
engage the Registrant or its representative in its separate role as an investment adviser to
invest those proceeds on their behalf. If the Registrant is engaged for investment advisory
services, a copy of the Registrant's Brochure shall be provided discussing the scope of its
investment advisory services and fees charged, and stating that any corresponding
investment advisory engagement of the Registrant shall be subject to the terms and
conditions of a separate written agreement.  The Principals and/or representatives of the
Registrant may be shareholders of FFI thereby creating a **conflict of interest** if banking,
loan, trust or consulting services through FFB incur less favorable banking or loan
costs/terms than the account would have otherwise incurred had banking, loan, trust or
consulting services been engaged through alternative service providers.

As indicated above, the Registrant is affiliated with FFB. Financial instruments such as
Money Market Funds or Certificates of Deposit offered by FFB may be recommended
and utilized by the Registrant in the management of advisory accounts. **Please Note**: This
arrangement creates a **conflict of interest**.  In light of the conflict of interest, a client may
direct the Registrant, in writing, not to purchase FFB investments/products for
his/her/its accounts.

In the event that a client requires a banking relationship (i.e., a bank account, loan, trust
services, consulting services, etc.), the Registrant's employees may refer the client to FFB,
in return for which referral the employee may be compensated (generally, employee
referrals will be considered when determining the employee's quarterly and/or annual
bonus). This referral arrangement creates a **conflict of interest**. In light of the conflict of
interest, no client is under any obligation to use FFB's services, and the Registrant shall
work with any bank of the client's choosing.

In the event that a client of the Registrant and/or customer of FFB requires insurance-
related services, FFB may refer the client to First Foundation Insurance Services, a
licensed insurance agency owned by FFB, or an unaffiliated licensed insurance agency, as
a result of which First Foundation Insurance Services (the Registrant's affiliate) shall
generally receive a commission, thereby creating a **conflict of interest**.   In addition, the
referring Registrant employee may indirectly be compensated (generally, such employee
referrals will be considered when determining the employee's quarterly and/or annual
bonus).  In light of the **conflict of interest**, no client is under any obligation to use First
Foundation Insurance Services, and the Registrant shall work with any insurance agent of
the client's choosing.

**FFB Referrals**: In addition to referrals from the Registrant's employees to FFB, FFB
employees may refer prospective clients to the Registrant, in return for which referral the
FFB employee may be compensated either directly by the Registrant and/or such referrals
will be considered by FFB when determining the employee's quarterly and/or annual
bonus. Given the commonality of ownership and control of the Registrant and FFB, FFB
is an affiliated solicitor as defined under Rule 206(4)-3 of the Investment Advisers Act of
1940, and, as such the FFB employee is not required to present a copy of the Registrant's
Brochure, nor a separate disclosure statement indicating that he/she may receive referral

compensation, at the time of the introduction to the Registrant.  See disclosure at Item 14.B below.

**The Registrant's Chief Compliance Officer, Greg Bruce, shall remain available to address any questions that a client or prospective client may have regarding the above conflicts of interest.**

D.  The Registrant does not receive, directly or indirectly, compensation from investment managers that it recommends or selects for its clients.

## Item 11          Code of Ethics, Participation or Interest in Client Transactions and Personal Trading

A.  The Registrant maintains an investment policy relative to personal securities transactions.  This investment policy is part of Registrant's overall Code of Ethics, which serves to establish a standard of business conduct for all of Registrant's Representatives that is based upon fundamental principles of openness, integrity, honesty and trust, a copy of which is available upon request.

In accordance with Section 204A of the Investment Advisers Act of 1940, the Registrant also maintains and enforces written policies reasonably designed to prevent the misuse of material non-public information by the Registrant or any person associated with the Registrant.

