SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
JENNIFER G. REDMOND, Cal. Bar No. 144790
jredmond@sheppardmullin.com
Four Embarcadero Center, 17th Floor
San Francisco, California 94111
Telephone:  (213) 434-9100
Facsimile:   (213) 434-3947

ISAIAH Z. WEEDN, Cal. Bar No. 229111
iweedn@sheppardmullin.com
650 Town Center Drive, 10th Floor
Costa Mesa, California 92626
Telephone:  (714) 513-5100
Facsimile:   (714) 428-5989

Y. DOUGLAS YANG, Cal. Bar No. 307550
dyang@sheppardmullin.com
333 South Hope Street, 43rd Floor
Los Angeles, California 90071-1422
Telephone:  (213) 620-1780
Facsimile:   (213) 620-1398

Attorneys for Plaintiffs
FIRST FOUNDATION INC. and
FIRST FOUNDATION ADVISORS

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| FIRST FOUNDATION INC., a Delaware Corporation; and FIRST FOUNDATION ADVISORS, a California Corporation,<br><br>        Plaintiffs,<br><br>      v.<br><br>THOMAS MUNSON GIDDINGS, an individual; and LOUIS PANCOAST ABEL, an individual,<br><br>        Defendants. | Case No. 8:20-cv-00359-DOC-KES<br><br>**PLAINTIFFS' CLOSING BRIEF RE: PRELIMINARY INJUNCTION**<br><br><br>Complaint Filed: February 21, 2020 |

# **TABLE OF CONTENTS**

I.      INTRODUCTION/SUMMARY OF EVIDENCE............................................5

II.     PLAINTIFFS ESTABLISHED ALL NECESSARY ELEMENTS FOR
        THIS COURT TO ISSUE A PRELIMINARY INJUNCTION.......................7

        A.      Plaintiffs Have Established That Defendants Have
                Misappropriated, And Threaten To Misappropriate, Plaintiffs'
                Trade Secrets.........................................................................................8

                1.      FFA's Confidential Client And Employee Information
                        Qualify As Protectable Trade Secrets............................................9

                2.      Plaintiffs' Trade Secrets Have Independent Economic
                        Value And Plaintiffs Take Reasonable Steps Toward
                        Protecting Their Trade Secrets ....................................................12

                3.      Defendants Have Misappropriated, And Continue To
                        Threaten To Misappropriate Plaintiffs' Trade Secrets ...............13

        B.      Plaintiffs Have Shown They Will Suffer Irreparable And
                Immediate Harm If The Court Declines To Issue A Preliminary
                Injunction ...........................................................................................16

        C.      The Balance of Equities Clearly Favor Enjoining Defendants.............17

        D.      Enjoining Defendants Is In The Public Interest....................................18

III.    PLAINTIFFS' REQUESTED INJUNCTIVE RELIEF.................................19

IV.     CONCLUSION ...........................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

<u>Federal Cases</u>

*AlterG, Inc. v. Boost Treadmills LLC*
    388 F. Supp. 3d 1133 (N.D. Cal. 2019) ................................................................. 9

*Am. Trucking Ass'ns Inc. v. City of L.A.*
    559 F.3d 1046 (9th Cir. 2009) ............................................................................... 8

*Chartwell Staffing Servs. Inc. v. Atl. Sols. Grp. Inc.*
    No. 819CV00642JLSJDE, 2019 WL 2177262 (C.D. Cal. May 20,
    2019) ..................................................................................................................... 16

*Hat World, Inc. v. Kelly*
    No. S-12-01591, 2012 WL 3283486 (E.D. Cal. Aug. 10, 2012) ......................... 17

*Henry Schein, Inc. v. Cook*
    191 F. Supp. 3d 1072 (N.D. Cal. 2016) ............................................................... 18

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*
    634 F.2d 1197 (9th Cir. 1980) .............................................................................. 18

*Language Line Servs., Inc. v. Language Servs. Assoc., LLC*
    No. C 10-02605 (JW), 2010 WL 2764714 (N.D. Cal. July 13, 2010) ................ 17

*MAI Sys. Corp. v. Peak Computer, Inc.*
    991 F.2d 511 (9th Cir. 1993) ................................................................................. 9

*Pac. Aerospace & Elec., Inc. v. Taylor*
    295 F. Supp. 2d 1188 (E.D. Wash. 2003) ........................................................... 16

*Pellerin v. Honeywell Int'l, Inc.*
    877 F. Supp. 2d 983 (S.D. Cal. 2012) ................................................................... 9

