FILED
CLERK, U.S. DISTRICT COURT
March 7, 2020
CENTRAL DISTRICT OF CALIFORNIA
BY: ____KD____ DEPUTY

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SOUTHERN DIVISION

| | |
|---|---|
| **FIRST FOUNDATION INC. et al.,**<br>    Plaintiffs,<br><br>    v.<br><br>**THOMAS MUNSON GIDDINGS et al.,**<br>    Defendants. | **Case No.: CV 20-00359-DOC-KES**<br><br>**ORDER GRANTING PRELIMINARY INJUNCTION** |

Before the Court are Plaintiffs First Foundation Inc. and First Foundation Advisors ("FFI," "FFA," and collectively "Plaintiffs"), and Defendants Thomas Munson Giddings and Louis Pancoast Abel ("Giddings," "Abel," and collectively "Defendants"). Having reviewed all submissions by the parties and considered their testimony and argument at the hearing in this matter, the Court now GRANTS a preliminary injunction pending the resolution of this case.

## I. Background

### A. Facts

The following facts are drawn from Plaintiffs' first application for a temporary restraining order ("First Application") (Dkt. 6). Plaintiff FFI is the parent corporation of Plaintiff FFA, the latter of which is a Registered[1] Investment Advisor offering a variety of wealth management and investment services. 1st Appl. at 11. Defendant Giddings was employed from September 2008 to February 18, 2020 as FFA's Senior Managing Director of sales and marketing. *Id.* In this role, Defendant Giddings led "all aspects of the new client acquisition process for FFA," and "was involved in every strategic decision regarding every aspect of the business." *Id.* at 11-12. Defendant Giddings also had extensive access to information on FFA's clients and employees. Defendant Abel worked as FFA's Chief Investment Officer from March 2010 to February 18, 2020. *Id.* at 14. Much like Defendant Giddings, Defendant Abel had access to confidential information on FFA's clients and employees. *Id.*

With respect to clients, Defendants had access to information like clients' names, contact information, assets, income, liabilities, and investment objectives. *Id.* at 12, 14. With respect to employees, Defendants had access to employee names, contact information, and compensation. *Id.*

Both Defendants were subject to similar agreements requiring them to protect and preserve Plaintiffs' confidential information, to loyally devote their best efforts to Plaintiffs' business, and not to induce Plaintiffs' employees from quitting their employment with Plaintiffs. *See id.* at 12-16.

---

[1] By the Securities and Exchange Commission. 1st Appl. at 11.

On February 18, 2020, the CEO of Plaintiff FFI, Mr. Scott Kavanaugh, learned from an employee of Plaintiff FFA that Defendants had drafted plans to start a competing business. *Id.* at 16. The employee gave Mr. Kavanaugh photocopies of three documents (collectively, the "Plan Documents"), *id.*, which the Court has also had the opportunity to examine as Exhibit A (at Dkt. 11-3).

The first is "a long typed document with handwritten notes," 1st Appl. at 16, detailing Defendants' consideration of soliciting Plaintiff FAA's clients and employees to start a competing wealth management company. This document includes numerous action items for setting up a new wealth management company and a variety of strategic questions and considerations. *See generally* Ex. A at 2-7. The document also refers to current FFA employees, their salaries and bonuses, and possible strategies for hiring them. Ex. A at 5-6.

The second is "a multi-page chart," 1st Appl. at 16, listing FAA clients, along with their corresponding brokerage firm (e.g., Schwab, Fidelity, etc.), their assets under management, and a letter ranking of "A," "B," or "C." *See generally* Ex. A at 8-14. During the hearing, Defendant Giddings testified that the letter grades represented how close his relationship was with the client—i.e., that he has very close relationships with A-ranked clients, somewhat less personal relationships with B-ranked clients, and weak relationships with C-ranked clients. The chart also includes comments for each client listed, such as their personal loyalty to FFA itself or various FFA employees, who referred the client to FFA, etc. *See generally* Ex. A at 8-14.

The third document consists of other related notes. 1st Appl. at 16. These notes are handwritten on lined paper and the Court finds them almost entirely illegible. *See generally* Ex. A at 15-22.