B.  As stated more fully in Item 10, the Registrant is wholly-owned by First Foundation Inc. (FFI).  FFI, through its Board of Directors have approved stock option plans to grant options to certain of the Registrant's Principals, affiliates, or related persons.  Certain members of the board of directors and executives of FFI and the Registrant own or have options to own stock in FFI.  The Registrant does not generally recommend to clients, or buy or sell for client accounts, FFI stock or options, except upon explicit request.  However, these transactions present a conflict of interest for certain of the Registrant's related persons, including FFI's directors, officers, and employees who all generally have an aligned incentive for higher FFI stock prices.  To address this conflict, as discussed more fully in Item 10, the Registrant will not purchase FFI stock or options for a client account, unless expressly requested by a client.  **The Registrant's Chief Compliance Officer, Greg Bruce, remains available to address any questions regarding this conflict of interest**.

C.  The Registrant and/or representatives of the Registrant *may* buy or sell securities that are also recommended to clients. This practice creates a situation where the Registrant and representatives of the Registrant are in a position to materially benefit from the sale or purchase of those securities. Therefore, this situation creates a conflict of interest. Practices such as "scalping" (i.e., a practice whereby the owner of shares of a security recommends that security for investment and then immediately sells it at a profit upon the rise in the market price which follows the recommendation) could take place if the Registrant did not have adequate policies in place to detect such activities. In addition, this requirement can help detect insider trading, "front-running" (i.e., personal trades executed prior to those of the Registrant's clients) and other potentially abusive practices.

The Registrant has a personal securities transaction policy in place to monitor the personal securities transactions and securities holdings of each of the Registrant's "Access Persons". The Registrant's securities transaction policy requires that an Access Person of the Registrant must provide the Chief Compliance Officer or his/her designee with a written report of their

current securities holdings within ten (10) days after becoming an Access Person. Additionally, each Access Person must provide the Chief Compliance Officer or his/her designee with a written report of the Access Person's current securities holdings at least once each twelve (12) month period thereafter on a date the Registrant selects.

D.   The Registrant and/or representatives of the Registrant *may* buy or sell securities, at or around the same time as those securities are recommended to clients. This practice creates a situation where the Registrant and/or representatives of the Registrant are in a position to materially benefit from the sale or purchase of those securities. Therefore, this situation creates a conflict of interest. As indicated above in Item 11 C, the Registrant has a personal securities transaction policy in place to monitor the personal securities transaction and securities holdings of each of Registrant's Access Persons.

## Item 12        Brokerage Practices

In the event that the client requests that Registrant recommend a broker-dealer/custodian for execution and/or custodial services, Registrant generally recommends that investment advisory accounts be maintained at *Charles Schwab, TD Ameritrade* and/or *Fidelity*. Prior to engaging Registrant to provide investment management services, the client will be required to enter into a formal *Investment Advisory Agreement* with Registrant setting forth the terms and conditions under which Registrant shall advise on the client's assets, and a separate custodial/clearing agreement with each designated broker-dealer/custodian.

Factors that Registrant considers in recommending *Charles Schwab, TD Ameritrade* and/or *Fidelity* (or any other broker-dealer/custodian to clients) include historical relationship with Registrant, financial strength, reputation, technology, execution capabilities, pricing, research, and service. Although the commissions and/or transaction fees paid by Registrant' clients shall comply with Registrant' duty to seek best execution, a client may pay a transaction fee that is higher than another qualified broker-dealer might charge to effect the same transaction where Registrant determines, in good faith, that the transaction fee is reasonable. In seeking best execution, the determinative factor is not the lowest possible cost, but whether the transaction represents the best qualitative execution, taking into consideration the full range of a broker-dealer's services, including the value of research provided, execution capability, commission rates, and responsiveness. Accordingly, although Registrant will seek competitive rates, it may not necessarily obtain the lowest possible commission rates for client account transactions. The brokerage commissions or transaction fees charged by the designated broker-dealer/custodian are exclusive of, and in addition to, Registrant's investment advisory fee.