*Pyro Spectaculars N., Inc. v. Souza*
    861 F. Supp. 2d 1079 (E.D. Cal. 2012) ............................................................... 18

*Vinyl Interactive, LLC v. Guarino*
    No. C 09-0987 (CW), 2009 WL 1228695 (N.D. Cal. May 1, 2009) ................... 17

*Wyndham Resort Dev. Corp. v. Bingham*
    No. 2:10-cv-01556-(GEB-KJM), 2010 WL 2740158 (E.D. Cal. July
    9, 2010) ................................................................................................................. 17

<u>State Cases</u>

*Bancroft–Whitney Co. v. Glen*
    64 Cal. 2d 327 (1966) ................................................................... 9

*Central Valley General Hosp. v. Smith*
    162 Cal. App. 4th 501 (2008) .................................................... 14

*Courtesy Temp. Serv., Inc. v. Camacho*
    222 Cal. App. 3d 1278 (1990) .............................................. 10, 11

*FLIR Systems, Inc. v. Parrish*
    174 Cal. App. 4th 1270 (2009) .................................................. 14

*Morlife, Inc. v. Perry*
    56 Cal. App. 4th 1514 (1997) ............................................... 15, 16

*Whyte v. Schlage Lock Co.*
    101 Cal. App. 4th 1443 (2002) .................................................... 9

<u>Docketed Cases</u>

*Ernest & Ernest*
    247 Cal. App. ............................................................................ 17

*Gable-Leigh, Inc. v. N. Am. Miss*
    No. CV 01-01019 ......................................................................... 9

<u>Federal: Statutes, Rules, Regulations, Constitutional Provisions</u>

18 U.S.C. § 1839(5) ............................................................................. 9

Defend Trade Secrets Act ..................................................................... 9

<u>State: Statutes, Rules, Regulations, Constitutional Provisions</u>

California Uniform Trade Secrets Act .................................................... 9

CUTSA .................................................................................... 9, 11, 18

# I.        INTRODUCTION/SUMMARY OF EVIDENCE

The evidence presented to the Court established that defendants Thomas Giddings and Louis Abel (collectively, "Defendants") were plotting to use plaintiff First Foundation Advisors' ("FFA") trade secrets to raid FFA's clients and employees.  (*See* Exs. A; B).  In service of what Defendants refer to as their "project," Defendants resolved to (and did) induce FFA's employees to unwittingly compile for them private, confidential information concerning FFA's clients, which FFA developed at great expense.  (*See* Ex. A, ECF 19-1 at p. 5 ("We need to do a deep dive analysis on our assets and revenue, who internally is tied to clients to the new firm.  Need spreadsheet showing revenue and fee schedules tied to every relationship[.]  *TG asked Brianna for info.  Learn how to pull revenue in APX[.]*" (italics handwritten by Defendant Louis Abel); *and see e.g.*, Exs. O; K).

Defendants used FFA's confidential information to create a targeted list of clients to raid for their competing business, ranked from A to C. (Ex A., ECF 19-1 at pp. 8-14).  The client ranking list also included a wide variety of client information that Defendants only had access to by virtue of their employment with FFA, including the clients' assets under management, risk tolerance, brokers and other professionals, upcoming liquidity events, relationships with other FFA employees,a and other client data compiled at great expense to FFA.  (*See e.g.*, Ex. A, ECF 19-1 pp. 8 ("Considering adding $5.5 million in closed end funds and 1031 exchange."), 9 ("His primary concern will be his FFB mortgage which FFB did not provide any huge favors for him…House on the market for $24 million."), 10 ("Cash management portfolio at 10 bps." and "He may have a large liquidity event when he sells his company."), and 11 ("He is in the process of selling his house and we may see an influx of $2 million.")).  Defendants intended to use this treasure trove of information, which FFA paid its employees (including Defendants) to cultivate, to give themselves an unfair head-start in their efforts to compete with FFA.

1    Defendants contend that they never actually executed the competing busines

2    plan and submitted sworn declarations stating that "as of September 2019, [they]

3    had decided not leave FFA …" and that prior to their termination on February 18,

4    2020, they "had no specific plans for leaving FFA at all."  (Ex. L, ¶ 15; Ex. N, ¶ 14).

5    But the *encrypted* WhatsApp messages recovered from Mr. Abel's phone tell a

6    much different story, with the Defendants exchanging messages about their plan to

7    raid employees and clients using FFA trade secrets up until February 2020.  (*See* Ex.