After reviewing the Plan Documents just described, Mr. Kavanaugh immediately recognized Defendants' goal to hire away current FAA employees and "charm" current FAA clients. 1st Appl. at 17. Mr. Kavanaugh immediately went to Defendant Abel's office, where he found a copy of the Plan Documents; Defendants were fired that same day. *Id.* at 17-18.

Defendants, for their part, assert that they have neither possession of nor access to Plaintiffs' confidential materials. *See, e.g.*, Consol. Opp'n at 7-8 (Dkt. 27). And Defendants

further represent that, while they had previously contemplated leaving FFA, they had decided by the time they were fired to remain with FFA. *Id.* at 5-6; *see also* Giddings Decl. ¶ 15 (Dkt. 27-1) ("[A]s of September 2019, I had decided not to leave FFA to start a separate firm."); Abel Decl. ¶ 14 (Dkt. 27-2) (same, verbatim). This latter representation is contradicted by evidence in documents submitted by Plaintiffs, the authenticity of which Defendants do not dispute.

In Exhibit J (at Dkt. 35), for example, Plaintiffs present a WhatsApp conversation between Defendants, extracted from Defendant Abel's phone. On October 11, 2019 (i.e., after September 2019, when Defendants claim they "had decided not to leave FFA"), Defendant Abel sent a message to Defendant Giddings, saying, "We need to resurrect our project." Ex. J at 175. On December 30, 2019, Defendant Giddings messaged,

> Received a call from one of my contacts at TD about an opportunity in Orange County. There is a $600 million firm which invests mostly for high net worth clients. The company is owned by an ESOP and they are looking for a succession plan. He asked if I would have any interest in discussions with them. Would you be interested?

*Id.* at 176. Less than an hour later, Defendant Abel responded, "Yes, definitely! Let's set up a Kahler meeting. This project in general is my New Year's resolution." *Id.*

Defendant Abel followed up on January 3, 2020, messaging, "Let's refocus in 2020 in our project. I suggest we meet or do a call maybe once per week and assign each other projects. . . . Can you give me sine [sic] dates/times for a meeting or call?" *Id.* at 177. Shortly thereafter, he messaged again to ask, "We're [sic] you able to contact your referral about setting up a meeting with the OC firm?" *Id.*

On January 22, 2020, Defendant Giddings texted, "I am scheduled to have a call with Tracy Kuntz on Friday. . . . This the [sic] group with $800 million in Orange County. Also was referred to another group with $400 million." *Id.* at 178. Later that day, Defendant Abel replied, in relevant part, "That's great that you finally connected with Tracy. Would you like me to join the call or do it yourself? And that's great to hear about another opportunity. Let's discuss this stuff later. Thanks." *Id.* Defendant Giddings responded,

> I think I will do the first call on my own . . . . I am nervous about the word getting out that you and I are looking to leave so trying to keep this as contained as possible. The other one is called 2020 Capital Management. They have $400 million.

*Id.* The next morning, Defendant Abel concurred: "Okay. Sounds good. I agree with being careful about the word getting out about us[.] Thanks." *Id.* at 179. On January 31, Defendants exchanged messages to coordinate their schedules to meet with "Tracy" (presumably Tracy Kuntz above, q.v.).

On February 5, 2020, Defendant Giddings sent what appears to be the entire text of a news article: "Whose Client Is It Anyway? RIA Fights Former Firm," by Jacqueline Sergeant, published February 4, 2020. *Id.* at 181. The article describes a case about investment advisors leaving their former firm, at which point "about 25 clients with roughly $25 million in assets followed them." *Id.* at 181. Although the judge refused to grant a temporary restraining order, the case was still ongoing, with the former firm "continu[ing] its attempt to gather evidence of soliciting." *Id.* Defendant Abel replied, "Very interesting and troubling article! All the more reason we need to do good pre-planning." *Id.* at 182.