**Non-Soft Dollar Research and Benefits**: Registrant receives from *Charles Schwab, TD Ameritrade* and/or *Fidelity* (and potentially other broker-dealers, custodians, investment platforms, unaffiliated investment managers, vendors, or fund sponsors) free or discounted support services and products.  Certain of these products and services assist the Registrant to better monitor and service client accounts maintained at these institutions. The support services that Registrant obtains can include investment-related research; pricing information and market data; compliance or practice management-related publications; discounted or free attendance at conferences, educational or social events; or other products used by Registrant to further its investment management business operations.

Certain of the support services or products received may assist the Registrant in managing and administering client accounts. Others do not directly provide this assistance, but rather assist the Registrant to manage and further develop its business enterprise.

18

*Charles Schwab* has agreed to pay up to $5,000 the Registrant would have otherwise incurred for technology and research.  This payment is not contingent upon the Registrant committing any specific amount of business to *Charles Schwab* in trading commissions or assets in custody but it does create a **conflict of interest**.  This creates an incentive for the Registrant to recommend *Charles Schwab* in order for the Registrant to receive *Charles Schwab's* payment for services for which it would otherwise have to pay.

Registrant's clients do not pay more for investment transactions effected or assets maintained at *Charles Schwab, TD Ameritrade* and/or *Fidelity* or other broker-dealers and custodians because of these arrangements. There is no corresponding commitment made by the Registrant to any broker-dealer or custodian or any other entity to invest any specific amount or percentage of client assets in any specific mutual funds, securities or other investment products because of the above arrangements.

**Registrant's Chief Compliance Officer, Greg Bruce, remains available to address any questions that a client or prospective client may have regarding the above arrangements and any corresponding perceived conflict of interest such arrangements may create.**

### Soft Dollar Arrangements

In return for effecting securities transactions through a designated broker-dealer/custodian, Registrant qualifies to receive through its relationship with Investment Technology Group, Inc. certain investment research products or services which assist the Registrant in its investment decision making process for the client pursuant to Section 28(e) of the Securities Exchange Act of 1934 (generally referred to as a "soft-dollar" arrangement). Investment research products or services received by Registrant may include, but are not limited to, analyses pertaining to specific securities, companies or sectors; market, financial and economic studies and forecasts; financial publications, portfolio management systems, and statistical and pricing services. Although the commissions paid by Registrant's clients shall comply with the Registrant's duty to seek best execution, a client may pay a commission that is higher than another qualified broker-dealer might charge to effect the same transaction where the Registrant determines, in good faith, that the commission is reasonable in relation to the value of the brokerage and research services received. In seeking best execution, the determinative factor is not the lowest possible cost, but whether the transaction represents the best qualitative execution, taking into consideration the full range of broker-dealer services, including the value of research provided, execution capability, commission rates, and responsiveness. Accordingly, although Registrant will seek competitive rates, it may not necessarily obtain the lowest possible commission rates for client account transactions. Although the investment research products or services that may be obtained by Registrant will generally be used to service all of Registrant's clients, a brokerage commission paid by a specific client may be used to pay for research that is not used in managing that specific client's account. With respect to investment research products or services obtained by the Registrant that have a mixed use of both a research and non-research (i.e., administrative, etc.) function, Registrant shall make a reasonable allocation of the cost of the product or service according to its use - the percentage of the product or service that provides assistance to the Registrant's investment decision-making process will be paid for with soft dollars while that portion which provides administrative or other non-research assistance will be paid for by the Registrant with hard dollars. The brokerage commissions or transaction fees charged by the designated broker-dealer/custodian are exclusive of, and in addition to, Registrant's investment management fee.

**The Registrant's Chief Compliance Officer, Greg Bruce, remains available to address any questions that a client or prospective may have regarding the above conflict of interest**.