8    J, pp. 176 (Abel on 12/30/19: "This project in general is my New Year's

9    resolution"), 177 (Abel on 1/3/20: "Let's refocus in 2020 in [sic] our project.  I

10   suggest we meet or do a call maybe once per week and assign each other projects."),

11   178 (Giddings on 1/22/20: "I am scheduled to have a call with Tracy Kuntz on

12   Friday…This group with $800 million in Orange County.  Also was referred to

13   another group with $400 million." Also Giddings on 1/22/20: "I am nervous about

14   the word getting out that you and I are looking to leave..."), 179 (Abel on 1/23/20: "I

15   agree with being careful about the word getting out about us.")).  Defendants seem

16   to think that because they were caught and fired before they could execute their

17   plan, no injunction should issue and they are entitled to proceed to compete with

18   FFA as if nothing has occurred.  (*See* Ex. I).  As further detailed below, they are

19   mistaken.

20    Defendants would like the Court to believe they alone were responsible for

21   the client relationships developed at FFA – that their personal relationships with

22   clients are not protectable- but they conveniently fail to acknowledge the teams of

23   FFA employees who provided critical assistance in developing these relationships.

24   Defendant Giddings bragged about how he has a personal relationship with every

25   single client of FFA, but admitted that FFA provided him with nearly a $100,000

26   client development expenditure account in 2019 alone.  Put simply, Defendants

27   could not have obtained or maintained the client relationships they are now trying to

28   steal but for the infrastructure and support system provided by Plaintiffs.  It is

Plaintiffs who undertook the heavy lifting and financial risk associated with developing these clients.  Defendants are now trying to take that hard work and claim it for themselves.

This is not a case of fair competition, whereby an employee leaves, properly notifies clients of his new affiliation, and clients elect to follow the employee.  To the contrary, Defendants' conduct includes extensive preparations to compete with FAA using FFA's trade secrets **while Defendants were fiduciaries of FFA** and submission of what are, at best, misleading sworn declarations to the Court concerning those preparations.  Under these circumstances, Defendants should not be afforded the benefit of the doubt and their protestations of future good behavior cannot be believed.  More specifically, their assertions that they no longer possess FFA's trade secrets and will not use those trade secrets to compete with FFA simply are not credible.  Moreover, Defendant Giddings admitted in court that he retains extensive client data in his memory.  Further, Defendant Giddings' former Executive Assistance regularly provided him with a hard copy of a spreadsheet containing FFA's most sensitive client data compilations.  (Ex. K).  His claim that he did not retain any copies of this spreadsheet is simply not credible in light of his and Defendant Abel's repeated obfuscations and outright lies.

Plaintiffs need the Court's protection in the form of a sufficiently restrictive preliminary injunction to ensure that the Defendants are not given free reign to exploit their knowledge of FFA's trade secrets to unfairly and unlawfully compete with FFA.

## II.   PLAINTIFFS ESTABLISHED ALL NECESSARY ELEMENTS FOR THIS COURT TO ISSUE A PRELIMINARY INJUNCTION

The Court should issue a preliminary injunction, as Plaintiffs FFA and First Foundation Inc. ("FFI" and collectively, "Plaintiffs") have established that they are likely to succeed on the merits of showing that Defendants have misappropriated, and threaten to continue to misappropriate, Plaintiffs' trade secrets; that Plaintiffs

are likely to suffer irreparable harm in the absence of preliminary injunctive relief; that the balance of equities tips in Plaintiffs' favor; and that an injunction against Defendants is in the public interest.  *Am. Trucking Ass'ns Inc. v. City of L.A.*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 21 (2008)).

The trade secrets at issue in this case (known thus far) include:

- Compilation of client names and contact information.
- Compilation of client data, including assets under management, investment profiles, risk tolerance, assets and liabilities, banking relationships, professional relationships, trust terms, financial plans, upcoming liquidity events, financial considerations, and additional client-specific data.
- Client fee revenue and negotiated fee schedules.
- Employee compensation packages, employee relationships with clients.

## A.    Plaintiffs Have Established That Defendants Have Misappropriated, And Threaten To Misappropriate, Plaintiffs' Trade Secrets

The evidence presented before the Court establishes in no uncertain terms that:

(1) confidential FFA client information, including assets under management ("AUM"), client contact information, upcoming liquidity events, *negotiated* fee schedules, investment/trading strategies, risk tolerance, assets, liabilities, expenses and investment custodians (such as Schwab or TD Ameritrade) is the property of Plaintiffs and qualifies as a protectable trade secret;

(2) confidential FFA employee information, such as their compensation packages, terms of employment, and special relationships with clients, is the property of Plaintiffs and qualifies as a protectable trade secret;

(3) Defendants misappropriated this information by acquiring and using this information in furtherance of their plan to establish a competing business; and