**B. Procedural History**

Plaintiffs filed their Complaint (Dkt. 1) on February 21, 2020, bringing the following seven causes of action:

(1) breach of contract;

(2) breach of fiduciary duty;

(3) trade secrets misappropriation (California Uniform Trade Secrets Act);

(4) threatened misappropriation (California Uniform Trade Secrets Act);

(5) violation of the Defend Trade Secrets Act;

(6) threatened violation of the Defend Trade Secrets Act; and

(7) unfair business practices (California Business and Professions Code § 17200 *et seq.*).

*See generally* Compl.

The same day, Plaintiffs also filed their First Application. Defendants filed a brief Opposition[2] (Dkt. 12) on February 22, 2020. The Court denied the First Application on February 24, 2020 (Dkt. 14), citing several procedural defects. On February 26, 2020, Plaintiffs filed a second application for a temporary restraining order ("Second Application") (Dkt. 24). Defendants responded with their Consolidated Opposition (Dkt. 27) on February 27, 2020. The Court granted in part the Second Application on February 28, 2020 (Dkt. 29) and scheduled a hearing for preliminary injunction on March 2, 2020.

The hearing began on March 2, 2020 and concluded on March 3, 2020 (Dkts. 34-35). In lieu of closing arguments, the parties agreed to submit briefing, which was filed on March 4, 2020 (Dkts. 36-37).

## II.  Legal Standard

A preliminary injunction is an "extraordinary remedy," requiring courts to balance competing claims on a case-by-case basis, with "particular regard for the public consequences" of issuing an injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Courts have recognized very few circumstances justifying the issuance of an ex parte temporary restraining order. *Reno Air Racing Ass'n., Inc. v. McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006).

A plaintiff seeking preliminary injunctive relief "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20). Alternatively, an injunction can also be justified if a plaintiff raises "serious questions going to the merits" and the balance of hardships "tips sharply toward the plaintiff . . . assuming the other two elements of the *Winter* test are also met." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011). A "serious question" is one on which the movant "has a fair chance of success on the merits." *Sierra On-Line, Inc. v. Phx. Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984). The Ninth Circuit follows a "sliding scale" approach to the four preliminary injunction elements, such that "a stronger showing of one

---

[2] In which Defendants also sought "leave to file a substantive opposition" on or before February 28, 2020.

element may offset a weaker showing of another, as long as plaintiffs 'establish that irreparable harm is *likely*.'" *Doe v. Kelly*, 878 F.3d 710, 719 (9th Cir. 2017) (quoting *Cottrell*, 632 F.3d at 1131).

**III. Discussion**

Plaintiffs' Second Application argues that all of the elements for preliminary injunctive relief are satisfied, and that Defendants' ongoing conduct has heightened the urgency of their request for an injunction. *See generally* 2d Appl. Defendants disagree, arguing that the client information at issue is not a trade secret, and properly belongs to the clients themselves instead of Plaintiffs. Defendants' Post-Hearing Brief at 3 (Dkt. 36). Defendants also characterize Plaintiffs' request for injunctive relief as an improper end run around California law against non-competition agreements. *Id.* at 2.

**A. Plaintiffs Have Established a Sufficient Likelihood of Success the Merits**

To succeed on a claim under the California Uniform Trade Secrets Act ("CUTSA"), three elements must be proved: (1) the plaintiff's possession of a trade secret; (2) the defendant's misappropriation of said trade secret, i.e., wrongful acquisition, disclosure, or use thereof; and (3) that the defendant's misappropriation caused or threatened damage to the plaintiff. *Integral Dev. Corp. v. Tolat*, 675 F. App'x 700, 702 (9th Cir. 2017) (citing *Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 220 (2010)). The Defend Trade Secrets Act ("DTSA") presents a similar standard, requiring "plaintiff's ownership of the trade secret; defendant's misappropriation of the trade secret; and damage to the plaintiff caused by the misappropriation." *Johnson Controls, Inc. v. Therma, LLC*, No. SA CV 18-00636 AG (KESx), 2018 WL 6133674, at *4 (C.D. Cal. Aug. 17, 2018).