TD Ameritrade Institutional

The Registrant participates in the institutional advisor program (the "*Program*") offered by TD Ameritrade Institutional. TD Ameritrade Institutional is a division of TD Ameritrade Inc., member FINRA/SIPC ("*TD Ameritrade*"), an unaffiliated SEC-registered broker-dealer and FINRA member. *TD Ameritrade* offers to independent investment advisers services which include custody of securities, trade execution, clearance and settlement of transactions. Registrant receives some benefits from *TD Ameritrade* through its participation in the *Program*. (Please see the disclosure under Item 14 below.)

**The Registrant's Chief Compliance Officer, Greg Bruce, remains available to address any questions that a client or prospective may have regarding the above arrangement and any corresponding conflict of interest such arrangement may create.**

**Directed Brokerage.** Registrant recommends that its clients utilize the brokerage and custodial services provided by *Charles Schwab, TD Ameritrade* and/or *Fidelity*. Registrant generally does not accept directed brokerage arrangements (when a client requires that account transactions be effected through a specific broker-dealer). In such client directed arrangements, the client will negotiate terms and arrangements for their account with that broker-dealer, and Registrant will not seek better execution services or prices from other broker-dealers or be able to "batch" the client's transactions for execution through other broker-dealers with orders for other accounts managed by Registrant As a result, a client may pay higher commissions or other transaction costs or greater spreads, or receive less favorable net prices, on transactions for the account than would otherwise be the case. **Please Note**: In the event that the client directs Registrant to effect securities transactions for the client's accounts through a specific broker-dealer, the client correspondingly acknowledges that such direction may cause the accounts to incur higher commissions or transaction costs than the accounts would otherwise incur had the client determined to effect account transactions through alternative clearing arrangements that may be available through Registrant. Higher transaction costs adversely impact account performance. **Please Also Note**: Transactions for directed accounts will generally be executed following the execution of portfolio transactions for non-directed accounts. **The Registrant's Chief Compliance Officer, Greg Bruce, remains available to address any questions that a client or prospective client may have regarding the above arrangement**.

**Aggregation**. To the extent that the Registrant provides investment management services to its clients, the transactions for each client account generally will be effected independently, unless the Registrant decides to purchase or sell the same securities for several clients at approximately the same time. The Registrant may (but is not obligated to) combine or "bunch" such orders to obtain best execution, to negotiate more favorable commission rates or to allocate equitably among the Registrant's clients differences in prices and commissions or other transaction costs that might have been obtained had such orders been placed independently. Under this procedure, transactions will be averaged as to price and will be allocated among clients in proportion to the purchase and sale orders placed for each client account on any given day. The Registrant shall not receive any additional compensation or remuneration as a result of such aggregation.

## Item 13          Review of Accounts

A. For those clients to whom Registrant provides investment supervisory services, account reviews are conducted on an ongoing basis by the Registrant's Principals and/or representatives. All investment supervisory clients are advised that it remains their responsibility to advise the Registrant of any changes in their investment objectives and/or financial situation. All clients (in person or via telephone) are encouraged to review financial planning issues (to the extent applicable), investment objectives and account performance with the Registrant on a minimum of an annual basis.

B. The Registrant **may** conduct account reviews on an other than periodic basis upon the occurrence of a triggering event, such as a change in client investment objectives and/or financial situation, market corrections and client request.

C. Clients are provided, at least quarterly, with written transaction confirmation notices and regular written summary account statements directly from the broker-dealer/custodian and/or program sponsor for the client accounts. The Registrant may also provide a written periodic report summarizing account activity and performance.

## Item 14          Client Referrals and Other Compensation

As indicated at Item 12 above, Registrant receives from *Charles Schwab, TD Ameritrade* and/or *Fidelity* free and discounted support services and products.

If a client is introduced to the Registrant by either a solicitor, Registrant may pay that solicitor a referral fee in accordance with the requirements of Rule 206(4)-3 of the Investment Advisers Act of 1940, and any corresponding state securities law requirements. Any referral fee is paid solely from the Registrant's investment advisory fee, and will not result in any additional charge to the client. If the client is introduced to the Registrant by an unaffiliated solicitor, the solicitor will provide each prospective client with a copy of the current version of this Brochure and a separate written disclosure statement disclosing the terms of the arrangement between the Registrant and the solicitor, including the compensation to be paid by the Registrant to the solicitor.