(4) Defendants continue to threaten to misappropriate this information by using Plaintiffs' trade secrets to solicit FFA's clients and employees. *See Pellerin v. Honeywell Int'l, Inc*., 877 F. Supp. 2d 983, 988 (S.D. Cal. 2012) (setting forth the elements of a claim for misappropriation of trade secrets under the California Uniform Trade Secrets Act ("CUTSA")); *AlterG, Inc. v. Boost Treadmills LLC*, 388 F. Supp. 3d 1133, 1144 (N.D. Cal. 2019) (recognizing the elements of a claim under the Defend Trade Secrets Act ("DTSA"), which has substantially similar elements to that of a CUTSA claim)  (citing *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 877 (N.D. Cal. 2018) (citation omitted)); 18 U.S.C. § 1839(5) (defining "misappropriation" in the context of trade secrets).

### 1.    FFA's Confidential Client And Employee Information Qualify As Protectable Trade Secrets

Non-public, confidential information compiled about FFA's clients is a protectable trade secret as a matter of law.  There is simply no dispute on this point among the federal courts in the Ninth Circuit.  *See MAI Sys. Corp. v. Peak Computer, Inc*., 991 F.2d 511, 521 (9th Cir. 1993) (customer database qualifies as a trade secret); *Gable-Leigh, Inc. v. N. Am. Miss*, No. CV 01-01019 MMM(SHX), 2001 WL 521695, at *16 (C.D. Cal. Apr. 13, 2001) (customer list qualified for trade secret protection); *Whyte v. Schlage Lock Co*., 101 Cal. App. 4th 1443, 1454–56 (2002) (cost and pricing information not readily known in the industry may constitute trade secret).   Similarly, non-public, confidential information concerning a company's employees qualifies as a protectable trade secret.  *See Bancroft–Whitney Co. v. Glen*, 64 Cal. 2d 327, 351–52 (1966) (unpublished list of salaries paid by a corporation to its employees was considered confidential information).

The evidence presented to the Court establishes that the client and employee information Plaintiffs seek to protect is the work product of FFA, and is not

available to the public.  At the Court's March 3, 2020 hearing, FFA President John Hakopian ("Hakopian") testified that the client sales process at FFA generally requires multiple in-person meets that span over multiple months at a cost of tens of thousands of dollars.   Hakopian also testified that, contrary to Defendants' representations that they did all of the work in obtaining new clients, FFA's client sales process involves an interdisciplinary team of highly-qualified and highly-compensated professionals, including the lead investment strategist (which, during Defendants' employment, was either Hakopian or Defendant Abel), wealth advisors, tax professionals, and others, who work in a collaborative manner to source new client business.  (*See also* Declaration of John Hakopian ("Hakopian Decl."), ECF 6-2 at ¶¶ 6-8).  Notably, Hakopian testified that FFA utilizes customized investment strategies for each client, and that special, non-standard fee schedules are negotiated with many of the clients.

In response, Defendants appear to argue that (1) FFA's confidential information concerning its clients is not a protectable trade secret because that information is known to the clients themselves; and (2) FFA's standard fee schedule is publicly available, and therefore all information concerning all of FFA's negotiated, non-standard fee schedules are not protectable trade secrets.  These arguments have been repeatedly rejected by the courts.

The factual scenario before the Court is functionally identical to that faced by the California Court of Appeal in *Courtesy Temp. Serv., Inc. v. Camacho*, 222 Cal. App. 3d 1278 (1990) ("*Courtesy*").  In *Courtesy,* the plaintiff, a temporary employment agency, provided various companies with temporary workers. The defendants, former employees of the agency, admitted scheming to form a competitive business and compiled a list of the agency's major customers while employed by the agency. The agency sued the defendants for unfair trade practices and injunctive relief for setting up a competing agency.  The trial court refused to enjoin the defendants' use and disclosure of the information.

The *Courtesy* court reversed the trial court ruling denying the injunction, concluding the customer list was a protectable trade secret under CUTSA.  In reaching this conclusion, the *Courtesy* court noted that CUTSA and case law "establish that a customer list procured by substantial time, effort, and expense is a protectable trade secret."  *Courtesy,* 222 Cal. App. 3d at 1287.  Such a list is a protectable trade secret even if the list contains information available to the public or competitors: "[E]ven if the customers' names could be found in telephone or trade directories, such public sources ' "would not disclose the persons who ultimately made up the list of plaintiff's customers." ' [Citation.] It is the list of persons who actually purchase Courtesy's services that constitute confidential information."  *Courtesy,* 222 Cal. App. 3d at 1288.