Under the CUTSA:

> "Trade secret" means information, including a formula, pattern, compliation, program, device, method, technique, or process, that:
> (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Cal. Civ. Code § 3426.1(d). The DTSA uses a very similar definition. *See* 18 U.S.C. § 1839(3). "Misappropriation" obtains when a person acquires the trade secret through improper means, or when they disclose or use the trade secret knowing or having reason to know that it was acquired through improper means. *See* 18 U.S.C. § 1839(5); Cal. Civ. Code § 3426.1(b). "Improper means" is defined to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means," but excludes reverse engineering and independent derivation. 18 U.S.C. § 1839(6); Cal. Civ. Code § 3426.1(a).

Plaintiffs have made a strong showing of each of the elements above:

*Possession of a trade secret.* The First Application represents that Plaintiffs expend substantial time and resources to assemble client information—a process that "takes approximately four to six months, at a cost to FFA that ranges from $25,000 to $50,000 per prospect." 1st Appl. at 24. This information is therefore independently valuable, as its acquisition by a competitor would save the competitor significant time and money. *Id.* Plaintiffs also allege that they make reasonable efforts to protect the secrecy of this information—e.g., by using confidentiality agreements with employees and clients, requiring annual acknowledgement of employee obligations (one of which is to refrain from misusing company trade secrets), and building data security tools into their network. *Id.* at 24-26. It appears, then, that Plaintiffs' client information qualifies as a trade secret.

*Misappropriation of a trade secret.* Misappropriation is defined to include "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." 18 U.S.C. § 1839(5)(A); Cal. Civ. Code § 3426.1(b)(1). Having independently reviewed Defendants' Plan Documents at length, the Court agrees with Plaintiffs' assessment that the Plan Documents contain "highly confidential client data such as upcoming liquidity events, financial needs, [and] asset locations," as well as confidential information about Plaintiffs' employees. 1st Appl. at 28. Defendants, moreover, knew or had reason to know—on

the basis of their contracts and their positions within the company—that they had acquired this information in "breach of a duty to maintain secrecy," a type of improper means. Ergo a showing of likely misappropriation by Defendants.

*Damages or threatened damages.* Plaintiffs allege that, "[i]f a competitor had access to this assembled information, it would be much easier to target the client for transfer." 1st Appl. at 28. Thus, if Defendants used the trade secrets in their possession, Plaintiffs could face "loss of customers, loss of employees, goodwill, [and] reputational damage." 2d Appl. at 7. The Court therefore finds that Plaintiffs have adequately proved threatened damages stemming from Defendants' misappropriation of trade secrets.

It should be noted that California has enacted a strong public policy that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void" (subject to narrow exceptions which do not appear germane to the present case). Cal. Bus. & Profs. Code § 16600. And section 16600 has been interpreted and enforced against restrictive contract provisions to allow a former employee to solicit customers from the former employer. *See Dowell v. Biosense Webster, Inc.*, 179 Cal. App. 4th 564, 577 (2009) (quoting *The Retirement Group v. Galante*, 176 Cal. App. 4th 1226, 1238 (2009)). California courts, however, have found that section 16600 does not prevent a court from enjoining "*tortious* conduct . . . by banning the former employee from using trade secret information to identify existing customers, to facilitate the solicitation of such customers, or to otherwise unfairly compete with the former employer." *Id.* (quoting *Galante*, 176 Cal. App. 4th at 1238).

Consistent with these state court interpretations of section 16600, the Court is inclined to believe that section 16600 does not protect Defendants' conduct, at least to the extent that their solicitation of Plaintiffs' customers relies on the use of protected trade secrets. The Court accordingly finds that Plaintiffs have shown a likelihood of success on the merits and satisfied the first element of the *Winter* standard for preliminary injunctive relief.

### B. Plaintiffs Have Shown a Risk of Irreparable Harm

Federal courts have found that the "threatened loss of . . . customers and goodwill" can constitute an irreparable injury. *Extreme Reach, Inc. v. Spotgenie Partners, LLC*, No. CV 13-07563-DMG (JCGx), 2013 WL 12081182, at *7 (C.D. Cal. Nov. 22, 2013) (citing *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001), and *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991)).