Schwab Advisor Network
Registrant receives client referrals from *Charles Schwab* through Registrant's participation in Schwab Advisor Network™ ("the Service"), designed to help investors find an independent investment advisor. *Charles Schwab* is a broker-dealer independent and unaffiliated with Registrant. *Charles Schwab* does not supervise Registrant and has no responsibility for Registrant's management of clients' portfolios or Registrant's other advice or services. Registrant pays *Charles Schwab* fees to receive client referrals through the Service. Registrant's participation in the Service may raise potential conflicts of interest described below.

Registrant pays *Charles Schwab* a Participation Fee on all referred clients' accounts that are maintained in custody at *Charles Schwab* and a Non-*Charles Schwab* Custody Fee on all accounts that are maintained at, or transferred to, another custodian. The Participation Fee paid by Registrant is a percentage of the fees owed by the client to Registrant or a percentage of the value of the assets in the client's account, subject to a minimum Participation Fee. Registrant pays *Charles Schwab* the Participation Fee for so long as the referred client's account remains in custody at *Charles Schwab*. The Participation Fee is billed to Registrant quarterly and may be increased, decreased or waived by *Charles Schwab* from time to time. The Participation Fee is

paid by Registrant and not by the client. Registrant has agreed not to charge clients referred through the Service fees or costs greater than the fees or costs Registrant charges clients with similar portfolios (pursuant to Registrant's standard fee schedule as in effect from time to time) who were not referred through the Service.

Registrant generally pays *Charles Schwab* a Non- *Charles Schwab* Custody Fee if custody of a referred client's account is not maintained by, or assets in the account are transferred from *Charles Schwab*, unless the client was solely responsible for the decision not to maintain custody at *Charles Schwab*. The Non- *Charles Schwab* Custody Fee is a one-time payment equal to a percentage of the assets placed in custody other than at *Schwab*. The Non- *Charles Schwab* Custody Fee is higher than the Participation Fees Registrant generally would pay in a single year. Thus, Registrant will have an incentive to recommend that client accounts be held in custody at *Charles Schwab*.

The Participation and Non- *Charles Schwab* Custody Fees will be based on assets in accounts of Registrant's clients who were referred by *Charles Schwab* and those referred clients' family members living in the same household.  Thus, Registrant will have incentives to encourage household members of clients referred through the Service to maintain custody of their accounts and execute transactions at *Charles Schwab* and to instruct *Charles Schwab* to debit Registrant's fees directly from the accounts.

For accounts of Registrant's clients maintained in custody at *Charles Schwab*, *Charles Schwab* will not charge the client separately for custody but will receive compensation from Registrant's clients in the form of commissions or other transaction-related compensation on securities trades executed through *Charles Schwab*. *Charles Schwab* also will receive a fee (generally lower than the applicable commission on trades it executes) for clearance and settlement of trades executed through broker-dealers other than *Charles Schwab*. *Charles Schwab*'s fees for trades executed at other broker-dealers are in addition to the other broker-dealers fees.  Thus, Registrant has an incentive to cause trades to be executed through *Charles* Schwab rather than another broker-dealer.  Registrant nevertheless acknowledges its duty to seek best execution of trades for client accounts. Trades for client accounts held in custody at *Charles Schwab* may be executed through a different broker-dealer than trades for Registrant's other clients. Thus, trades for accounts custodied at *Charles Schwab* may be executed at different times and different prices than trades for other accounts that are executed at other broker-dealers.