The *Courtesy* court thus concluded that "[h]ere, the evidence established that Courtesy's customer list and related information was the product of a substantial amount of time, expense and effort on the part of Courtesy. Moreover, the nature and character of the subject customer information, i.e., billing rates, key contacts, specialized requirements and markup rates, is sophisticated information and irrefutably of commercial value and not readily ascertainable to other competitors. Thus, Courtesy's customer list and related proprietary information satisfy the first prong of the definition of 'trade secret' under section 3426.1." *Courtesy,* 222 Cal. App. 3d at 1288.  Likewise, here, Defendants' arguments fail as a matter of law.

As an initial matter, FFA's standard fee schedule, which is available to the public, is *not* the type of information Plaintiffs seek to protect.  Rather, one of the trade secrets that Plaintiffs seek to protect are the non-public, *negotiated* fee schedules.  FFA's standard fee schedule is akin to the Manufacturer Suggested Retail Price ("MSRP") of a vehicle.  The MSRP of a given car model sold throughout the United States is identical – so why do consumers hunt for the best deal they can get? Because car dealers can – and regularly do – compete with each other to offer purchase prices below that of the MSRP.  Similarly, FFA offers non-

public negotiated fee schedules to its clients.  Both Defendant Giddings and Hakopian testified that negotiated fee schedules are not available to the public.

Second, Plaintiffs do not dispute that a client can share whatever they want with whomever they want.  That freedom, however, belongs to the client – not to the trusted custodians of that information.  The fact that a client can choose to disclose confidential information does not obviate the trade secret status covering the compilation of client data.  Taken to its logical end, Defendants' position would mean that customer information can never qualify as a trade secret; this position has no basis in the law and should be rejected out of hand.

## 2. Plaintiffs' Trade Secrets Have Independent Economic Value And Plaintiffs Take Reasonable Steps Toward Protecting Their Trade Secrets

It is undisputed among the parties that the information Plaintiffs assert are trade secrets retain independent economic value. As Hakopian testified at the March 3, 2020 hearing, FFA expends significant resources in developing and obtaining the confidential client information at issue.  Hakopian testified that the client sales process at FFA generally requires multiple in-person meets that span over multiple months, at a cost to FFA that ranges in the tens of thousands of dollars.  The trade secrets Plaintiffs seek to protect are so valuable that, as Hakopian testified, should a competitor (like Defendants) have knowledge about this client data, the competitor would have the ability to shorten the sales process to FFA's clients at a significantly reduced cost.  (*See also* Hakopian Decl., ECF 6-2 at ¶¶ 6-8).

Similarly, it is undisputed that confidential information concerning how much FFA compensates its employees, and/or what client relationships FFA employees hold, has independent economic value.  Defendants could easily use such information to raid FFA's workforce and assemble a team that would be most likely to convince a client to transfer its business away from FFA, based on the team's familiarity with the client's business.  (Hakopian Decl., ECF 6-2 at ¶¶ 13-15).

**3.      Defendants Have Misappropriated, And Continue To Threaten To Misappropriate Plaintiffs' Trade Secrets**

The evidence presented by Plaintiffs – and admitted to by Defendants under examination –demonstrates conclusively that Defendants not only misappropriated Plaintiffs' trade secrets, but also continue to threaten to misappropriate them.

The documents in this case tell the story:  For over a year, Defendants have surreptitiously, and through deception of FFA's employees, compiled private, confidential information concerning FFA's clients, which FFA developed at great expense.  (*See* Ex. A, ECF 19-1 at p. 5 ("We need to do a deep dive analysis on our assets and revenue, who internally is tied to clients to the new firm.  Need spreadsheet showing revenue and fee schedules tied to every relationship[.]  *TG asked Brianna for info.  Learn how to pull revenue in APX[.]"* (italics handwritten by Defendant Louis Abel); *and see e.g.*, Exs. O; K).

Defendants admitted that armed with FFA's confidential information, they created a list of clients to target for their "project," ranked from A to C in order of how successful they thought they would be in taking the clients with them to their new competing business.  (Ex A., ECF 19-1 at pp. 8-14).  The list also included a wide variety of information Defendants only had access to as FFA employees, including the clients' assets under management, brokers and other professionals, upcoming liquidity events, and relationships with other FFA employees.  (*See e.g.*, Ex. A, ECF 19-1 pp. 8 ("Considering adding $5.5 million in closed end funds and 1031 exchange."), 9 ("His primary concern will be his FFB mortgage which FFB did not provide any huge favors for him…House on the market for $24 million."), 10 ("Cash management portfolio at 10 bps." and "He may have a large liquidity event when he sells his company."), and 11 ("He is in the process of selling his house and we may see an influx of $2 million.").)  Defendants intended to use this treasure trove of information, which FFA paid its employees (including Defendants) to cultivate, to give them a head-start in their efforts to compete with FFA.  At the

March 3 hearing, Defendant Abel admitted that he and Defendant Giddings had been in discussions with at least two of FFA's competitors during the time period that Defendants secretly gathered FFA's confidential client information: Yosemite Capital Management and Miracle Mile Advisors, and it appears from Exhibit B that Defendants shared client data with these competitors of FFA.