California courts have also found that injuries to a business's "identity, reputation and goodwill, causing the loss of valuable customers, employees, and profits and threatening the complete destruction of its business," can support a finding of irreparable injury. *E.g.*, *Courtesy Temp. Serv., Inc. v. Camacho*, 222 Cal. App. 3d 1278 (1990). Similarly, the California Court of Appeal upheld a finding of irreparable injury when a defendant "intended to create his own competing business and had taken significant steps to carry out his business plan," part of which conduct included misappropriating the plaintiff's "proprietary and confidential information" and "soliciting [the defendant's] employees and customers." *ReadyLink Healthcare v. Cotton*, 126 Cal. App. 4th 1006, 1023 (2005).

Plaintiffs, for their part, allege just this sort of injury: a threatened "loss of customers, loss of employees, goodwill, reputational damage and more." 2d Appl. at 7. Absent an injunction, there is thus a risk of irreparable injury, and Plaintiffs have met the second *Winter* element.

### C. The Balance of Equities Favors an Injunction

The balance of equities tips in Plaintiffs' favor, though Defendants also have a reasonable argument against preliminary relief. Put simply, the Court identifies two competing values: one is Plaintiffs' business interest in protecting their confidential information and goodwill, as against Defendants' interest in starting their own business and engaging in their trade of choice. The former will be threatened if the Court denies the requested injunction; the latter will be harmed if an injunction is granted. However, the grant of an injunction would likely only *delay* Defendants' ability to launch their new business venture, whereas a denial could allow Defendants to irreparably harm Plaintiffs' business by using trade secrets to solicit clients,

recruit employees, and damage Plaintiffs' goodwill. Overall, then, the balance of equities tilts in Plaintiffs' favor, though the Court is aware of the burden an injunction might place on Defendants. Plaintiffs have therefore met their burden under the third *Winter* element.

### D. The Public Interest Will Be Served by an Injunction

This case involves two former employees of a "wealth management" company who seek to solicit said company's "high net worth clients." 1st Appl. at 10; *see also* Ex. I, Dkt. 26-3. It is therefore rather unlikely that the public interest, in any meaningfully *public* sense, will be affected—whether the Court grants an injunction or not. On the other hand, as an abstract legal matter, certain courts have found that the public interest is served by enforcing "trade laws" and "by enabling the protection of trade secrets." *Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1078 (N.D. Cal. 2016) (citing *Bank of Am., N.A. v. Lee*, No. CV-08-5546 CAS (JWJx), 2008 WL 4351348, at *7 (C.D. Cal. Sept. 22, 2008)). The Court therefore finds that the public interest will be served by an injunction, satisfying the fourth and final element of the *Winter* standard.

As the standard for injunctive relief has been met, the Court finds it appropriate to issue a preliminary injunction.

## IV. Disposition

For the reasons set forth above, the Court hereby ORDERS as follows:

Defendants shall not use or disclose the following information (the "Protected Information"):

(1) Plaintiffs' confidential client information, defined as: (a) client names, (b) client contact information, and (c) client financial information and objectives; which information Plaintiffs expended time and money to develop, and including the stipulated spreadsheet labeled as Exhibit K (at Dkt. 35); and

(2) Plaintiff's confidential employee information, defined as (a) employee names, (b) employee compensation, (c) specialized employee expertise, and (d) level of employee involvement in specific client relationships.

However, Defendants may use or disclose any such Protected Information, if in so doing, they do not rely on Plaintiffs' confidential records or their memory thereof. That is, Defendants shall

not be prevented from using or disclosing any Protected Information if they are able to determine it from another source or derive it independently.

The Court recognizes the complexity of the issues involved in this action and the potential burden on Defendants stemming from this injunction pending trial. To help allay these concerns, the Court has offered the parties an expedited trial date in June, July, or August 2020, depending on input from counsel and the Court's availability.

To monitor compliance with this injunction, the Court hereby APPOINTS the Honorable James L. Smith (Ret.) as Special Master. Any further disputes arising under this injunction should be directed to the Special Master for resolution.

Finally, the Court DENIES Plaintiffs' request for expedited discovery.

DATED: March 7, 2020

*David O. Carter*

DAVID O. CARTER
UNITED STATES DISTRICT JUDGE