<u>TD Ameritrade Institutional</u>

As disclosed under Item 12 above, Registrant participates in *TD Ameritrade's* institutional customer program and Registrant may recommend *TD Ameritrade* to clients for custody and brokerage services.  There is no direct link between Registrant's participation in the program and the investment advice it gives to its clients, although Registrant receives economic benefits through its participation in the program that are typically not available to *TD Ameritrade* retail investors.  These benefits include the following products and services (provided free or at a discount): receipt of duplicate client statements and confirmations; research related products and tools; consulting services; access to a trading desk serving Registrant participants; access to block trading (which provides the ability to aggregate securities transactions for execution and then allocate the appropriate shares to client accounts); the ability to have advisory fees deducted directly from client accounts; access to an electronic communications network for client order entry and account information; access to mutual funds with no transaction fees and to certain institutional money managers; and discounts on compliance, marketing, research, technology, and practice management products or services provided to Registrant by

third party vendors. *TD Ameritrade* may also have paid for business consulting and professional services received by Registrant's related persons. These products or services may assist Registrant in managing and administering client accounts, including accounts not maintained at *TD Ameritrade*. Other services made available by *TD Ameritrade* are intended to help Registrant manage and further develop its business enterprise. The benefits received by Registrant or its personnel through participation in the program do not depend on the amount of brokerage transactions directed to *TD Ameritrade*. As part of its fiduciary duties to clients, Registrant endeavors at all times to put the interests of its clients first. Clients should be aware, however, that the receipt of economic benefits by Registrant or its related persons in and of itself creates a conflict of interest and may indirectly influence the Registrant's choice of *TD Ameritrade* for custody and brokerage services.

Registrant may receive client referrals from *TD Ameritrade* through its participation in TD Ameritrade AdvisorDirect. In addition to meeting the minimum eligibility criteria for participation in AdvisorDirect, Registrant may have been selected to participate in AdvisorDirect based on the amount and profitability to *TD Ameritrade* of the assets in, and trades placed for, client accounts maintained with *TD Ameritrade*. *TD Ameritrade* is a discount broker-dealer independent of and unaffiliated with Registrant and there is no employee or agency relationship between them. *TD Ameritrade* has established AdvisorDirect as a means of referring its brokerage customers and other investors seeking fee-based personal investment management services or financial planning services to independent investment advisors. *TD Ameritrade* does not supervise Registrant and has no responsibility for Registrant's management of client portfolios or Registrant's other advice or services. Registrant pays *TD Ameritrade* an on-going fee for each successful client referral. For referrals that occurred through AdvisorDirect before April 10, 2017, this fee is a percentage (not to exceed 25%) of the advisory fee that the client pays to Registrant ("Solicitation Fee"). For successful referrals made on or after June 9, 2017 the Solicitation Fee is an annualized fee based in the amount of referred client assets that does not exceed 25% of 1%, unless such client assets are subject to a Special Services Addendum. In the case of a special Services Addendum, the Solicitation Fee an annualized fee based on the amount of referred client assets that does not exceed 10% of 1%. Registrant will also pay *TD Ameritrade* the Solicitation Fee on any assets received by Registrant from any of a referred client's family members, including a spouse, child or any other immediate family member who resides with the referred client and hired Registrant on the recommendation of such referred client. Registrant will not charge clients referred through AdvisorDirect any fees or costs higher than its standard fee schedule offered to its clients or otherwise pass Solicitation Fees paid to *TD Ameritrade* to its clients. For information regarding additional or other fees paid directly or indirectly to *TD Ameritrade*, please refer to the TD Ameritrade AdvisorDirect Disclosure and Acknowledgement Form.

Registrant's participation in AdvisorDirect raises potential conflicts of interest. *TD Ameritrade* will most likely refer clients through AdvisorDirect to investment advisors that encourage their clients to custody their assets at *TD Ameritrade* and whose client accounts are profitable to *TD Ameritrade*. Consequently, in order to obtain client referrals from *TD Ameritrade*, Registrant may have an incentive to recommend to clients that the assets under management by Registrant be held in custody with *TD Ameritrade* and to place transactions for client accounts with *TD Ameritrade*. In addition, Registrant has agreed not to solicit clients referred to it through AdvisorDirect to transfer their accounts from *TD Ameritrade* or to establish brokerage or custody accounts at other custodians, except when its fiduciary duties require doing so. Registrant's participation in AdvisorDirect does not diminish its duty to seek best execution of trades for client accounts.