The Court should not believe Defendants' contention that they abandoned their plans to use FFA's trade secrets to compete with FFA.  The WhatsApp messages between Defendants tell the truth:  Defendants took significant steps toward starting their own competitive venture, unfairly based upon Plaintiffs' trade secrets, right up until the day of their respective terminations.  (*See* Ex. J, pp. 176 (Abel on 12/30/19: "This project in general is my New Year's resolution"), 177 (Abel on 1/3/20: "Let's refocus 2020 in [sic] our project.  I suggest we meet or do a call maybe once per week and assign each other projects."), 178 (Giddings on 1/22/20: "I am scheduled to have a call with Tracy Kuntz on Friday…This the group with $800 million in Orange County.  Also was referred to another group with $400 million." Also Giddings on 1/22/20: "I am nervous about the word getting out that you and I are looking to leave..."), 179 (Abel on 1/23/20: "I agree with being careful about the word getting out about us.")).

These bad acts – breaches of fiduciary duty, violation of the Code of Ethics, unauthorized access to data, and many more – are more than sufficient evidence to support Plaintiffs' claim of threatened misappropriation.  *See FLIR Systems, Inc. v. Parrish,* 174 Cal. App. 4th 1270, 1280 (2009) (holding that threatened misappropriation is manifested by words or conduct); *Central Valley General Hosp. v. Smith*, 162 Cal. App. 4th 501, 527-28 (2008) (a showing that defendant has "misused or disclosed some of those trade secrets in the past" or has an intent to use trade secrets in the future supports a claim for threatened misappropriation).  Here, Defendant Giddings admitted under oath that Defendants intended to use the client data contained in the client ABC ranking that they compiled to compete with FFA.

1  This admission alone is sufficient to support an injunction based on threatened

2  misappropriation.

3       Caught with their hands in the cookie jar, Defendants present a "nothing to

4  see here" defense and argue that because they were caught and fired before they

5  could execute their plan to use trade secrets to raid FFA's clients and employees,

6  they are entitled to proceed to compete with FFA as if nothing has occurred.  (*See*

7  Ex. I).  Indeed, Defendants are so brazen in their unfounded belief that they are

8  entitled to solicit FFA's clients regardless of their prior bad acts that they have

9  contacted more than a dozen FFA clients since their February 18, 2020 termination.

10  Defendants further claim that Defendant Giddings had "personal relationships" with

11  *all* of FFA's clients on the ABC client ranking list, and therefore he – not FFA – is

12  entitled to know, use, and take with him their confidential information.  This

13  argument has no merit whatsoever.[1]

14       In *Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514 (1997) ("*Morlife*"), the

15  defendant employees of a roofing company resigned and joined a competitor.  Upon

16  leaving Morlife, one of the defendant employees took business cards of Morlife's

17  clients that the defendant employee had collected during his employment with

18  Morlife and the defendant employees used those cards to help them solicit Morlife's

19  clients.  *Id.* at 1524.  The trial court determined that Morlife's customer list was " 'a

20  compilation, developed over a period of years, of names, addresses, and contact

21  persons, containing pricing information and knowledge about particular roofs and

22  roofing needs of customers using its services.'"  *Id.* at 1521.  The trial court noted "

23  '[t]he identity of those particular commercial buildings using such services [was]

24  ───────────────

25  [1] At the March 3, 2020 hearing, Defendants presented Exhibit 3, which Defendant

26  Giddings purported was his personal holiday card mailing list.  Upon inspection

       of Exhibit 3, however, it is clear that the holiday mailing list is a business venture

27  by Defendant Giddings.  117 names present in Exhibit 3 overlap with the 144-

       person ABC client ranking list (Exhibit A) Defendants prepared in furtherance of

28  their plan to steal FFA's clients.

not generally known to the roofing industry.'" *Id*. The *Morlife* decision, which has been cited favorably by the federal courts, *see Chartwell Staffing Servs. Inc. v. Atl. Sols. Grp. Inc.*, No. 819CV00642JLSJDE, 2019 WL 2177262, at *7 (C.D. Cal. May 20, 2019), plainly rejects Defendants' "personal relationships" argument.