Registrant serves on the TD Ameritrade Institutional President's Council ("Council"). The Council consists of former Advisor Panel Members who are independent investment advisors that advise TD Ameritrade Institutional ("*TDA Institutional*") on issues relevant to the independent Advisor community.  The Registrant may be called upon periodically to attend Advisor Panel meetings and participate on conference calls or outreaches on an as needed basis. Investment advisors are invited to serve on the Council for an ongoing term by *TDA Institutional* senior management.  At times, Council members are provided confidential information about *TDA Institutional* initiatives. Council Members are required to sign a confidentiality agreement.  *TD Ameritrade* does not compensate Council Members. The benefits received by the Registrant or its personnel by serving on the Council do not depend on the amount of brokerage transactions directed to *TD Ameritrade*. Clients should be aware, however, the receipt of economic benefits by Registrant or its related person in and of itself creates a potential conflict of interest and may inadvertently influence the Registrant's recommendation of *TD Ameritrade* for custody and brokerage services.

**The Registrant's Chief Compliance Officer, Greg Bruce, remains available to address any questions that a client or prospective client may have regarding the above arrangements and any corresponding conflict of interest any such arrangement may create.**

## Item 15          Custody

Registrant shall have the ability to deduct its advisory fee from the client's custodial account. Clients are provided with written transaction confirmation notices, and a written summary account statement directly from the custodian (i.e., *Charles Schwab, TD Ameritrade, Fidelity,* etc.) at least quarterly. **Please Note:** To the extent that Registrant provides clients with periodic account statements or reports, the client is urged to compare any statement or report provided by Registrant with the account statements received from the account custodian. **Please Also Note:** The account custodian does not verify the accuracy of Registrant's advisory fee calculation.

Certain clients have established asset transfer authorizations that permit the qualified custodian to rely upon instructions from Registrant to transfer client funds or securities to third parties. These arrangements are disclosed at Item 9 of Part 1 of Form ADV. However, in accordance with the guidance provided in the SEC's February 21, 2017 *Investment Adviser Association* No-Action Letter, the affected accounts are not subject to an annual surprise CPA examination. In addition, certain of the Registrant's employees may serve clients in a trustee capacity, which service result in the Registrant being deemed to have custody of the corresponding assets, as also disclosed at Item 9 of Part 1 of Form ADV. However, when serving in a trustee capacity, the Registrant is subject to an annual surprise CPA examination relative to the affected accounts.

The Registrant can also be deemed to have custody of certain client account assets due to its relationship with its affiliate, First Foundation Bank.  As indicated above, the Registrant is subject to an annual surprise CPA examination. In addition, First Foundation Bank undergoes an annual internal controls report performed by a Public Company Accounting Oversight Board (*PCAOB*) registered and inspected accountant  relating to those assets. First Foundation Bank provides a copy of the *PCAOB* report to the Registrant.

As mentioned previously, the Registrant is the investment adviser to The Keller Late Stage VC Fund, LP (the "*affiliated private fund*").  Some cash assets of the *affiliated private fund* are held

at the Registrant's affiliate, First Foundation Bank. The *affiliated private fund* is subject to an annual certified audited performed by a *PCAOB* registered and inspected accountant. A copy of the audited financial statements are provided to each *affiliated private fund* investor. As indicated above, the *affiliated private fund* is no longer open for investment, and is in the ongoing process of liquidating and winding down its operations.