"There is no legitimate reason for characterizing differently the conduct of a former employee who uses customer information personally developed for the employer during the period of employment from the use of the very same information developed by a coworker who had no customer contact." *Morlife*, 56 Cal. App. 4th at 1526. This is because "information developed by an employee concerning the employer's customers represents an investment of time and money *on the part of the employer*, justifying a grant of trade secret protection against exploitation by the former employee." *Id.* (emphasis in original). Thus, Defendant Giddings cannot hide behind his own personal efforts in procuring and maintaining FFA clients. Again, this is not a situation where Defendant Giddings behaved ethically in connection with his departure – far from it.

> **B.    Plaintiffs Have Shown They Will Suffer Irreparable And Immediate Harm If The Court Declines To Issue A Preliminary Injunction**

"[A]n intention to make imminent or continued use of a trade secret or to disclose it to a competitor will almost always certainly show irreparable harm." *Pac. Aerospace & Elec., Inc. v. Taylor*, 295 F. Supp. 2d 1188, 1198 (E.D. Wash. 2003) (quoting *Campbell Soup Co. v. ConAgra, Inc*., 977 F.2d 86, 92–93 (3rd Cir. 1992)). "Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm." *Stuhlbarg Int'l Sales*, 240 F.3d at 841.

As discussed above, the evidence presented before the Court unambiguously establishes that Defendants have misappropriated, and continue to threaten to misappropriate, Plaintiffs' trade secrets. Thus, Plaintiffs are entitled to a

1  presumption that they will suffer irreparable injury without the temporary
2  restraining order. *Ernest & Ernest*, 247 Cal. App. at 128-29; *Vinyl Interactive, LLC*
3  *v. Guarino*, No. C 09-0987 (CW), 2009 WL 1228695, at *8 (N.D. Cal. May 1,
4  2009).

5        Plaintiffs have shown that if Defendants are not enjoined and are instead
6  permitted to execute on their plan to raid FFA's clients and employees using
7  confidential trade secret information, FFA will suffer irreparable harm.  At the
8  Court's March 3, 2020 hearing, FFA President Hakopian testified FFA could lose
9  approximately 20 percent of its revenue stream by and through its loss of clients,
10 which may result in layoffs at FFA, and would suffer an adverse impact to its
11 reputation and goodwill.  Without the protection of a preliminary injunction, FFA
12 also faces substantial harm in the form of the loss of key FFA employees whom
13 Defendants would solicit with full knowledge of these employees' FFA
14 compensation packages and their special relationships with targeted clients, the
15 harm to Plaintiffs' reputation with clients, prospective clients, investors and market
16 analysis, and the inevitable drop in FFI's stock price as a result of negative publicity
17 and potential loss of FFA customers and revenue.  (Hakopian Decl. ECF 6-2, ¶ 18).
18 These forms of harm are undoubtedly recognized as that which a preliminary
19 injunction may prevent and/or mitigate.  *See Wyndham Resort Dev. Corp. v.*
20 *Bingham*, No. 2:10-cv-01556-(GEB-KJM), 2010 WL 2740158, at *6-7 (E.D. Cal.
21 July 9, 2010) (disclosure of confidential customer information threatened irreparable
22 harm in the form of loss of goodwill); *Language Line Servs., Inc. v. Language*
23 *Servs. Assoc., LLC*, No. C 10-02605 (JW), 2010 WL 2764714, at *5 (N.D. Cal. July
24 13, 2010) (finding the plaintiff faced a risk of irreparable harm in the form of lost
25 customers and goodwill); *Hat World, Inc. v. Kelly*, No. S-12-01591 (LKK/EFB),
26 2012 WL 3283486, at *8 (E.D. Cal. Aug. 10, 2012) (stating that harm to goodwill
27 may be considered irreparable)
28     **C.**    **The Balance of Equities Clearly Favor Enjoining Defendants**

1     Plaintiffs recognize that in deciding to issue a preliminary injunction, the

2   Court must "balance the interests of all parties and weigh the damage to each."  *L.A.*

3   *Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir.