**ANY QUESTIONS: Registrant's Chief Compliance Officer, Greg Bruce, remains available to address any questions that a client or prospective client may have regarding custody-related issues.**

## Item 16        Investment Discretion

The client can determine to engage the Registrant to provide investment advisory services on a discretionary basis. Prior to the Registrant assuming discretionary authority over a client's account, the client shall be required to execute an *Investment Advisory Agreement*, naming the Registrant as the client's attorney and agent in fact, granting the Registrant full authority to buy, sell, or otherwise effect investment transactions involving the assets in the client's name found in the discretionary account.

Clients who engage the Registrant on a discretionary basis may, at any time, impose restrictions, **in writing**, on the Registrant's discretionary authority (i.e. limit the types/amounts of particular securities purchased for their account, exclude the ability to purchase securities with an inverse relationship to the market, limit or proscribe the Registrant's use of margin, etc.).

## Item 17        Voting Client Securities

Unless the client directs otherwise in writing, the Registrant is responsible for voting client proxies. However**,** the client shall maintain exclusive responsibility for all legal proceedings or other type events pertaining to the account assets**,** including, but not limited to, class action lawsuits.). The Registrant shall vote proxies in accordance with its Proxy Voting Policy, a copy of which is available upon request. The Registrant shall monitor corporate actions of individual issuers and investment companies consistent with the Registrant's fiduciary duty to vote proxies in the best interests of its clients.  Although the factors which Registrant will consider when determining how it will vote differ on a case by case basis, they may, but are not limited to, include the following: a review of recommendations from issuer management, shareholder proposals, cost effects of such proposals, effect on employees and executive and director compensation. With respect to individual issuers, the Registrant may be solicited to vote on matters including corporate governance, adoption or amendments to compensation plans (including stock options), and matters involving social issues and corporate responsibility. With respect to investment companies (e.g., mutual funds), the Registrant may be solicited to vote on matters including the approval of advisory contracts, distribution plans, and mergers. The Registrant maintains records pertaining to proxy voting as required by Rule 204-2 under the Advisers Act.  In addition, information pertaining to how the Registrant voted on any specific proxy issue is also available upon written request. Requests should be made by contacting the Registrant's Chief Compliance Officer, Greg Bruce.

**Item 18          Financial Information**

A.  The Registrant does not solicit fees of more than $1,200, per client, six months or more in advance.

B.  The Registrant is unaware of any financial condition that is reasonably likely to impair its ability to meet its contractual commitments relating to its discretionary authority over certain client accounts.

C.  The Registrant has not been the subject of a bankruptcy petition.

**<u>ANY QUESTIONS</u>**: **<u>The Registrant's Chief Compliance Officer, Greg Bruce, remains available to address any questions that a client or prospective client may have regarding the above disclosures and arrangements.</u>**

Exhibit 5

**From:**         Rory Miller
**Sent:**         Tuesday, March 3, 2020 8:18 PM
**To:**           Jennifer Redmond; Isaiah Weedn; Douglas Yang; Molly Brooks
**Cc:**           Patricia Glaser; Michael Smith; Tanisha Abrams
**Subject:**      First Foundation v. Giddings

All:

During the hearing today, an issue of the availability of First Foundation's publicly available standard fee schedule arose. We will be lodging a flash drive containing the two videos available at the link with the court tomorrow, as well as attaching the PDFs downloaded in those videos, and are providing these materials to you in advance of that lodging. They will be available at the below link until the flash drive is lodged with the court tomorrow. Please let us know if Plaintiffs will insist on receiving a physical flash drive containing these same files.

https://www.dropbox.com/s/u28rrp8ezutomgc/Form%20ADV%20Access.zip?dl=0



**Rory S. Miller | Partner**
10250 Constellation Blvd., 19th Floor, Los Angeles, CA 90067
Main: 310.553.3000 | Direct: 310. 282.6289 | Fax: 310.785.3589
E-Mail: rmiller@glaserweil.com | www.glaserweil.com



This message and any attached documents may contain information from the law firm of Glaser Weil Fink Howard Avchen & Shapiro LLP that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.