4   1980).  The damage to Plaintiffs, as noted above, is loss of approximately 20 percent

5   of Plaintiffs' revenue, the loss of customers, loss of employees, goodwill,

6   reputational damage.  (Hakopian Decl., ¶ 18 (ECF No. 6-2).  Defendants will likely

7   argue that they were only preparing to compete and did not engage in actual

8   competition.  Yet, their hearing testimony, Competing Business Plan (Exhibit A)

9   and related files conclusively evinces their willingness to cheat to get ahead.  A

10   preliminary injunction that would preserve Plaintiffs' trade secrets "would not cause

11   any significant hardship to defendant[s], because it would essentially only require

12   [them] to abide by existing law regarding the unauthorized use of another's trade

13   secrets." *Pyro Spectaculars N., Inc. v. Souza*, 861 F. Supp. 2d 1079, 1092 (E.D. Cal.

14   2012) (entering preliminary injunction in CUTSA matter).  Thus, this factor strongly

15   favors a preliminary injunction against Defendants.

16         **D.     Enjoining Defendants Is In The Public Interest**

17         "The public interest is served when [a] defendant is asked to do no more than

18   abide by trade laws and the obligations of contractual agreements signed with [his]

19   employer.  The public interest is also served by enabling the protection of trade

20   secrets." *Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1078 (N.D. Cal. 2016)

21   (citing *Bank of Am., N.A. v. Lee*, No. CV 08–5546 CAS (JWJX), 2008 WL 4351348,

22   at *7 (C.D. Cal. Sept. 22, 2008)).  Here, there is no doubt that the public interest

23   would be served by requiring Defendants to play fair ball, and therefore refrain from

24   exploiting the trade secret information compiled during the course of their

25   employment as fiduciaries of FFA (regardless of whether that information is in their

26   heads or on a piece of paper).  This factor falls squarely in favor of issuing a

27   preliminary injunction against Defendants.

28

## III.    PLAINTIFFS' REQUESTED INJUNCTIVE RELIEF

The injunctive relief Plaintiffs seek is straightforward, unambiguous, and rooted squarely in the written and testimonial evidence presented to the Court. Plaintiffs request that until such time as this Court orders otherwise after Trial:

    1) Defendants, and all those acting in concert with them, are hereby enjoined and restrained, directly or indirectly, from:

        a. Using or disclosing the confidential information and trade secrets of Plaintiffs;

        b. Soliciting any FFA clients listed in Plaintiff's Exhibit A.[2]

        c. Soliciting FFA's clients by using any FFA client data, except for the names of clients retained in Defendants' memory;

        d. Soliciting FFA's clients through the use of Plaintiffs' trade secrets;

        e. Soliciting FFA's employees using Plaintiffs' trade secrets, including knowledge of Plaintiffs' employee relationship(s) with FFA clients; and

        f. Engaging in any conduct that violates Defendants' respective Employment Agreement and/or Confidentiality Agreement.

---

[2] As an alternative, if the Court concludes that Defendant Giddings' personal relationships with the clients listed in Exhibit A somehow obviate the trade secret status of the client information compiled in the client ABC ranking chart, then the court could consider an injunction that prohibits Defendants from soliciting FFA's clients who are:  (1) identified as "B" or "C" clients in Plaintiffs' Exhibit A; (2) identified as "A" clients in Plaintiffs' Exhibit A and, in the notes column, are identified as having relationships with any FFA employees other than Defendants, even if Defendants are also identified as persons with whom such "A" clients have relationships; and (3) identified as "A" clients in Plaintiffs' Exhibit A and are noted requiring assistance from any third party to convince the "A" client to become a client of Defendants.

2) Defendants shall immediately return to Plaintiffs all confidential information, trade secrets and property belonging to Plaintiffs in their possession, custody or control, including without limitation all passwords and user names, regardless of whether such items have been provided to their counsel.

3) Defendants shall produce for inspection and imaging all computers, personal electronic devices, cloud accounts, email accounts, and other electronic storage devices belonging to, under the control of, accessible to, or operated by the Defendants in order to ensure the return and removal of all of Plaintiffs' confidential business information and trade secrets.

## IV.   CONCLUSION

The evidence and testimony presented before and elicited at the March 3, 2020 hearing presents a stark picture of the secretive efforts of two highly compensated officers of FFA who were more than willing to bend the rules and steal trade secrets to further their plan set up a competing business.  Through their prior misappropriation and their expressed intent to continue to use FFA's client data, Defendants present a threat of future harm.  Plaintiffs have met their burden for requested injunctive relief, and respectfully request that the Court issue the requested preliminary injunction.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

Dated:  March 4, 2020

By           */s/ Jennifer G. Redmond*
      JENNIFER G. REDMOND
      ISAIAH WEEDN
      Y. DOUGLAS YANG

      Attorneys for Plaintiffs
      FIRST FOUNDATION INC. and FIRST
      FOUNDATION ADVISORS